No. 2015-1667

# In the United States Court of Appeals
### for the
# Federal Circuit

**INVESTPIC LLC,**
*Appellant,*

*v.*

**INTERNATIONAL BUSINESS MACHINES
CORPORATION, SAS INSTITUTE INC.,**
*Appellees.*

Appeal from the United States
Patent Trial and Appeal Board in Appeal
No. 2015-001450

## BRIEF FOR APPELLANT, INVESTPIC LLC

JAY P. KESAN
CECIL E. KEY
TERESA M. SUMMERS
DIMURO GINSBERG PC/DGKEYIP GROUP
1101 King Street, Suite 610
Alexandria, VA 22314
(703) 684-4333

*Counsel for Appellant,
InvestPic, LLC*

July 16, 2015

# CERTIFICATE OF INTEREST

Counsel for <u>Appellant InvestPic LLC</u> certifies the following:

1. The full name of every party or amicus represented by me is:

   <u>InvestPic LLC</u>

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   <u>InvestPic LLC</u>

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   <u>Each of the following entities owns a share of 10% or more in InvestPic LLC: ISPD Inc.; Regulus International Capital Corp.; S.A.M. 2000 Irrevocable Trust. None of these entities is publicly held.</u>

4. The names of all the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   <u>Jay P. Kesan, Cecil E. Key, Teresa Summers, DiMuroGinsberg PC/DGKEYIP Group; Richard T. Black, Foster Pepper PLLC.</u>

   <u>    /s/  Jay P. Kesan    </u>

   JAY P. KESAN
   CECIL E. KEY
   TERESA M. SUMMERS
   DIMURO GINSBERG PC/DGKEYIP
   GROUP
   1101 King Street, Suite 610
   Alexandria, VA 22314
   (703) 684-4333

July 16, 2015                          *Counsel for Appellant,*
                                       *InvestPic LLC*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS......................................................................... ii

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF JURISDICTION........................................................2

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE.................................................................5

STATEMENT OF THE FACTS ............................................................11

I.      The Invention Combines Disparate Arts and Philosophies To Solve Many Problems In the Art.............................................................11

II.     Background of the Invention ....................................................13

        A. The Evolution of Statistical Analysis of Financial Information .........13

        B. The Invention Solves Problems Related To The Statistical Analysis of Financial Information. ........................................15

                1.      The Invention Enables Users to Enter a Bias Parameter In The Selection of Samples.............................................15

                2.      The Invention Permits Users to Evaluate Multiple Investments in Multiple Time Periods While Preserving Interrelationships Between the Data. ................................17

III.    The Board's Decision Is Legally Erroneous On Several Grounds................20

        A. The Board Failed to Provide Any Claim Construction Much Less a *Reasonable* One.......................................................20

        B. The Board Failed to Address the Examiner's Grounds of Rejection..21

SUMMARY OF ARGUMENT ...............................................................24

STANDARD OF REVIEW .................................................................26

ARGUMENT ........................................................................................28

I.    LEGAL STANDARDS ................................................................28

II.   THE BOARD FAILED TO PROVIDE A CLAIM CONSTRUCTION. .....30

    A. The Board Failed To Provide A Meaningful Claim Construction And Its Apparent Understanding Of The Claims is Divorced From The Intrinsic Record. ................................................................30

        1.  The "Bias Parameter" Limitation in Claims 1-5, 8-16, and 19-21. ...........................................................................31

        2.  The "Resampling" Limitation in Claims 1-5, 8-16, 19-21 and 29-31. ...........................................................................35

        3.  The "Pertaining/Corresponding to Two or More Investments" Limitation in Claims 29-31. ....................................................38

III.  THE BOARD'S INVALIDITY FINDINGS ARE ERRONEOUS ..............41

    A. Sortino Does Not Anticipate Claims 1-5, 8-16, 19-21, and 29-31 Under § 102(b). ....................................................................41

        1.  Sortino does not teach or suggest the "bias parameter" limitation and hence cannot anticipate independent Claims 1-5, 8-16, and 19-21. ...................................................................42

            a)  It Is Undisputed That Sortino Selects Samples Randomly and Permits Weighting Data Only After Sample Selection. ....................................................43

            b)  Sortino's Post-Selection Weighting is the Opposite of the '291 Patent's Pre-Selection Bias Parameter. ..................44

        2.  Sortino does not teach or suggest the "resampling" limitation and hence cannot anticipate Claims 1-5, 8-16, 19-21 and 29-31 of the '291 Patent. ....................................................47

3.    Sortino does not teach the "pertaining/corresponding to two or more investments" limitation and hence Sortino cannot anticipate Claims 29-31 of the '291 Patent................................49

4.    The Board Failed to Consider The Understanding of a Person Having Ordinary Skill in the Art. .............................................50

a)    Sortino does not enable a person of ordinary skill in the art to carry out the "bias parameter" limitation. .............52

b)    Sortino does not enable a person of ordinary skill in the art to carry out the "resampling" and "two or more" limitations. ..................................................................53

B.  Barraquand Does Not Anticipate Claims 29-31 Under § 102(b)........55

C.  Kaufman in View of Sortino Does Not Render Claims 29-31 Obvious Under § 103(a)....................................................................................60

CONCLUSION .......................................................................................................64

# TABLE OF AUTHORITIES

## <u>Cases</u>

*3M Innovative Properties Co. v. Avery Dennison Corp.* 350 F.3d 1365 (Fed. Cir. 2003) ..............................................................................................32

*Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272 (Fed. Cir. 2000)........................................................................................29

*AIA Engineering Ltd. v. Magotteaux Intern. S/A*, 657 F.3d 1264 (Fed. Cir. 2011)................................................................... 28, 32

*Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986) .................50

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003) ......50

*Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352 (Fed. Cir. 2001)........................................................................................38

*Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325 (Fed. Cir. 2013) ................ 30, 63

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938).................................................26

*Curtiss–Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006)........................................................................................33

*Elan Pharms., Inc. v. Mayo Found. for Med. Edu. & Research*, 346 F.3d 1051 (Fed. Cir. 2003) ................................................................... 50, 53, 55

*Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367 (Fed. Cir. 2012)...........26

*Gechter v. Davidson*, 116 F.3d 1454 (Fed. Cir. 1997) ..................................... 31, 41

*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966)...............................60

*Helifix, Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339 (Fed. Cir. 2000)............................50

*In re Antor Media Corp.*, 689 F.3d 1282 (Fed. Cir. 2012) ......................................51

*In re Bond*, 910 F.2d 831 (Fed. Cir. 1990) .............................................................41

*In re Cortright*, 165 F.3d 1353 (Fed. Cir. 1999)......................................................29

*In re Deuel*, 51 F.3d 1552 (Fed. Cir. 1995) ...........................................................30

*In re Donohue*, 766 F.2d 531 (Fed. Cir. 1985) ................................................. 41-42

*In re Gartside*, 203 F.3d 1305 (Fed. Cir. 2000)....................................................26

*In re Geiger*, 815 F.2d 686 (Fed. Cir. 1987)..........................................................30

*In re Morsa*, 713 F.3d 104 (Fed. Cir. 2013) ..........................................................51

*In re NTP, Inc.*, 654 F.3d 1279 (Fed. Cir. 2011) ............................................. 29, 46

*In re Oetiker*, 977 F.2d 1443 (Fed. Cir. 1992)................................................. 30, 55

*In re Piasecki*, 745 F.2d 1468 (Fed. Cir. 1984) .....................................................55

*In re Skvorecz*, 580 F.3d 1262 (Fed. Cir. 2009) ....................................................28

*In re Suitco Surface, Inc.*, 603 F.3d 1255 (Fed. Cir. 2010) ................. 26, 28, 29, 33

*Microsoft Corp. v. Proxyconn, Inc.*, 2015 WL 3747257, __ F.3d __ *Slip Op.*, Case No. 2014-1542, -1543 (Fed. Cir. June 16, 2015) ......................................... 28, 45

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008).....................29

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ...................... 27, 31, 33, 39

*Tempo Lighting Inc. v. Tivoli LLC*, 742 F.3d 973 (Fed. Cir. 2014) ................. 28, 46

*Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015).............26

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)....................35

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356 (Fed. Cir. 2012)........................................................................................................29

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ..........................................................................................1

35 U.S.C. § 103(a) ...............................................................................................29

**Regulations**

37 C.F.R. § 42.3 .....................................................................................................1

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant provides as follows:

(a)      There have been no other appeals in this case.

(b)      Appeal No. 15-1502 is an appeal from the Patent Trial and Appeal Board's rejection, in *ex parte* reexamination, of claims 22-25 of U.S. Patent No. 6,349,291 (the same patent at issue here) in which two of the primary references (Sortino and Barraquand) relied on by the Examiner during *ex parte* reexamination are the same primary references relied on by the same Examiner in this appeal from an *inter partes* reexamination.  Accordingly, Appeal No. 15-1502 is related to this matter.  On June 9, 2015, this Court issued a Note to File stating that "[t]hese cases shall be considered companion cases and assigned to the same merits panel for oral argument."

1

## STATEMENT OF JURISDICTION

The case below was an *inter partes* reexamination at the Patent Trial and Appeal Board, which had jurisdiction under 37 C.F.R. § 42.3. The United States Patent Trial and Appeal Board entered the Decision on Appeal against InvestPic on March 30, 2015, [JA1-13], referencing and agreeing with the opinions of the Examiner as expressed in the Right of Appeal Notice that was entered on February 21, 2014 [JA14-50.] This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.      Whether the Patent Trial and Appeal Board (Board) erred in failing to construe any of the disputed claim terms of the '291 patent.

2.      Whether the Board's apparent understanding of the claim term "bias parameter, wherein the bias parameter determines a degree of randomness in a sample selection" (the "bias parameter" claim limitation) is divorced from and inconsistent with the intrinsic evidence.

3.      Whether the Board's apparent understanding of the related claim terms "performing resampled statistical analysis," "using a resampled statistical method," and "in a resampling process" (the "resampling" claim limitation) is divorced from and inconsistent with the intrinsic evidence.

4.      Whether the Board's apparent understanding of the claim terms "based upon investment data pertaining to the two or more selected investments" and "receiving a statistical analysis request corresponding to two or more selected investments" (the "pertaining/corresponding to two or more investments" claim limitation) is divorced from and inconsistent with the intrinsic evidence.

5.      Whether the Board erred in concluding that any claims of the '291 patent are anticipated or rendered obvious by the prior art when that art does not disclose or suggest at least the bias parameter, resampling, and/or

pertaining/corresponding to two or more investments limitations, as those limitations are properly construed.

## STATEMENT OF THE CASE

U.S. Patent No. 6,349,291 ("the '291 patent") issued on February 19, 2002. [JA51-78.]  Appellant InvestPic LLC ("InvestPic") is the sole assignee of the '291 patent.  [JA814-833.]

On March 15, 2012, International Business Machines Corporation, Algorithmics (US), Inc., SAS Institute, Inc. (collectively, "Appellees"),[1] filed a Request for Inter Partes Reexamination of claims 1-31 of the '291 patent.  [JA79-80.] On May 18, 2012, the U.S. Patent and Trademark Office (PTO) issued an order instituting *inter partes* reexamination control no. 95/001,939 ("the reexamination"), agreeing with certain of the issues raised in the Request and stating that it would reexamine claims 1-5, 8-16, 19-21, and 29-31 of the '291 patent.  [JA231-260.] Claims 6-7, 17-18, and 22-28 were not subject to reexamination and are not at issue in this appeal.  [*Id*.]

On February 22, 2013, the PTO issued a First Action Closing Prosecution ("ACP") in which it rejected claims 1-5, 8-16, 19-21, and 29-31 of the '291 patent. [JA713-732.]  The Examiner found: (1) claims 1-5, 10-16, 19, and 21 to be anticipated by Sortino, Frank, A., *"The Look of Uncertainty,"* Investing, Vol. 4, No. 1, pp. 3034, Winter 1990 ("Sortino") [JA211-216]; (2) claims 8 and 9 to be

---

[1] Algorithmics (US), Inc. which was subsequently purchased by International Business Machines Corporation, withdrew as a party, and is no longer a separate Appellee.  *See* Doc. ID 28.

5

unpatentable over Sortino in view of Efron, B., "*Bootstrap Methods: Another Look at the Jackknife,*" The Annals of Statistics, Vol. 7, No. l, pp. 1-26, Jan. 1979 ("Efron") [JA193-197]; (3) claim 20 to be unpatentable over Sortino in view of Admitted Prior Art (APA); (4) claim 29 to be unpatentable over Kaufman, L., "*Using a Parallel Computer System for Statistical Resampling Methods,*" Computational Statistics Quarterly 2, pp. 129-141, 1988 ("Kaufman") [JA198-210] in view of Sortino; (5) claim 30 to be unpatentable over Kaufman in view of Sortino and APA; and (6) claim 31 to be unpatentable over Kaufman in view of Sortino and Stewart, G. W., "*Parallel Linear Algebra in Statistical Computations,*" COMSTAT '88 Proceedings in Computational Statistics, pp. 3-14, 1998 ("Stewart") [JA219-230]. Notably, the ACP Examiner rejected all grounds for invalidation presented by Appellees based on Barraquand, Jerome, "*Monte Carlo integration, quadratic resampling, and asset pricing,*" Mathematics and Computers in Simulations, Vol. 38, pp. 173-182, 1995 ("Barraquand"). [JA183-192; JA717-18.]

On March 22, 2013, InvestPic filed comments and amendments in response to the ACP. [JA733.] Specifically, InvestPic argued that the rejections should not stand and, in an abundance of caution to overcome the rejections, amended each of the three independent claims at issue in this appeal, claims 1, 11 and 29, adding additional claim limitations as follows (additional limitations of the independent claims at issue underlined):

6

1. (Amended) A method for calculating, analyzing and displaying investment data comprising the steps of:

(a) selecting a sample space, wherein the sample space includes at least one investment data sample;

(b) generating a distribution function using a re-sampled statistical method and a bias parameter, wherein the bias parameter determines a degree of randomness in sample selection in a resampling process; and,

(c) generating a plot of the distribution function.

11. (Amended) A method for providing statistical analysis of investment data over an information network, comprising the steps of:

(a) storing investment data pertaining to at least one investment;

(b) receiving a statistical analysis request corresponding to a selected investment;

(c) receiving a bias parameter, wherein the bias parameter determines a degree of randomness in sample selection in a resampling process; and,

(d) based upon investment data pertaining to the selected investment, performing a resampled statistical analysis to generate a resampled distribution.

29. (Amended) A system for providing statistical analysis of investment information over an information network comprising:

a financial data database for storing investment data pertaining to two or more investments;

a front end subsystem for receiving a statistical analysis request corresponding to two or more selected investments;

a parallel processor, wherein the parallel processor includes:

at least one processor for performing resampled statistical analysis based upon the statistical analysis request.

[JA733-743.]

7

These additional claim limitations were all directly responsive to the Examiner's grounds of rejection. [JA744-745.] InvestPic amended claims 1 and 11 to add the limitation that the bias parameter determines a degree of randomness "in sample selection" because this amendment was "helpfully suggested by the Examiner in paragraph 12 of the ACP." [JA745-749.] In that paragraph, the Examiner suggested that claims 1 and 11 might be valid if rewritten to "wherein the bias parameter determines a degree of randomness **in the selection of samples** in a resampling process." [JA721 (emphasis in original).] Accordingly, InvestPic proposed the amendment to claims 1 and 11 suggested by the Examiner to overcome his rejection and pointed out that Sortino does not anticipate claims 1 and 11 as amended. [JA749-760.]

InvestPic also explained that it was amending claim 29 to specify that the financial data database is for two or more investments, and the statistical analysis request corresponds to two or more investments. [JA761-770.] In paragraph 8 of the ACP, the Examiner rejected this claim based on the arguments set forth on pages 94-95 of the Request for Reexamination and incorporated those arguments by reference. [JA719.] The arguments adopted by the Examiner assert that claim 29 is unpatentable over Kaufman in view of Sortino because Kaufman discloses the parallel processor limitations of claim 29 and Sortino relates the limitations to investment data. [JA177-178.] In response to these arguments, InvestPic made the

amendments to make clear that the inventions of the '291 patent, unlike the prior art, are directed to the simultaneous and cross-correlated analysis of at least two different investment holdings.  [JA761-766.]

On April 22, 2013, Appellees filed a response to InvestPic's response and amendments, arguing that the original grounds of rejection should be maintained and that the proposed amendments are untimely and improper and should not be allowed. [JA937.]

On August 2, 2013, the PTO issued a Second Action Closing Prosecution ("Second ACP") in which a new examiner allowed and entered the above amendments but nevertheless maintained the rejection of claims 1-5, 8-16, 19-21, and 29-31, as amended by InvestPic, on the same grounds that formed the basis of the rejections in the ACP and in addition found: (1) claim 29 to be anticipated by Barraquand; (2) claim 30 to be unpatentable over Barraquand in view of APA; and (3) claim 31 to be unpatentable over Barraquand in view of Stewart.  [JA985-1025.] This represented a reversal of the prior conclusion, and was based not on new positions presented, but on the same arguments that had been previously presented by Appellees and rejected.  [JA1019.]

On August 30, 2013, InvestPic filed a response to the Second ACP.  [JA1026.] On February 21, 2014, the PTO issued a Right of Appeal Notice (RAN) wherein the Examiner refused to enter InvestPic's August 30, 2013 amendments and maintained

9

the final rejection of claims on all of the grounds previously stated in the Second Action Closing Prosecution.  [JA14-50.]

On March 20, 2014, InvestPic filed a Notice of Appeal from the Examiner to the Board.  [JA1222-1223.]  On April 21, 2014, InvestPic filed its Appeal Brief, appealing the rejections of claims 1-5, 8-16, 19-21, and 29-31 to the Board.  [JA1224; JA1230-1235; JA1238.]  Appellees filed a Respondent Brief on June 30, 2014.  [JA1285.]  On July 23, 2014, the PTO issued an Examiner's Answer, maintaining all of the grounds of rejection of claims 1-5, 8-16, 19-21 and 29-31 from the RAN, and affirming it did not enter InvestPic's further claim amendments filed August 30, 2013.  [JA1310-1312.]  On August 25, 2014, InvestPic filed a Rebuttal Brief.  [JA1313.]

On March 30, 2015, the Board issued its Decision on Appeal, affirming the final decision of the Examiner adverse to the patentability of claims 1-5, 8-16, 19-21 and 29-31.  [JA1-13.]  On April 13, 2015, InvestPic timely filed a notice of appeal to this Court.  [JA1332-1335.]

## STATEMENT OF THE FACTS

I.   **The Invention Combines Disparate Arts and Philosophies To Solve Many Problems In the Art.**

The '291 patent claims and discloses a computerized system and method for the thorough and robust analysis of the performance of multiple investments. [JA51 (abstract).] The development of the claimed invention required the application of several disparate disciplines and philosophies.

First, the '291 patent combines two divergent schools of statistics—referred to as "frequentist" and "Bayesian." Dr. Herzog, a renowned mathematician and statistician [JA306-307], explained that one of the differences in these paradigms is that "[t]he Bayesian paradigm enables the analyst to obtain reasonable answers to some real-world practical problems in a coherent fashion in cases where the frequentist paradigm can't" because the frequentist paradigm is purely objective. [JA306-309.] Frequentists and Bayesians come from opposite ends of statistics that traditionally are not combined. [JA311 (stating that "Bayesians and frequentists get along about as well as the Hatfields and McCoys").] The frequentist believes that data is paramount, and therefore the statistical distribution should reflect just that information that is in the data itself, and nothing more. However, this model is incomplete because it does not address the problem of limited data (and/or unsatisfactory data).

11

For example, suppose that a user owns a stock that very recently went public in a strong market that historically was only going up because the stock market was only going up. Conventional tools would use just the necessarily very limited historical data of the stock which would not (because it could not) show how the stock would do during periods where the stock market (as a whole) was falling, because no such periods would exist in the data. Therefore, conventional tools would underestimate the chance of the stock falling, and they would underestimate the depth and length of the fall because, if the entire stock market took a fall, the new stock would most likely fall too.

The invention solves this problem by allowing the user to inject his opinions into the process, and the way to inject these opinions is to vary the probability of the data point being picked. This injection of "opinion" is purely a "Bayesian" philosophy. [JA306-309.]

Next, the '291 patent employs complex algorithms and specialized equations that were developed for implementing this new chimeric analysis that is based on two divergent schools of statistics. These algorithms and equations were used to program a computer using a parallel processing environment. [*See generally*, JA51-78.]

This cross-disciplinary approach was the work of Dr. Varma, the sole inventor on the '291 patent, and, as described below, resulted in a marked departure from

what was available in the art at the time of the invention. Dr. A Michael Spence, the 2001 Winner of the Nobel Prize in Economics, sums it up well: "Innovations often come from taking innovations in different fields (statistics and computing) and then applying them in a new area (finance and specifically risk assessment which is explicitly about the tails of a distribution.) This seems a clear case of exactly that." [JA526-28; JA536 at ¶54.] The Board failed to understand that the inventor selected key aspects of the invention from many disparate arts and philosophies, pulling them together to form the claimed invention despite that the prior art taught away from Dr. Varma's approach. Because the invention is at an intersection of many dissimilar and unrelated technologies, the Board's out-of-hand rejections are superficial and, as explained below, are not supported by the record.

## II.    Background of the Invention

### A.    The Evolution of Statistical Analysis of Financial Information

Financial markets have what is known as "leptokurtotic" distributions. In a leptokurtotic distribution, the points along the X-axis are clustered, resulting in a higher peak and fatter (or longer) tails than the curvature found in a normal distribution. The distribution is more clustered around the mean than in a normal distribution, and will have a relatively smaller standard deviation. Figures 16 and 17 of the '291 patent depict such distributions. [JA68-69.] A leptokurtotic distribution means that small changes happen less frequently than in a normal

distribution because historical values have clustered by the mean.  However, this also means that large fluctuations are more likely than in a normal distribution due to the fat tails.  [JA70 at 1:41-42.]  The fat tail means risk is coming from outlier events and extreme observations are much more likely to occur.

Statistical analysis of financial data is concerned with sequences of bad events rather than an individual bad event, and must include those sequences that are rare. It bears emphasizing that the fat tails drive the risk and return of an investment and so they must be filled out.  The system must therefore run the simulation a very large number of times so that enough such sequences could be generated to fill out the "tails" (the extreme occurrences in a leptokurtotic distribution) and thereby simulate real time or near real time statistical analysis.  [JA70 at 2:25-35.]

At the time of the invention, those of ordinary skill in the art were just starting to realize that the probability distribution for financial data does not follow a "normal" or Gaussian, bell curve distribution.  [JA70 at 1:33-55.]  Standard tools and methods for assessing risk in financial markets were, at the time, still based on these Gaussian assumptions.  Tools for analyzing financial data existing at the time of the invention did not fill out the fat tails and therefore understated the risk (because they understated the likelihood of extreme events) and overstated the return (because a single large event could overshadow many years' worth of gains).  [JA70 at 1:52-29.]  The tools that were available at the time of the invention effectively

assumed that high risk situations are impossible. Tools existing at the time of the invention may have included the resampling[2] of financial data, however, these conventional tools were incapable of accomplishing the type of complex financial analysis disclosed in the '291 patent.

**B.    The Invention Solves Problems Related To The Statistical Analysis of Financial Information.**

The invention disclosed and claimed in the '291 patent solves problems that were, at the time of the invention, significant barriers to the statistical analysis of financial markets. At a high level, the invention disclosed in the '291 patent pertains to and addresses individual samples or securities as well as how each individual sample or security performs in any specific type of financial market. The purpose of this granular analysis is to allow users to perform a reliable risk analysis in building a portfolio of individual investments. [JA70 at 2:52-58.] The invention enables this level of granular analysis in at least the following two ways.

**1.    The Invention Enables Users to Enter a Bias Parameter In The Selection of Samples.**

---

[2] Resampling is a way of estimating the precision of sample datapoints by using subsets of available data or drawing randomly with replacement from a set of data points. One method of resampling known as the bootstrap was well-known at the time of filing of the '291 patent. Specifically, the '291 patent states that Fig. 9a (reprinted from the prior art) depicts the underlying theory of the bootstrap method. [JA74 at 10:1-2.]

First, as disclosed in the '291 patent, users have the ability to input a number of parameters and thereby simulate various financial environmental conditions. [JA70 at 2:17-19.]  One of the input parameters contemplated by the '291 patent is the "bias parameter," which serves to control a degree of randomness in the selection of samples (e.g., drawn from the underlying individual securities at any time period in a financial market) that will eventually be analyzed using a resampling process. [JA70 at 22-23; JA77 at 16:39-42.]

The bias parameter is particularly useful in situations where there is only a very small amount of historical data in the sample selection space or when a user wishes to simulate market conditions such as in the example above where the user sought to evaluate the risk in new stock but only had data from a bull market environment.  [JA70 at 2:19-24; JA70 at 2:55-56; JA77 at 15:52-60.]  The way the '291 patent solves the problem of limited data (and/or unsatisfactory data) is to allow the user to inject his opinions into the process and vary the probability of a given data point being picked by setting the bias parameter.  [JA62; JA63; JA66; JA75 at 11:55-66; JA76 at 14:5-10.]

Another useful aspect of the bias parameter is that a user can manipulate what samples to select from the sample space and can then perform a resampling statistical analysis of the data with the bias built into the sample that was selected for analysis. [JA70 at 2:55-56.]  For example, a conservative user can use the bias parameter to

16

dial up how much to sample weak economic conditions and dial down how much to sample strong economic conditions across multiple assets simultaneously. The "bias parameter" thus gives users an added dimension to play out various economic scenarios and do so systematically. By contrast, without the bias parameter, every individual security in any time period in the sample space is treated the same.

> **2.    The Invention Permits Users to Evaluate Multiple Investments in Multiple Time Periods While Preserving Interrelationships Between the Data.**

Second, the '291 patent allows for financial data to be "resampled" to simulate non-Gaussian (e.g., non-normal) distributions such as leptokurtotic distributions. [JA56; JA63; JA70 at 2:4-13.] Importantly, during the resampling process of the invention, unlike that in the prior art, the invention preserves interrelationships between multiple datasets. [JA70 at 2:13-17.] The '291 patent describes keeping track of multiple investments (such as stocks, mutual funds, etc.) in many time periods and then performing a statistical analysis of that financial data. [JA75 at 12:62-66 ("Because financial database 150d may store samples for investments for many different time periods, in step 1115, a set of relevant samples for the resampled statistical analysis requested by the client 105 is determined.")] The most common way to describe the interrelationship between investments is through the concept of covariance or the closely related concept, correlation. [JA579 at ¶36.] Both of these

concepts measure the degree to which multiple assets tend to move together, in opposition to each other, or independent of each other. [*Id.*]

Keeping track of how multiple investments are performing in the same time period is important for any prudent investor. Generally speaking, similar investments move up and down together. For example, if you own both Oracle and Microsoft stock, on most days, if the value of Oracle stock is up, so will be the stock of Microsoft, and if Oracle is down, Microsoft's will be as well. This is because both stocks are affected by the same overarching economic forces. Similarly, on a day when the stock market as a whole is up a lot, there is a good chance that both Oracle and Microsoft stocks will also be up a lot, and if the market is down a lot, both stocks will also likely be down a lot.

Therefore, if a prudent investor owns both stocks in her portfolio, she must account for this relationship between the two stocks. This is called cross-correlation. If the investor does not account for the cross-correlation relationship, she may mistakenly assume that her portfolio is more diversified and less risky than it actually is.

In the '291 patent, to keep track of this interrelationship between different investments, the investments must be sampled simultaneously. [JA75 at 12:62-66; JA19.] If the investments are not sampled simultaneously, the data will no longer accurately capture whether on days when one stock went up, the other is also likely

18

to be up, and down when the other stock is down.  As a result, without capturing how these stocks behave relative to each other, an investor may understate the risk and overstate the expected return.  [JA70 at 2:13-18.]

Each stock also has an autocorrelation.  This is the tendency that a return from a particular stock in a given time period will have an effect on a future time period.  This too has to be measured and accounted for, as taught in the '291 patent.  [JA63; JA76 at 13:15-14:5.]  Some investments are positively autocorrelated.  That is, up in one time period means up in the next time period.   Some are negatively autocorrelated.  Up in one time period means down in the next time period.  All these autocorrelations have to be accounted for.

Further, the minimization procedure that is taught in the '291 patent for autocorrelation only makes sense if it also includes the cross-correlation information.  Consider once again the two stock portfolio example with daily data.  At the outset, the investor must pick a certain number of days at a time to observe the autocorrelation.  But how many days do you pick?  The '291 patent teaches that you pick that lag (i.e., the time period) where the autocorrelation function first crosses zero (meaning there is no autocorrelation anymore on that day relative to prior days).  [JA76 at 13:15-14:3.]

Suppose that the time period when there is no autocorrelation is five days for Microsoft and seven days for Oracle.  If Oracle is sampled for five days at a time

19

and Microsoft for seven days, then this sample itself would destroy the cross-correlation because now there are 5 days of data for one stock and 7 days of data for another stock. This means that two days are missing in the Oracle data that cannot be matched against the Microsoft data. It follows that what needs to be done in this situation is to sample from both stocks for 7 days.

A system that allowed a user to analyze an investment portfolio with this level of granularity and flexibility simply did not exist at the time Dr. Varma conceived his invention. Dr. A. Michael Spence succinctly summarized all the cited prior art by noting that "none of the papers develop a risk and assessment system. I don't know of any other full-fledged system at the time that provided this service with its rather complex parts [as the '291 patent]." [JA526; JA534 at ¶42.]

In sum, the '291 patent provides novel means of solving problems that, at the time of the invention, were significant impediments to statistical analysis of financial data. The Board, however, overlooked these novel aspects.

## III.     The Board's Decision Is Legally Erroneous On Several Grounds

### A.     The Board Failed to Provide Any Claim Construction Much Less a *Reasonable* One.

Nowhere in the record is there any proper claim construction, leaving InvestPic and this Court to guess at how the Examiner and Board construed the relevant claim limitations. Instead, the Examiner rejected the claims at issue either using indecipherable statements that do not comport with a coherent legal analysis

or by adopting Appellees' argument without any explanation. [*See, e.g.,* JA40-44, where the Examiner rejects the claims, relying on illogical and at times incomprehensible statements from paragraphs 6-8 of the RAN [JA33-35] and paragraphs 5-6 of the Second ACP [JA985-987; JA992-1017].] The Board likewise did not construe the claims and either endorsed the Examiner's rejections, also without any reasoning based on the intrinsic record, or failed to address the Examiner's grounds of rejection, as explained below.

### B.     The Board Failed to Address the Examiner's Grounds of Rejection.

The grounds for the rejections that were appealed to the Board and the Board's reasoning for affirming these rejections are summarized in the chart shown below:

| Ground | Claim(s) Rejected | Examiner's Grounds of Rejection on Appeal to Board | Board's Reasoning for Affirming the Rejection |
|---|---|---|---|
| 1 [JA5; JA1238.] | 1-5, 10-16, 19, and 21 | § 102(b) based on Sortino | Sortino discloses the "bias parameter" limitation. [JA7.] |
| 2 [JA5; JA1238.] | 8 and 9 | § 103(a) based on Sortino in view of Efron | The Board did not discuss § 103(a) rejection but appears to have affirmed the rejection for the reasons in Ground 1. [JA12.] |
| 3 [JA5; JA1238.] | 20 | § 103(a) based on Sortino in view of admitted prior art | The Board did not discuss § 103(a) rejection but appears to have affirmed the rejection for the reasons in Ground 1. [JA12.] |

| Ground | Claim(s) Rejected | Examiner's Grounds of Rejection on Appeal to Board | Board's Reasoning for Affirming the Rejection |
|---|---|---|---|
| 4 [JA5; JA1238.] | 29 | § 102(b) based on Barraquand | The Board states that it does not reach this ground but nevertheless finds that Sortino anticipates on the ground that Sortino discloses the "two or more investments" limitation in claim 29. [JA12; JA8.] |
| 5 [JA6; JA1238.] | 30 | § 103(a) based on Barraquand in view of admitted prior art | The Board states that it does not reach this ground yet nevertheless holds that Kaufman in combination with Sortino suggest the "resampled statistical analysis" and "parallel processing" limitations in claim 29. [JA12; JA9.] |
| 6 [JA6; JA1238.] | 31 | § 103(a) based on Barraquand in view of Stewart | The Board does not reach this ground. [JA12.] |
| 7 [JA6; JA1238.] | 29 | § 103(a) based on Kaufman in view of Sortino | The Board affirms on this ground but with respect to claims 29-31. [JA12; JA9.] |
| 8 [JA6; JA1238.] | 30 | § 103(a) based on Kaufman in view of Sortino and admitted prior art | The Board states that it is affirming this ground, yet does not discuss the § 103(a) rejection and does not provide any analysis of Barraquand or Stewart. [JA12.] The Board finds instead that Kaufman in view of Sortino render claims 29-31 obvious. [JA9.] |
| 9 [JA6; JA1238.] | 31 | § 103(a) based on Kaufman in view of Sortino and Stewart | The Board affirms on this ground but with respect to claims 29-31, and without discussing Stewart. [JA12.] |

As shown in the above chart, the Board's affirmance is wholly detached from, and fails in large part to consider, the Examiner's bases of rejection that the Board purports to affirm. As explained below, under a proper claim construction that is grounded in the intrinsic record, the Board's invalidity findings must be reversed.

## SUMMARY OF ARGUMENT

The Board committed multiple legal errors, all of which flow from its failure to construe the disputed claim terms and to consider the specification and other intrinsic evidence of the '291 patent. The Board not only failed to provide any claim construction, but it also failed to address certain of the arguments raised on appeal and, to the extent it did address those arguments, it did so without any meaningful explanation or analysis, often simply citing to the Examiner's statements in the RAN. Those failures alone are reversible.

To the extent the Board's understanding of the claim terms can be gleaned from the Board's decision, it is inconsistent with, and divorced from, the express language of the claims, the specification, and prosecution history. Even under the broadest reasonable interpretation standard applied by the Board, such a "construction" is not reasonable and is yet another basis for reversal.

The Board's error was then compounded when it misunderstood the teachings or suggestions of the prior art and therefore misapplied the prior art to the claims of the '291 patent in determining that those claims, even as amended after the ACP, were anticipated or rendered obvious by the prior art. In addition, the Board failed to fully consider both the level of ordinary skill in the art and the understanding of persons of ordinary skill in the art as to whether any references would enable a person of ordinary skill in the art to carry out the invention. In large part, the Board

24

simply deferred to the Examiner's opinion as expressed in the RAN.  The RAN, however is at times virtually undecipherable and demonstrates both a lack of understanding of the art and an inexplicable dismissive attitude toward the testimony of the very authors of the prior art the Examiner relied on.

The result was the Board's analysis failed to appreciate the scope and content of the prior art, as well as the differences between that art and the invention as claimed.  When the art is properly considered in light of the record evidence and applied to the claims 1-5, 8-16, 19-21, and 29-31 of the '291 patent as properly construed, it is apparent that all elements of those claims are neither anticipated, taught nor suggested by the prior art.

In light of these errors, the Board's decision invalidating claims 1-5, 8-16, 19-21, and 29-31 of the '291 patent should be reversed.

## STANDARD OF REVIEW

This Court reviews the Board's conclusions of law de novo and its findings of fact for substantial evidence. *See In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding. *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938).

Anticipation is a question of fact, *In re Suitco Surface, Inc.,* 603 F.3d 1255, 1259 (Fed. Cir. 2010) and obviousness is a question of law based on underlying findings of fact, *Flo Healthcare Solutions, LLC v. Kappos,* 697 F.3d 1367, 1375 (Fed. Cir. 2012) (overruled on other grounds).

As concerns claim construction, in *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015), the Supreme Court clarified the standards of review for claim construction. Pursuant to *Teva's* framework and this Court's review of Board determinations, this Court reviews the Board's ultimate claim constructions de novo and its underlying factual determinations involving extrinsic evidence for substantial evidence. *See Teva*, 135 S. Ct. at 841–42.

In this case, because the intrinsic record fully determines the proper construction, this Court should review the Board's claim constructions de novo. *Teva*, 135 S. Ct. at 840–42. To the extent the Board considered extrinsic evidence when construing the claims, this Court need not consider the Board's findings on

that evidence because the intrinsic record is clear.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc).

# ARGUMENT

## I.    LEGAL STANDARDS

As this Court has explained, the Board may not construe claims so broadly using the "broadest reasonable interpretation" standard that its constructions are unreasonable under general claim construction principles.  *Microsoft Corp. v. Proxyconn, Inc.*, 2015 WL 3747257, __ F.3d __, Slip Op., Case No. 2014-1542, -1543 (Fed. Cir. June 16, 2015).  "The protocol of giving claims their broadest reasonable interpretation . . . does not include giving claims a legally incorrect interpretation."  *In re Skvorecz*, 580 F.3d 1262, 1267 (Fed. Cir. 2009); *see also Suitco*, 603 F.3d at 1260) ("The broadest construction rubric coupled with the term 'comprising' does not give the PTO an unfettered license to interpret claims to embrace anything remotely related to the claimed invention.").  "[C]laims should always be read in light of the specification and teachings in the underlying patent."  *Suitco*, 603 F.3d at 1260.  Moreover, a patentee may act as his own lexicographer, and when he does so, the patentee's definition must be used.  *AIA Engineering Ltd. v. Magotteaux Intern. S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011).

The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review.  *See Tempo Lighting Inc. v. Tivoli LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014).  Even under the broadest reasonable interpretation, the Board's construction "cannot be divorced

from the specification and the record evidence," *In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011), and "must be consistent with the one that those skilled in the art would reach," *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999). A construction that is "unreasonably broad" and which does not "reasonably reflect the plain language and disclosure" will not pass muster. *Suitco*, 603 F.3d at 1260.

A patent claim is invalid as anticipated only if "the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). Moreover, a prior art reference can only anticipate a claim if it discloses all the claimed limitations "arranged or combined in the same way as in the claim." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012) (quoting *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008)).

A patent is obvious, and, therefore, invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). A finding of obviousness requires not only that all elements of the claim be found in or suggested by the references being combined, but that a person having

ordinary skill in the art (PHOSITA) would have a reasonable expectation that the combination would be successful. *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1335 (Fed. Cir. 2013). To reject claims in an application under section 103, an examiner must show an unrebutted *prima facie* case of obviousness. *See In re Deuel,* 51 F.3d 1552, 1557 (Fed. Cir. 1995). In the absence of a proper *prima facie* case of obviousness, an applicant who complies with the other statutory requirements is entitled to a patent. *See In re Oetiker,* 977 F.2d 1443, 1445 (Fed. Cir. 1992). When a rejection depends on a combination of references, there must be some teaching, suggestion, or motivation to combine the references. *See In re Geiger,* 815 F.2d 686, 688 (Fed. Cir. 1987).

As explained below, it is evident that the Board erred in its understanding of the claims during reexamination, which was so overly broad that its apparent constructions are *unreasonable* under general claim construction principles.

## II.    THE BOARD FAILED TO PROVIDE A CLAIM CONSTRUCTION.

### A.    The Board Failed To Provide A Meaningful Claim Construction And Its Apparent Understanding Of The Claims is Divorced From The Intrinsic Record.

In this case, the Board failed to construe any of the claim terms in a manner that would permit meaningful appellate review. As this Court has admonished, the Board's "findings must be expressed with sufficient particularity to enable [the] court, without resort to speculation, to understand the reasoning of the Board, and to

determine whether it applied the law correctly and whether the evidence supported the underlying fact findings." *Gechter v. Davidson,* 116 F.3d 1454, 1457 (Fed. Cir. 1997). The Board's claim construction "must . . . be explicit, at least as to any construction disputed by parties." *Id.* at 1460. The Board's failure to construe any of the claim terms at issue is a fatal error. *Id.*

The following chart identifies which of the disputed claim terms are at issue in each of the claims that were rejected by the Board:

| Claim(s) Rejected | Claim term(s) at issue |
|---|---|
| 1-5, 8-16, and 19-21 | "bias parameter" and "resampling" limitations |
| 29-31 | "resampling" and "pertaining/corresponding to two or more investments" |

### 1. The "Bias Parameter" Limitation in Claims 1-5, 8-16, and 19-21.

The claims at issue in this appeal that recite the "bias parameter" limitation are claims 1-5, 8-16, and 19-21. [JA77-78.] As noted above, this term was never construed by the Examiner or the Board.

To ascertain the scope and meaning of a claim, this Court considers the claim language, the specification, the prosecution history, and the relevant extrinsic evidence. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314–17 (Fed. Cir. 2005) (en banc). Even under the Board's "broadest reasonable interpretation" standard, a construction that is "unreasonably broad" and which does not reasonably reflect the

plain language of the patent claims is unreasonable and cannot be upheld. *Suitco*, 603 F.3d at 1260.

Turning first to the claim language at issue here, the claims expressly recite that the "bias parameter" "determines a degree of randomness ***in sample selection***." [JA77 at 16:38-43; JA78 at 17:24-27 (emphasis added).]   The claim language itself makes clear that the bias parameter is applied at the outset, in the selection of samples, prior to any resampling.

Moreover, the patentee acted as its own lexicographer in defining the term "bias parameter."  The '291 patent defines the "bias parameter" as a decimal value that is set by the user to either -1 or between 0 and 1 [JA75 at 11:55-56] and, if no bias is selected in the selection of samples, then the samples will be selected randomly from the sample space [JA76 at 14:5-6].  The '291 patent thus claims a bias parameter that enables the user to vary the degree of randomness (from completely random to not), that is applied in the selection of samples.  Because the patentee acted as its own lexicographer in expressly defining "bias parameter," the ordinary meaning does not apply and the express definition controls.  *3M Innovative Properties Co. v. Avery Dennison Corp.* 350 F.3d 1365, 1371 (Fed. Cir. 2003); *see also AIA Engineering Ltd. v. Magotteaux Intern. S/A*, 657 F.3d 1264 (Fed. Cir. 2011).

32

Apart from the claim language itself and any surrender of claim scope by expressly defining the term, "the specification is the single best guide to the meaning of a claim term." *Curtiss–Wright Flow Control Corp. v. Velan, Inc.,* 438 F.3d 1374, 1378 (Fed. Cir. 2006); *Suitco*, 603 F.3d at 1260 ("claims should always be read in light of the specification and teachings in the underlying patent"). Here, the claim language and express definition are supported by the disclosure in the '291 patent specification. As explained in the specification, the bias parameter is received as an input parameter when a user first selects samples and before the resampling process is initiated. [JA62, JA75 at 11:32-43 (describing the bias parameter as an "input" parameter)]. As shown in Figure 10, the input parameters (1010) are received before any resampling computation (1020) is performed. [JA62.] As shown in Figure 11, the bias parameter is received in step 1105, before the data is transformed in step 1150. [JA63; JA76 at 14:5-6.] Accordingly, the invention requires entering a "bias parameter" at the outset when samples are first selected, which will then determine randomness in sample selection. Nowhere does the specification refer to the bias parameter as anything other than an input parameter that is received before any resampling processing takes place.

The prosecution history may "demonstrat[e] how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Phillips,* 415 F.3d at 1317. Here, the prosecution history also informs

33

that the bias parameter is limited to bias in sample selection before any resampling processing takes place.  Independent claims 1 and 11 as originally challenged in reexamination recited a bias parameter, but did not specify that the bias parameter determines a degree of randomness in sample selection.  [JA77 at 16:34-43; 17:17-30.]  In the ACP, the Examiner rejected claims 1 and 11 in view of Sortino.  [JA719-721.]  The Examiner explained that InvestPic's attempts to distinguish Sortino made it appear that InvestPic "wants to 'rewrite' the claim language as 'wherein the bias parameter determines a degree of randomness **in the selection of samples** in a resampling process' reading in limitations regarding how and when the 'bias parameter' must operate."  [JA721 (emphasis in original).]  As explained in the above Statement of the Case, in light of this comment, InvestPic accordingly amended claims 1 and 11 to recite that the bias parameter "determines a degree of randomness **in sample selection** in a resampling process."  [JA735; JA738; JA744-760.]  Thus, the bias parameter is limited to use when initially selecting samples from the sample space.

Entering the bias parameter at the outset, during initial sample selection, rather than later in the resampling process is important because it permits a user to inject her opinion about possible economic scenarios into more than one asset at the same time.  That the claimed bias parameter functions across multiple assets at the same time is critical because only then can the resampling process maintain the

interrelationships between the samples, known as covariance, described *supra*, Statement of Facts, Section II.B.1.

In sum, the claim language, specification and prosecution history all support that the claimed "bias parameter" is an input parameter that is used to set a degree of randomness to be applied in the initial selection of samples from the sample space.

### 2.    The "Resampling" Limitation in Claims 1-5, 8-16, 19-21 and 29-31.

The claims at issue that recite the "resampling" limitation are claims 1-5, 8-16, 19-21, 29-31.  [JA77-78.]  As noted above, this term also was never construed by the Examiner or the Board.

As disclosed in the '291 patent, the "resampling" claim term means a statistical analysis using resampling of data involving multiple investments for multiple time periods, wherein the interrelationships in the financial data are preserved.  This construction is supported by the disclosure of the '291 patent and the intrinsic record.

Turning first to the specification, which "is always highly relevant to the claim construction analysis" and here provides "the single best guide to the meaning of a disputed term," *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996), the patent describes a system with which a "client may specify a number of parameters including an investment or investments (e.g., a portfolio) to be analyzed." [JA70 at 2:52-58.]  Thus, the user may create portfolios or multi-period

strategies of their own design to meet their own risk/return performance requirements. Naturally, a "portfolio" cannot be analyzed unless the interrelationships in the financial data within the portfolio are preserved because portfolios will vary from user to user and will have biasing that will vary for every user. Accordingly, the '291 patent advantageously employs resampled statistical analysis that not only can (1) obtain a meaningful and reasonable description of financial information which typically escapes modeling using parametric methods (i.e., the assumption of a Gaussian/normal distribution) [JA70 at 1:66-2:3], but that also (2) permits analyzing multiple investments for multiple time periods while preserving interrelationships in the financial data being resampled [JA70 at 2:13-18].

The '291 patent accomplishes this in some embodiments by starting with an historical database, then adding a financial sample database, which feeds shared memory where bootstrapping is performed simultaneously over multiple assets and multiple time periods. For example, the '291 patent discloses that resampled statistical methods such as the bootstrap can be used to estimate the probability distribution function (PDF) of an unknown distribution using existing data that is then resampled. [JA74 at 10:20-22.] To begin, users can submit requests for resampled statistical analysis of various financial investments and investment portfolios that are stored in a database. [JA70 at 2:10-13; JA72 at 6:35-42.]

36

With reference to Figure 2, the patent discloses that "Investment database 150e . . . stores financial data regarding investments for which clients may be interested in performing resampled statistical analysis (i.e., stocks, mutual funds, etc.)." [JA72 at 6:38-43.]  Again with reference to Figure 2, the '291 patent discloses financial database 150d that stores financial sample data relating to particular investments.  [JA72 at 6:36-38.]

Figure 4 depicts the structure of an investment record that is stored in the financial database 150d.  [JA73 at 7:45-58.]  And, in Figure 11, the specification expressly states that financial database "may store samples for investments for many different time periods" and that, from this financial database 150d, a set of relevant samples for the resampled statistical analysis that is requested by the client is determined.  [JA75 at 12:62-66.]

Importantly, the patent discloses that this is a financial database that may contain coherent (also known as covariant) samples that may be coordinated over multiple assets and multiple time periods, from which the resampling of a portfolio or strategy is drawn while preserving the interrelationships of the financial data. [JA70 at 2:13-18 ("[t]he [resampled statistical analysis engine] performs resampled statistical analysis of financial data in response to user queries and incorporates routines to preserve temporal correlation in financial data, which necessarily provides more accurate analysis"); JA73 at 8:60-65 ("[d]ate field 630 stores a data

37

object corresponding to the data of a return and value field 635 stores the value (dollar amount or otherwise) of the investment on the date stored in date field 630").]

Moreover, in amending the claims following the ACP, InvestPic made expressly clear that the amendments, when read in the context of the claim language, mean that the interrelationship between two or more individual investments is maintained. [JA764-766 (explaining that with amendments, claims are limited to preserving coherence between individual investments and stating: "because Sortino only analyzes a single investment, he cannot perform a single statistical analysis request on a portfolio or proposed strategy. Sortino not only *does not* analyze more than one security, with his approach he *cannot*, because he cannot preserve coherence of his samples").] The Examiner accepted the amendments, which in this case limits the interpretation of this claim element. *Ballard Med. Prods. v. Allegiance Healthcare Corp.,* 268 F.3d 1352, 1361 (Fed. Cir. 2001) (noting that an applicant may disclaim claim scope during prosecution).

In sum, the "resampling" claim term should be construed to mean a statistical analysis using resampling of data involving multiple investments for multiple time periods wherein the interrelationships in the financial data are preserved because this construction is fully supported by the teachings of the '291 patent.

### 3. The "Pertaining/Corresponding to Two or More Investments" Limitation in Claims 29-31.

38

The claims at issue that recite the "pertaining/corresponding to two or more investments" limitation are claims 29-31. [JA78.] This term, too, was never construed.

Starting first with the plain language of the claims, *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314–17 (Fed. Cir. 2005) (en banc), claim 29 (and claims 30 and 31 that depend from claim 29) of the '291 patent explicitly recite "a financial data database for storing investment data pertaining to two or more investments" and "a front end subsystem for receiving a statistical analysis request corresponding to two or more selected investments." [JA78.]

Moreover, the specification discloses that "pertaining/corresponding to two or more selected investments" includes capturing and storing the values of multiple investments in different time periods. The '291 patent expressly states that investments being described may include stocks, mutual funds, and the like. [JA73 at 7:49-50.] The '291 patent teaches that users submit requests for resampled statistical analysis of various financial investments or investment "portfolios." [JA70 at 2:10-13; JA70 at 2:52-53.]

In one embodiment described in the '291 patent, a financial database stores financial sample data relating to particular investments, and an investment database stores financial data regarding investments that the user wishes to analyze. [JA72 at 6:35-42.] Figure 17 of the '291 patent shows a plot of a resampled statistical analysis

39

comparing two investment strategies with respect to a monitor function, the percent of negative days.  [JA77 at 16:29-33; JA69.]  Specifically, Figure 17 shows the distribution of negative days (i.e., the number of occurrences of negative days) for different portfolios of investments such as a portfolio consisting of a partially hedged stock strategy based on the S&P 500 Index, a portfolio consisting of a partially hedged stock strategy based on the NASDAQ 100, and a portfolio consisting of various combinations of stocks and futures.  [JA69.]

Moreover, the financial database stores samples for multiple investments for many different time periods.  [JA75 at 12:62-66.]  As described above, both with respect to the "resampling" claim limitation and in the fact section, by storing the values for multiple investments in the same time period, the '291 patent captures the interrelationships (i.e., how each individual investment behaves relative to others in the same time period—the covariance) between investments in the financial data being resampled.  [JA70 at 2:13-18.]

In addition, as noted above, in amending the claims following the ACP, InvestPic made expressly clear that the amendments meant that the term "two or more investments," when read in the context of the remainder of the claims, means that the interrelationship between two or more individual investments is maintained, thus limiting the scope of the claim.  *See supra*, Argument Section II.A.2. (citing JA764-766).

40

In sum, the claim language and the specification of the '291 patent demonstrate that "pertaining/corresponding to two or more selected investments" includes capturing and storing the values of multiple investments in different time periods where the interrelationship between two or more individual investments is maintained.

## III.    THE BOARD'S INVALIDITY FINDINGS ARE ERRONEOUS.

### A.    Sortino Does Not Anticipate Claims 1-5, 8-16, 19-21, and 29-31 Under § 102(b).

The Board relied primarily on Sortino for its out-of-hand and unsupported rejections of claims 1-5, 8-16, 19-21, and 29-31.  [JA6-12.]  The Board provided only a limited, cursory analysis and ignored critical distinctions between Sortino and the disclosure of the '291 patent.  This is yet another ground on which to vacate the Board's opinion.  *See Gechter,* 116 F.3d at 1457 (vacating and remanding the Board's opinion and stating that "Board opinion must contain sufficient findings and reasoning to permit meaningful appellate scrutiny"); *In re Bond,* 910 F.2d 831, 833 (Fed. Cir. 1990) (holding that, because the Board made no finding that the claim element and the prior art reference were structurally equivalent, "its decision as to the anticipation of claim 1 is deficient and must be vacated").

In addition, as explained below, the Board failed to consider that the record shows that a PHOSITA would find that Sortino fails to enable a person of ordinary skill in the art to carry out the invention.  *In re Donohue,* 766 F.2d 531,

41

533 (Fed. Cir. 1985) ("[P]rior art . . . must sufficiently describe the claimed invention to have placed the public in possession of it. Such possession is effected if one of ordinary skill in the art could have combined the publication's description of the invention with his own knowledge to make the claimed invention.") (citation omitted).

### 1. Sortino does not teach or suggest the "bias parameter" limitation and hence cannot anticipate independent Claims 1-5, 8-16, and 19-21.

The Board did not expressly construe the "bias parameter" limitation. However, the Board found that Sortino's choosing probabilities of economic scenarios based on data that is generated *after* an initial sample selection introduces a "bias parameter." [JA7.] The Board relied solely on the Sortino reference for its conclusion that claims 1-5, 8-16, and 19-21 are invalid solely because "Sortino teaches the application of bias *after* an initial selection by application of the various enumerated scenarios …." [JA7 (emphasis added).] This conclusion could only be reached, however, based on a construction of "bias parameter" that is divorced from the specification and the patentee's own express definition, both of which indicate the claimed bias parameter is an input parameter to be applied *in* the selection of samples, not *after* the selection of samples.

In finding that Sortino's weighting of output data anticipates the '291 patent's application of a bias parameter to input data, the Board ignored the claim language, specification, and prosecution history.

      **a)    It Is Undisputed That Sortino Selects Samples Randomly and Permits Weighting Data Only After Sample Selection.**

It is undisputed that Sortino does not "bias" the randomness in sample selection. To the contrary, in actual sample selection, Sortino always selects randomly. Sortino states: "All of the monthly returns for a given asset in a given scenario were entered into a file. Twelve monthly returns were randomly selected from this file." [JA214 at n.4.] Sortino does not alter the randomness of the samples that are drawn. Rather, Sortino teaches the ability to combine and weight various scenarios after sampling different market conditions using a bootstrap method, as follows:

(1)    <u>Step 1</u>: The Sortino methodology first enters all of the returns for a given asset in a given scenario into a file, and then randomly selects twelve returns from that file. [JA214 at n.4.] This process is repeated for each scenario (e.g., deep recession, mild recession, etc.) to generate a bootstrap statistical distribution for each scenario.

(2)    <u>Step 2</u>: The Sortino methodology then permits a user to assign probabilities for how likely it is for each scenario to occur. [JA216.]

(3)    <u>Step 3</u>:    Finally, the Sortino methodology combines the pre-generated bootstrap distributions for each asset according to the weight that the user assigned to each scenario.  [*Id.*]

Thus, according to Sortino, an investor may weigh the results of various scenarios after the random bootstrap sampling has already been completed, but that does not constitute a bias parameter that is used at the outset to determine a degree of randomness in the sample selection.  Sortino does not bias the selection of sample space from which samples would be selected.  Instead, Sortino samples randomly from each "scenario" (e.g., deep recession, mild recession, etc.), generates a distribution for each scenario, and then, "weights" the resulting distributions to create a new weighted combined distribution.  Sortino's method requires that bias may be introduced—only after the resampling is finished—in the combining of the resulting distributions to form a weighted combined distribution.

### b)    Sortino's Post-Selection Weighting is the Opposite of the '291 Patent's Pre-Selection Bias Parameter.

Each time the '291 patent refers to the bias parameter, it specifically defines the bias parameter as an input parameter that determines randomness in the selection of samples from the sample space.  *Supra*, Argument Section II.A.1.  There is nothing in the intrinsic record to suggest that the claimed bias parameter is anything other than an input parameter that is applied at the outset in initial sample selection before any resampling takes place.

44

Yet, with only two short sentences in support of its holding, the Board found claims 1 and 11 invalid on the ground that "Sortino teaches the application of bias **after an initial selection**. . . . We therefore find that Sortino shows or suggest the [bias parameter limitation] set forth in claims 1 and 11." [JA7 (emphasis added).] The Board's finding that application of bias *after* sample selection is the same as application of bias and an input parameter *in* the initial sample selection is not reasonable in light of the claim language, the express definition and the description in the specification. *Microsoft Corp.* 2015 WL 3747257 at *5-6 (finding the Board's construction unreasonable because in each instance where the term at issue was used in the specification, it described the term in ways that were distinct from the prior art).

The methodologies are complete opposites. Sortino only weights the resultant output distributions by creating a weighted combined distribution. But weighting the statistical analysis output that is generated *after* initial sample selection is completed is not biasing the randomness *in* sample selection. While Sortino may permit a user to make determinations or adjustments, specifying some percentage, it is not in sample selection. The '291 patent sets out the different market conditions in sample selection through the bias parameter *before* sample selection, whereas Sortino draws random samples first and then permits for a weighting of scenarios *after* the sample selection.

45

In addition, the Board ignored that the patentee acted as his own lexicographer when he expressly defined "bias parameter" in the specification as an "input" parameter that "is a decimal value that is either -1 or between 0 and 1 that specifies the degree of randomness in the resampling process." [JA75 at 11:32-40; JA75 at 11:55-59.] The Board ignored this express definition in the specification despite that this Court has admonished that, even under the broadest reasonable interpretation, the Board's construction "cannot be divorced from the specification and the record evidence." *In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011).

Further, the Board completely disregards the prosecution history, where the patentee amended claims 1 and 11 during reexamination to add the limitation that biasing takes place "in sample selection." The Examiner invited this amendment and entered it, yet the Board nevertheless determined that Sortino's weighting after a statistical analysis of the sample selection anticipates the '291 patent's bias parameter element. Nowhere does the Board consider the patent's prosecution history. This is legally erroneous. *See Tempo Lighting Inc. v. Tivoli LLC*, 742 F.3d 973, 978 (Fed. Cir. 2014).

In sum, because the Board held that Sortino anticipates the bias parameter element of claims 1 and 11 despite that the '291 patent describes the claimed "bias parameter" as an input parameter that determines the degree of randomness in

sample selection, the Board's construction is unreasonably broad and is therefore improper.

### 2. Sortino does not teach or suggest the "resampling" limitation and hence cannot anticipate Claims 1-5, 8-16, 19-21 and 29-31 of the '291 Patent.

The Board acknowledged that InvestPic argued that none of the references, including Sortino, show or suggest "a statistical analysis request that corresponds to two or more investments, and a resampled statistical analysis performed based upon investment data pertaining to two or more investments." [JA6; JA11.] This argument was also addressed by the Examiner in the RAN. [JA28-30.] However, the Board provided no analysis as to whether Sortino discloses the "resampling" limitation that is found in claims 1-5, 8-16, 19-21 and 29-31.

As noted above (*see* Argument Section II.A.2), the Board's apparent understanding of the "resampling" limitation, which it failed to construe, is inconsistent with the intrinsic record. When the "resampling" limitation is properly construed and then considered in light of Sortino, it is apparent that Sortino does not teach or suggest the limitation.

Sortino evaluates the performance (i.e., risk vs. return) of a single financial asset or asset category (e.g., growth stocks or municipal bonds) in a future time period based on historical data and uses a resampling technique, bootstrapping, in his analysis. [JA214.] Sortino shows the results for the performance of the S&P 500

47

index (i.e., a single asset category such as mutual funds tied to the S&P 500 index) in seven different market conditions. [JA214-215.]

Sortino also describes performing the same analysis on nine asset categories. [JA216.] The asset categories are analyzed separately and treated independent of each other. [JA214 at n.4.] Furthermore, after bootstrapping the returns for each asset category for each scenario (e.g., real growth, mild inflation, etc.), Sortino shows how all these distributions for the different scenarios for that single asset category may be combined by assigning a particular percentage representing the likelihood of a given scenario occurring to each distribution. [JA216.]

In contrast, as discussed earlier, the '291 patent keeps track of multiple investments in multiple time periods in order to preserve and track the interrelationships between investments during resampling. Tracking the uncertainties in the returns for individual stocks along with their interrelationships (the so-called "joint distribution") is a key feature of the '291 patent. *See* Argument Section II.A.2., *supra.* In the '291 patent, preserving the interrelationships between investments by maintaining their covariance and cross-correlation during actual sampling results in coherence.

In sum, the Sortino reference does not meet the "resampling" claim limitation that is found in all the claims at issue because Sortino does not perform resampling of multiple investments for multiple time periods while preserving the

48

interrelationships between investments.    The PTAB simply ignored this key distinction and failed to even address it.

> **3.    Sortino does not teach the "pertaining/corresponding to two or more investments" limitation and hence Sortino cannot anticipate Claims 29-31 of the '291 Patent.**

While the Examiner relied on Barraquand for its finding that claims 29-31 are anticipated (*see* Argument Section III.B. below), the Board found that claims 29-31 are anticipated by Sortino on the ground that Sortino teaches or suggests the "pertaining/corresponding to two or more investments" limitation.    [JA7-9.] However, under a proper construction of this claim element as set forth *supra* in Argument Section II.A.3., Sortino does not anticipate because Sortino does not preserve the interrelationships, including the temporal correlation, of financial data as disclosed in the '291 patent.  [JA70 at 2:13-18.]

As discussed above, the "resampling" claim term refers to resampling of multiple investments (i.e., two or more investments) for multiple time periods while preserving the interrelationships between these investments.  Hence, the claim term "pertaining/corresponding to two or more investments" is an integral part of resampling two or more investments in multiple time periods while preserving the interrelationships between those investments.

It follows that for the same reasons discussed in Argument Section III.A.2. above with respect to the "resampling" claim limitation, Sortino also does not teach

or suggest the "pertaining/corresponding to two or more investments" claim limitation because Sortino does not teach or suggest capturing and storing the values of multiple investments in different time periods in order to preserve their interrelationships. [*See, e.g.,* JA1263-1265.] Instead, Sortino is directed solely to asset categories and Dr. Sortino "did not want to, need to, and did not, estimate the much more complex correlation and co-variance relationships between all the underlying individual securities," as is done by the inventions of the '291 patent. [JA294-295 at ¶20.] Thus, Sortino's failure to teach or suggest this limitation is another reason why Sortino cannot anticipate claims 29-31 of the '291 patent.

### 4.    The Board Failed to Consider The Understanding of a Person Having Ordinary Skill in the Art.

In order to be anticipating, a prior art reference must be enabling so that the claimed subject matter may be made or used by one skilled in the art. *Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1354 (Fed. Cir. 2003); *Helifix, Ltd. v. Blok–Lok, Ltd.,* 208 F.3d 1339, 1346 (Fed. Cir. 2000); *Akzo N.V. v. U.S. Int'l Trade Comm'n,* 808 F.2d 1471, 1479 (Fed. Cir. 1986). Prior art is not enabling so as to be anticipating if it does not enable a person of ordinary skill in the art to carry out the invention. *See Elan Pharms., Inc. v. Mayo Found. for Med. Edu. & Research,* 346 F.3d 1051, 1057 (Fed. Cir. 2003) (remanding the case to the district court for a determination of whether the prior art reference enabled persons of ordinary skill to make the invention without undue experimentation).

50

Although publications used as prior art by the PTO are presumed enabling, *In re Antor Media Corp.,* 689 F.3d 1282, 1288 (Fed. Cir. 2012), the Board and the Examiner must engage in a proper enablement analysis and must address the applicant's concrete evidence that the reference is not enabling. *In re Morsa,* 713 F.3d 104, 109-111 (Fed. Cir. 2013) (holding that examiner and Board failed to engage in proper enablement analysis and vacating the finding of anticipation). Here, as explained below, during the *inter partes* review, InvestPic came forward with evidence showing that the prior art references are not enabling, all of which the Examiner and Board failed to consider.

First, Sortino, as a PHOSITA, submitted a declaration regarding what his reference, non-patent literature, teaches. [JA289-290.] Sortino was careful to explain that his reference is a simple, non-technical, non-peer-reviewed article. [JA291-292.] The Sortino article is a high-level, four page article published in a non-technical, non-academic journal, *Investing Roundtable*. [*Id.*] As Dr. Sortino explains, the article reported what some professionals in finance at the Pension Research Institute (PRI), an institute founded by Dr. Sortino, were doing. [*Id.*] The article provided no technical details or explanation on how the ideas were to be implemented. [*Id.*] That is not surprising, because it was not the purpose of the article or the intent of the journal in which it was published. [*Id.*]

51

Moreover, Sortino himself explained how and why his reference does not teach that which is claimed in the patent. [JA294-302 (explaining how and why the teachings in Sortino and the disclosure in the '291 patent are "completely different".] By ignoring Dr. Sortino's own testimony as to what his reference teaches, the Board failed to evaluate validity through the lens of one of ordinary skill in the art, which is improper.

<div align="center">

**a)    Sortino does not enable a person of ordinary skill in the art to carry out the "bias parameter" limitation.**

</div>

Specifically, as concerns the bias parameter limitation, Dr. Sortino testified that his reference teaches weighting of distributions only after the resampling process was completely finished and that his article has no bias parameter. [JA295-297.] Dr. Sortino further states that his approach does not bias the underlying data or samples (as do the inventions of the '291 patent) but rather the underlying data always remains unchanged. [JA302 at ¶52 (stating that "In contrast, in '291, the user uses the "bias parameter" to actually change the preceding sampling process itself which alters the *sampling process*; the bootstrapped data itself changes. There is nothing in our system that allows the user to do that."] Accordingly, Dr. Sortino, as a PHOSITA would not consider his reference to enable a person of ordinary skill in the art to carry out the bias parameter limitation in the '291 patent because Sortino does not teach or suggest a bias parameter that is an input parameter used to

determine a degree of randomness *in sample selection* before any resampling. Thus, it cannot be considered invalidating art. *Elan Pharms*., 346 F.3d at 1057.

> **b)  Sortino does not enable a person of ordinary skill in the art to carry out the "resampling" and "two or more" limitations.**

As concerns the "resampling" and "two or more" limitations, Dr. Sortino describes his paper as using a bootstrap procedure to generate a distribution of returns for a single asset category, and he shows that by using the S&P 500 as an example. [JA294-295.] These asset categories were analyzed independent of each other in Sortino, and Dr. Sortino explains that since he was doing asset allocation (in other words, what percentage of one's portfolio should be assigned to stocks, bonds and the like) and not picking what stocks to buy in constructing an investment portfolio (like the '291 patent), he did not need to measure how individual stocks were behaving relative to each other. [*Id.*] In fact, he thought "that level of detail was unnecessary noise." [*Id.*] Thus, even Dr. Sortino would not find his reference to enable a PHOSITA to carry out the "resampling" and "two or more" limitations.

Moreover, as Dr. Savage, a renowned expert in mathematics [JA571-573] explains in his declaration, a PHOSITA would understand that Sortino's calculations mathematically force the results for different assets or asset categories to be statistically independent of one another [JA577 at ¶ 29]. A PHOSITA would understand that this combined distribution in Sortino is not the same as, and does

53

not enable a PHOSITA to carry out, the joint distribution of the '291 patent. [JA581-582 at ¶¶45-46.] Moreover, as Dr. Herzog explains, the restrictive assumption in Sortino is that the draws, while performing bootstrapping, are uncorrelated, which would not enable a PHOSITA to carry out the '291 patent. [JA310-311 at ¶14.] The Board also failed to consider that the record shows that Dr. Herzog stated that he finds that the Sortino paper has a "dearth of technical details" and that "the Sortino paper is of little relevance to the ['291] patent." [JA306-307; JA322.]

While, as Dr. Savage notes, the term combined distribution "could easily be confused" with joint distribution [JA581-582 at ¶46], the distinction is clear. In the combined distribution of Sortino, after bootstrapping each distribution, the independently generated distributions are combined without preserving their interrelationships. [JA581-583 at ¶¶46, 50.] In a joint distribution, as taught in the '291 patent, the bootstrapping is performed on the joint distribution that is created by preserving the interrelationships between multiple assets. *Supra*, Argument Section II.A.2.

Dr. Sortino agrees with this understanding of how a PHOSITA would view his paper compared to the '291 patent. He notes that, unlike the '291 patent, the combining of the distributions by assigning different weights is undertaken *after* resampling is completely finished. [JA291 at ¶30.] His categorical summation puts it best—"'291's system is completely different". [*Id.*] Yet again, the Board failed to

54

consider the understanding of those of skill in the art and, yet again, its rejections based on a non-enabling reference cannot stand. *Elan Pharms.*, 346 F.3d at 1057.

## B.    Barraquand Does Not Anticipate Claims 29-31 Under § 102(b).

Barraquand concerns the "resampling" limitation. In the ACP, the original Examiner (Examiner Choi) rejected Barraquand as invalidating prior art on either anticipation or obviousness grounds. [JA717-718.] In the Second ACP, the next Examiner (Examiner Sager) did not dispute the original Examiner's conclusion, but nevertheless reasserted Barraquand as an invalidating reference based solely on the same Appellee arguments that had already been considered and rejected. [JA1014-1015]. Examiner Sager focused on what he believed to be Barraquand's teaching of the resampling method of the '291 patent. [JA1015.]

In its Decision, the Board was silent as to the issue of whether Claims 29-31 of the '291 patent are anticipated by the Barraquand reference. It therefore failed to provide any analysis or reasoning as to this issue, despite the fact that InvestPic had raised it on appeal to the Board. As this court has admonished, the Board must consider all of the applicant's evidence. *See In re Oetiker,* 977 F.2d 1443, 1445 (Fed. Cir. 1992) ("An observation by the Board that the examiner made a *prima facie* case is not improper, as long as the ultimate determination of patentability is made on the entire record."); *In re Piasecki,* 745 F.2d 1468, 1472 (Fed. Cir. 1984).

Here, the only analysis in support of the conclusion that Barraquand is an invalidating reference is that set forth in the RAN.

In the RAN, the Examiner rejected claims 29-31 as anticipated by Barraquand based on the reasoning that "each limitation for broadest reasonable interpretation of claims as detailed in the proposed rejection on pages 73-75 of Request which is ADOPTED as incorporated by reference into this action for reasons stated in paragraphs 6-8." [JA42.] The express reason given by the Examiner in those paragraphs reads as follows: "in reconsideration of its scope and teachings of applied art, although Requester fails to address claim 29 in their April 22, 2013 for its specific limitations that do not regard same functions of 1 and 11-13 [e.g. name of the game is the claim], the examiner agrees with facts in Request pages 73-75 and 79-81 and prior Requester reply received November 15, 2013 pages 2 and 14-17 regarding Barraquand for claims 29-31 for broadest reasonable interpretation of the claimed elements in consideration of '291 without improperly importing elements into the claims where claims 29-31 are broader than 1 and 11-13." [JA34-35.]

The Examiner's reasoning concerning Barraquand is virtually incomprehensible, but it is clear that he relied solely on the Appellee's positions in interpreting Barraquand. Barraquand discusses what the author calls "quadratic resampling," and Appellees' position, which the Examiner adopted without further

56

analysis, is that Barraquand's "quadratic sampling" is equivalent to the "resampling" element of each of claims 29-31.  [JA74; JA183; JA457.]

Appellees' interpretation, and thus the Examiner's reasoning, is, however, fatally flawed.  To begin with, the resampled statistical analysis of the '291 patent calculates estimated behavior of investments where the fundamental values, such as the average return and standard deviation, are unknown.  This explanation is expressly set forth in the specification of the '291 patent.  [JA70 at 1:24-37 (noting limitations of prior art that '291 patent overcomes); *id.* at 1:66-2:3 ("Resampled statistical analysis [of the '291 patent) provides a meaningful and reasonable statistical description of financial information, which typically escapes modeling using parametric methods (i.e., assumptions of a Gaussian distribution.").]

"Quadratic resampling," by contrast, is a term coined by Barraquand for a calculation to be used when values such as the expected average return and standard deviation are known.  [JA457-459.]  Indeed, Barraquand expressly states that "quadratic resampling" requires these values to be precomputed.  [JA459.]

In the petition for reexamination, Appellees, and thus the Examiner, ignored the express definition of "resampled statistical analysis" set forth in the patent as well as the plain language of Barraquand.  Appellees cited to and discussed only a single statement appearing on the title page of the reference [JA257], but had the reference as a whole been fully considered, as it should have been, the critical

57

distinction between Barraquand's "quadratic resampling" and the "resampled statistical analysis" of the '291 patent would have been apparent.

These distinctions were confirmed by Dr. Barraquand, who, as the author of the reference relied upon by Appellees and the Examiner [JA456-457], is in the best position to know what was meant by the term he coined. Dr. Barraquand confirmed that the types of resampling techniques contemplated by the '291 patent, such as bootstrapping, were not discussed or disclosed in the Barraquand reference because they are irrelevant, and even antithetical, to his "quadratic resampling" techniques. [JA460-61.] Dr. Barraquand also explained that the goal and the function of his sampling technique was to reduce the statistical error in the computed results, not to study various scenarios. [JA462 at ¶2.] In fact, Dr. Barraquand testified that "[h]ad I known at the time that other authors, especially statisticians, used the term 'resampling' in a totally unrelated meaning, I would have chosen a more descriptive name for the technique described in Barraquand, such as 'second order moment matching.'" [JA457-458 at ¶4.]

This view was corroborated by others. Dr. Savage, for example, whose work was also cited and relied upon by Appellees, had extensive experience and expertise regarding resampling simulation. [JA571-573.] He first learned of the term "quadratic resampling" through the Barraquand article, and, as one of ordinary skill, concluded that "quadratic resampling" is totally unrelated to resampling, such as the

bootstrapping method of the '291 patent: "[Quadratic resampling] does not randomly sample data at all, but is a form of Moment Matching, used to increase the accuracy of traditional (non-resampled) simulations."  [JA574 at ¶13; JA576-577 at ¶28.]

In short, the only similarity between the "resampled statistical analysis" of the '291patent and the "quadratic resampling" of Barraquand is that they both use the word "resample."  That similarity is merely superficial; it says nothing about the substantive meaning of the terms.  As Dr. Barraquand testified, "'[r]esampling' in [quadratic resampling] and 'resampling' in the '291 patent are just homonyms.  By homonyms, I mean words spelled and pronounced alike but different in meaning (as the noun 'quail' and the verb 'quail,' or the word 'set' what has numerous disparate meanings)."  [JA464.]  Neither Requester, the Examiner, nor the Board properly considered that Barraquand coined his own term that has nothing to do with statistical resampling and, as a result, failed to consider Barraquand for its substantive meaning.

As a result, Barraquand cannot anticipate independent claim 29, or dependent claims 30-31, because it does not teach or disclose the required "resampled statistical analysis" element of those claims, as that term is properly construed in light of the specification.  *See supra,* Argument Section II.A.3.  Because all elements of the claim are not disclosed, Barraquand cannot and does not anticipate any claims of the '291 patent.

## C. Kaufman in View of Sortino Does Not Render Claims 29-31 Obvious Under § 103(a).

The Board relied on Kaufman in view of Sortino regarding the combination of the "resampling" and "parallel processing" limitations, finding that the resampling techniques disclosed and taught by Sortino would be combined with the parallel computer system disclosed by Kaufman to render claims 29-31 obvious. [JA7, JA9.]

In order to determine obviousness as a legal matter, four factual inquiries must be made concerning: 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the claimed invention and the prior art; and 4) secondary considerations of nonobviousness, which includes commercial success, long-felt but unresolved need, failure of others, copying, and unexpected results. *Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 17–18 (1966). Properly considered, these factors demonstrate that the Board's conclusion regarding Kaufman in view of Sortino is legally incorrect for several reasons.

First, the Board's analysis fails to appreciate the scope and content of the prior art as well as the differences between the claimed invention and the prior art. As disclosed in the specification of the '291 patent, the "resampled statistical analysis" recited in claims 29-31 utilizes a joint distribution, which, as explained above, requires covariance and cross-correlation to maintain the interrelationship between individual investments. *Supra*, Argument Section II.A.2. Sortino, which is only

concerned with asset categories and "did not want to, need to, and did not, estimate the much more complex correlation and co-variance relationships between all the underlying individual securities," does not teach or suggest the claimed "resampled statistical analysis." *Supra,* Argument Section III.A.2.; [JA294-295 at ¶20.] Moreover, Kaufman merely discloses a general parallel computer using algorithms that were developed to use parallel processing to perform cluster analysis and robust regression [JA198], and thus does not disclose or suggest the remaining elements (financial database and resampled statistical analysis) required for claims 29-31.

Second, the Board did not consider the level of ordinary skill in the art. The record demonstrates that a PHOSITA would readily understand that since neither cluster analysis nor robust regression techniques are employed in the '291 patent, Kaufman is not relevant art. [JA312-313 at ¶22.] As Dr. Kaufman, the first author of the Kaufman article [JA502-503] himself notes, "[w]hile Kaufman discloses a number of parallel processing architectures for the two problems that were implemented, Cluster Analysis and Robust Regression, Kaufman does not disclose such an architecture for other parallelizable statistical techniques, such as bootstrap. Developing such an architecture was identified as possible future research, but it is not taught in Kaufman." [JA505-506 at ¶21.]

Another PHOSITA, Dr. Spence states very plainly that "[o]ther than the use of the term resampling, it wasn't clear to be me what the relevance of [Kaufman]

was to the Varma patent in question." [JA533 at ¶36.]  And, Dr. Philip M. Neches, founder and Chief Technical Officer of Teradata Corp. and Member of the National Academy of Engineering [JA414-415] notes "what one learns from Kaufman about clustering teaches *nothing* about how to approach the other problems mentioned [] or addressed in '291."  [JA424 at ¶38 (emphasis in original).]  Furthermore, Kaufman does not have any teachings that would be helpful to eliminate or reduce the critical differences between the Sortino reference and claims 29-31 of the '291 patent that were described above.

Speaking as a PHOSITA, Dr. Kaufman himself testified that there is no motivation to combine the Sortino paper and the Kaufman paper and systematically rejects any attempts to find a reason to combine them.  [JA506-509 at ¶¶23-34.]  In fact, he notes that there are reasons why they should not be combined.  [JA506 at ¶23.]  Dr. Kaufman states that his article does not even mention distributions, and it is not the purpose of his article to characterize distributions.  [JA506-507 at ¶24.]  Dr. Kaufman also states that there no "bootstrap" process in his article, and it is only mentioned as a potential future research topic area.  [JA507-508 at ¶¶25, 30.]  In short, a PHOSITA would easily conclude that there is no reason to combine the Sortino paper with the Kaufman paper.

Further, there is no suggestion that the techniques of Sortino could successfully perform the resampled statistical analysis required by those claims, and,

in fact, Sortino himself stated that they could not.  [JA294-95 at ¶¶ 20-21, 22 ("covariance *at the underlying individual security level* was not one of our concerns, it was not relevant" (emphasis original), and 23 ("I have never used the bootstrap procedure to construct a portfolio made up of individual securities such as stocks or bonds.")].  The lack of evidence that the combination of Kaufman and Sortino would have been successful in practicing the invention of the '291 patent means the combination cannot render claims 29-31 obvious.  *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1334-5 (Fed. Cir. 2013) (patent not rendered obvious by combination of references where not all elements were taught by the references and "expert testimony indicated that the proposed combination . . . would not have resulted in the invention . . . and would not have worked for its intended purpose").

In sum, the Kaufman and Sortino references in combination neither disclose nor suggest all elements of claims 29-31, nor that the combination would work to accomplish the inventions of the '291 patent as claimed.  They, therefore, cannot render claims 29-31 obvious.

## CONCLUSION

For the foregoing reasons, InvestPic respectfully requests that the Court vacate the Board's purported understanding of the "bias parameter," "resampling," and "pertaining/corresponding to two or more" claim limitations and reverse the Board's rejection of claims 1-5, 8-16, 19-21, 29-31 based on its erroneous understanding.

<div align="right">

Respectfully submitted,

    /s/  Jay P. Kesan

JAY P. KESAN
CECIL E. KEY
TERESA M. SUMMERS
DIMURO GINSBERG PC/DGKEYIP
GROUP
1101 King Street, Suite 610
Alexandria, VA 22314
(703) 684-4333

</div>

July 16, 2015

*Counsel for Appellant,*
*InvestPic LLC*

**ADDENDUM**

**ADDENDUM TABLE OF CONTENTS**

<u>**JUDGMENTS AND ORDERS APPEALED FROM**</u>

Judgment, Appeal No. 2015-001450, *Inter Partes* Reexamination 95/001,939
(PTAB, March 30, 2015).......................................................................JA1-13

Right of Appeal Notice, Appeal No. 2015-001450, *Inter Partes* Reexamination
95/001,939,
(PTAB, February 21, 2014) ...............................................................JA14-50

<u>**PATENT AT ISSUE**</u>

U.S. Patent No. 6,349,291 ("the '291 patent") .............................................JA51-78



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,939 | 03/29/2012 | 6349291 | 206801-14000-100 | 7624 |

16579        7590        03/30/2015
Foster Pepper PLLC
1111 3rd Avenue Suite 3400
Seattle, WA 98101-3299

| EXAMINER |
|---|
| SAGER, MARK ALAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/30/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

**JA1**

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

IBM, SAS, and ALGORITHMICS INC.
Requester and Respondent

v.

INVESTPIC, LLC
Patent Owner and Appellant

————————————

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1
Technology Center 3900

————————

Before JOHN A. JEFFERY, ERIC B. CHEN, and ANDREW J. DILLON, *Administrative Patent Judges*.

DILLON, *Administrative Patent Judge*

DECISION ON APPEAL

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1

## STATEMENT OF THE CASE

Owner appeals under 35 U.S.C. § 134(b) (2002) from the final decision of the Examiner adverse to the patentability of claims 1-5, 8-16, 19-21, and 29-31.  We have jurisdiction under 35 U.S.C. § 315 (2002).

We affirm.

### *Invention*

The '291 patent describes a method and system for the statistical analysis, display and dissemination of financial data over an information network such as the Internet and World Wide Web.  Abstract.

### *Claims*

Claims 1-5, 8-16, 19-21 and 29-31 are subject to reexamination and have been rejected.  Claims 1-31 are original patent claims.  Claims 7, 18, and 22-28 are not subject to reexamination.  Claims 6 and 17 are deemed patentable.  Claims 1, 11, and 29 are independent.

Claims 1, 11, and 29 are illustrative.

1.  A method for calculating, analyzing and displaying investment data comprising the steps of:

   (a) selecting a sample space, wherein the sample space includes at least one investment data sample;

   (b) generating a distribution function using a re-sampled statistical method and a bias parameter, wherein the bias parameter determines a degree of randomness in sample selection in a resampling process; and,

   (c) generating a plot of the distribution function.

JA3

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1

11.  A method for providing statistical analysis of investment data over an information network, comprising the steps of:

   (a) storing investment data pertaining to at least one investment;

   (b) receiving a statistical analysis request corresponding to a selected investment;

   (c) receiving a bias parameter, wherein the bias parameter determines a degree of randomness in sample selection in a resampling process; and,

   (d) based upon investment data pertaining to the selected investment, performing a resampled statistical analysis to generate a  resampled distribution.

29.  A system for providing statistical analysis of investment information over an information network comprising:

   a financial data database for storing investment data pertaining to two or more investments;

   a front end subsystem for receiving a statistical analysis request corresponding to two or more selected investments:

   a parallel processor, wherein the parallel processor includes:

   at least one processor for performing resampled statistical analysis based upon the statistical analysis request.

<div align="center">*Prior Art*</div>

Sortino, Frank, A., "*The Look of Uncertainty*," 4(1) Investing 30-34 (Winter 1990) ("Sortino");

Efron, B., "*Bootstrap Methods: Another Look at the Jackknife*, " 7(1) The Annals of Statistics  1-26 (Jan. 1979) ("Efron");

<div align="center">3</div>

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1

Barraquand, Jerome, "*Monte Carlo integration, quadratic resampling, and asset pricing,*" 38 Mathematics and Computers in Simulation173-182 (1995) ("Barraquand ");

Stewart, G. W., "*Parallel Linear Algebra in Statistical Computations,*" COMSTAT '88 Proceedings in Computational Statistics, pp. 3-14 (1998) ("Stewart");

Kaufman, L., "*Using a Parallel Computer System for Statistical Resampling Methods,*" 2Computational Statistics Quarterly 129-141 (1988) ("Kaufman").

*Owner's Contentions*

Owner contends that the Examiner erred in entering the following grounds of rejections against claims 1-5, 8-16, 19-21 and 29-31 (App. Br. 3):

1. The rejection of claims 1-5, 10-16, 19, and 21 under 35 U.S.C. §102(b) as being anticipated by Sortino[1];

2. The rejection of claims 8 and 9 under 35 U.S.C. §103(a) as being unpatentable over Sortino in view of Efron;

3. The rejection of claim 20 under 35 U.S.C. §103(a) as being unpatentable over Sortino in view of Admitted Prior Art;

4. The rejection of claim 29 under 35 U.S.C. §102(b) as being anticipated by Barraquand[2];

---

[1]  Owner's Appeal Brief mistakenly lists claims 1-5, 10-16, 19, and 21 and as rejected under "103(a) as being anticipated by Sortino" which we consider to be harmless typographical error.

[2]  Owner's Appeal Brief mistakenly lists claim 29 as rejected under "103(a) as being anticipated by Barraquand" which we consider to be harmless typographical error.

JA5

5.  The rejection of claim 30 under 35 U.S.C. §103(a) as being unpatentable over Barraquand in view of admitted prior art;

6.  The rejection of claim 31 under 35 U.S.C. §103(a) as being unpatentable over Barraquand in view of Stewart;

7.  The rejection of claim 29 under 35 U.S.C. §103(a) as being unpatentable over Kaufman in view of Sortino;

8.  The rejection of claim 30 under 35 U.S.C. §103(a) as being unpatentable over Kaufman in view of Sortino and further in view of admitted prior art;

9.  The rejection of claim 31 under 35 U.S.C. §103(a) as being unpatentable over Kaufman in view of Sortino and further in view of Stewart.

## ANALYSIS

Owner initially argues the Examiner's rejection of claims 1-5, 8-16, 19-21, and 29-31 was improper, based upon four arguments.  Owner first argues that none of the cited references shows or suggests "a bias parameter that determines a degree of randomness in sample selection in a resampling process."  Next, Owner argues that none of the cited references show or suggest "a statistical analysis request that corresponds to two or more investments, and a resampled statistical analysis performed based upon investment data pertaining to two or more investments."  Thirdly, Owner argues that none of the cited references show or suggest "a plurality of processors collectively arranged to perform a parallel processing computation and adapted to receive a statistical analysis request

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1

corresponding to two or more selected investments." Finally, Owner argues that the Examiner "failed to give legally sufficient consideration or weight to the expert evidence in his reasoning and analysis." App. Br. 4-19.

Requester argues that Sortino discloses a "bias parameter" that "determines a degree of randomness in sample selection" by at least, restricting the data to be sampled to certain economic scenarios (*e.g.* recessions, growth, inflation, etc.). Req. Resp. Brief 1-2.

We find that Sortino teaches the application of bias after an initial selection by application of the various enumerated scenarios, noted above. We, therefore, find that Sortino shows or suggests the "bias parameter that determines a degree of randomness in sample selection in a resampling process" set forth in claims 1 and 11. We also note that claim 29 fails to recite the argued "bias parameter."

With regard to Owner's arguments pertaining to "two or more investments" Requester cites numerous instances within the Sortino reference which refer to "each asset" when discussing uncertainty, return characteristics and the like. Similarly, Requester points out that Sortino discloses a bootstrap analysis of S & P 500 data as "merely one exemplary investment" which includes "nine asset categories." Req. Resp Brief 7.

Further, Requester argues that Owner has improperly read a temporal limitation into claim 29 by urging that the claim should be interpreted to require an analysis of the claimed "two or more assets" at a time. Requester finds that claim 29 does not require any simultaneous analysis of two or more investments. *Id.* at 8.

6

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1

We agree with Requester and the Examiner.  The absence of a temporal limitation from Owner's claims indicating that "two or more investments" are analyzed at the same time leads us to conclude that Sortino suggests the ability to analyze "two or more investments."  Regarding Owner's argument that two requests would be necessary in the Sortino system to accomplish an analysis of "two or more investments," we note that Owner utilizes the transitional term "comprising."  "The transitional term 'comprising' . . . is inclusive or open-ended and does not exclude additional, unrecited elements or method steps." *Georgia-Pacific Corp. v. U.S. Gypsum Co.,* 195 F.3d 1322, 1327-28 (Fed. Cir. 1999) (citing MPEP § 2111.03 (6th ed.1997)).  "A drafter uses the term 'comprising' to mean 'I claim at least what follows and potentially more.'" *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1383 (Fed. Cir. 2000).

Further, Owner's claim recites "a statistical analysis request." "[A]n indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000).  To be sure, "[w]hen the claim language and specification indicate that 'a' means one and only one, it is appropriate to construe it as such even in the context of an open-ended 'comprising' claim." *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011).  But that exception is not the case here, nor has Owner shown as much on this record.  Consequently, we find that a system such as that disclosed by Sortino, that may utilize multiple "requests" to analyze "two or more investments," shows or suggests the claimed feature.

**JA8**

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1

We also note that only claim 29 recites the argued "two or more investments" argued above.

Addressing Owner's arguments regarding "a plurality of processors collectively arranged to perform a parallel processing computation and adapted to receive a statistical analysis request corresponding to two or more selected investments" Requester points out that Kaufman discloses the use of the IBM LCAP parallel computer system that functions as a "front end subsystem" for receiving a statistical analysis request.  Req. Resp. Br. 9.

The Examiner finds that Kaufman is indeed analogous art and would have been obvious to one of ordinary skill in the art in combination with Sortino to show or suggest parallel processing of a statistical analysis request for two or more selected investments.  RAN 17-18.

We concur with the Examiner. The benefits and advantages of parallel processing were well known to those of ordinary skill in the art at the time of the invention and the combination of Kaufman with Sortino was clearly within the ordinary skill level of persons in this art.  Again, we note that only claim 29 recites the use of parallel processing.

As for the alleged failure of the Examiner to adequately consider the expert declarations, the Requester argues  that "full, fair, and careful consideration" was given to the declarations of Owner's expert declarations but notes that the declarations "almost entirely ignore" the content of the rejected claims and mostly address

> irrelevant issues unrelated to the '291 patent claims,
> offering opinions and anecdotes on topics ranging from
> risk management, to portfolio theory, to computational
> complexity, to statistical paradigms, to the 'holy war'

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1

> between Bayesian and frequentist statisticians, and to other
> subjects having nothing to do with what is actually recited in
> the claims.
>
> Req. Resp. Br. 14.

The Examiner notes that Owner's expert declarations lacked factual support to be persuasive "since they improperly import disclosed features from '291 into their analysis." RAN 22.

Consequently, we find the Examiner properly considered all of the objective evidence submitted by Appellant and found such evidence, including expert declarations, not to be persuasive.

Owner also specifically argues that the Examiner erred in rejecting claim 10 "because Sortino fails to teach maximum drawdown or monitor functions." App. Br. 20-21.

In the Original Reexamination Request, Requester asserts that Sortino discloses "determining a return rate function" for the sampled investments and also discloses monitoring the results (a monitor function). Issue 1, Req. Reexam. 29.

The Examiner adopted Issue 1, as noted in the RAN, at page 25-26.

We find that the return rate function of Sortino clearly suggests the ability to determine a maximum drawdown capacity of an analyzed investment, in view of a broadest reasonable definition of "drawdown capacity." Similarly, a "monitor" function is expressly disclosed. Therefore we find the Examiner did not err in rejecting claim 10.

Owner also argues that Efron, Barraquand and Stewart, either alone or in conjunction with the Admitted Prior Art, all fail to disclose the "missing Bias Parameter." App. Br. 22-25.

9

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1

For the reasons we set forth above in our analysis of Sortino, we find that the claimed "Bias Parameter" was clearly shown or suggested by Sortino and consequently we decline to address this argument.

Next, Owner argues Kaufman and Sortino fail to disclose "a statistical analysis request corresponding to two or more selected investments" and "performing resampled statistical analysis based upon the statistical analysis request" and that a person of ordinary skill would not have been motivated to combine Kaufman and Sortino. App. Br. 25-26, 28.

We have addressed the issue of "two or more selected investments" above. With regard to the combination of Kaufman and Sortino, Requester points out that Kaufman is analogous art under the two criteria which have evolved for answering that question: (1) it is in the same field of endeavor, and, (2) it is reasonably pertinent to the problem addressed by the '291 patent. *See In re Deminski*, 796 F.2d 436, 442 (Fed. Cir. 1986); *In re Wood*, 599 F.2d 1032, 1036 (CCPA 1979). The Examiner agreed with the Requester.

We agree with the Examiner for the reasons set forth above.

Finally, Owner argues the Examiner erred since Sortino fails to disclose a "database" as Sortino merely discloses "a text file with a single column of numbers" which "has no key or index." App. Br. 30.

Sortino, at page 31, discloses a table of S&P 500 Distributions from 1960 to 1988. We consider that description to encompass a "database" within the ordinary meaning of that term. As for the lack of a "key" or "index," we find those terms are not utilized within the claims. Consequently we agree with the Examiner's application of Sortino to claims 1-5, 8-16, 19-

10

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1

21 and 29-31, as noted in Grounds of Rejection 1-3 and 7-9 set forth above. As this finding is dispositive for all claims we do not reach the Examiner's alternative Grounds of Rejection 4-6.

## DECISION

The Examiner's decision adverse to the patentability of claims 1-5, 8-16, 19-21 and 29-31 is affirmed.

Requests for extensions of time in this proceeding are governed by 37 C.F.R. §§ 1.956 and 41.79(e).

<u>AFFIRMED</u>

JA12

Appeal 2015-001450
Reexamination Control 95/001,939
Patent US 6,349,291 B1


ack

Patent Owner:

FOSTER PEPPER PLLC
1111 3RD AVENUE SUITE 3400
SEATTLE, WA 98101-3299

Third Party Requester:

JOHN V. BIERNACKI
JONES DAY
901 LAKESIDE AVENUE
CLEVELAND. OH 44114



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,939 | 03/29/2012 | 6349291 | 206801-14000-100 | 7624 |

16579        7590        02/21/2014

Foster Pepper PLLC
1111 3rd Avenue Suite 3400
Seattle, WA 98101-3299

| EXAMINER |
|---|
| SAGER, MARK ALAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 02/21/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| Transmittal of Communication to Third Party Requester *Inter Partes* Reexamination | Control No. 95/001,939 | Patent Under Reexamination 6349291 | |
|---|---|---|---|
| | Examiner MARK SAGER | Art Unit 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

┌──── (THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS) ────┐

John V. Biernacki
Jones Day
901 Lakeside Avenue
Cleveland, OH 44114

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination prceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

| *Right of Appeal Notice* *(37 CFR 1.953)* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/001,939 | 6349291 |
| | Examiner | Art Unit |
| | MARK SAGER | 3992 |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --

Responsive to the communication(s) filed by:
Patent Owner on <u>30 August, 2013</u>
Third Party(ies) on <u>24 September, 2013</u>

Patent owner and/or third party requester(s) may file a notice of appeal with respect to any adverse decision with payment of the fee set forth in 37 CFR 41.20(b)(1) within **one-month or thirty-days (whichever is longer)**. See MPEP 2671. In addition, a party may file a notice of **cross** appeal and pay the 37 CFR 41.20(b)(1) fee **within fourteen days of service** of an opposing party's timely filed notice of appeal. See MPEP 2672.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

If no party timely files a notice of appeal, prosecution on the merits of this reexamination proceeding will be concluded, and the Director of the USPTO will proceed to issue and publish a certificate under 37 CFR 1.997 in accordance with this Office action.

The proposed amendment filed <u>30 August, 2013</u>    ☐ will be entered    ☒ will not be entered*

*Reasons for non-entry are given in the body of this notice.

1a. ☒ Claims <u>1-6,8-17,19-21 and 29-31</u> are subject to reexamination.
1b. ☒ Claims <u>7,18 and 22-28</u> are not subject to reexamination.
2. ☐ Claims _____ have been cancelled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims].
4. ☒ Claims <u>6 and 17</u> are patentable. [Amended or new claims].
5. ☒ Claims <u>1-5, 8-16, 16-21 and 29-31</u> are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____ ☐ are acceptable. ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is ☐ approved. ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d) or (f). The certified copy has:
    ☐ been received.    ☐ not been received.    ☐ been filed in Application/Control No. _____.
10. ☐ Other _____

**Attachments**
1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☐ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

*Reexamination*

This reexamination of U.S. Patent 6349291 (hereinafter '291 Patent or '291) regarding claims 1-5, 8-16, 19-21 and 29-31 continues from ACP mailed Aug 2, 2013 in response to Patent Owner reply received March 22, 2013 that amends claims 1, 10, 11, 21 and 29 and also in reply to Third Party Requester response received April 22, 2013.  Per Order, the claims 7, 18 and 22-28 are not subject of this reexamination.

## Identification of References

The references discussed in prior ACP mailed Feb 22, 2013 and herein are as follows:

- Sortino, Frank, A., *"The Look of Uncertainty,"* Investing, Vol. 4, No. 1, pp. 30-34, Winter 1990 ("Sortino");

- Barraquand, Jerome, *"Monte Carlo integration, quadratic resampling, and asset pricing,"* Mathematics and Computers in Simulations, vol. 38, pp. 173-182, 1995 ("Barraquand ");

- Kaufman, L., *"Using a Parallel Computer System for Statistical Resampling Methods,"* Computational Statistics Quarterly 2, pp. 129-141, 1988 ("Kaufman");

- Efron, B., *"Bootstrap Methods: Another Look at the Jackknife,"* The Annals of Statistics, vol. 7, no.1, pp. 1-26, Jan. 1979 ("Efron");

- Stewart, G. W., *"Parallel Linear Algebra in Statistical Computations,"* COMSTAT '88 Proceedings in Computational Statistics, pp. 3-14, 1998 ("Stewart");

- Hamilton, J., *"Time Series Analysis,"* Princeton University Press, 1994 ("Hamilton");

- U.S. Patent No. 5,862,325 ("Reed");

- Efron, et al., *"The Bootstrap Method for Assessing Statistical Accuracy,"* Laboratory for Computational Statics, Technical Report No. 19, Stanford University, 1985 ("Efron et al.").

Application/Control Number: 95/001,939                                    Page 3
Art Unit: 3992

- Johns, M., *"Importance Sampling for Bootstrap Confidence Intervals,"* Journal of the American Statistical Association, vol. 83, no. 403, Theory and Method, 1988 ("Johns").

### *Patent Owner Amendment*

1.      In consideration of Patent Owner's amendment filed August 30, 2013, the amendment fails to comply with 37 CFR 1.530(d)(2) and (f) in that for example claims 6, 10-11, 17 and 29 do not have the proper notation of claim changes *with respect to claims of '291* <u>rather than with respect to a prior amendment</u> and at least claims 6 and 17 do not have the proper status identifier after the claim number should be 'Amended' rather than 'Allowed/Confirmed…'.  It is suggested that Patent Owner review the claim markings and status identifiers of all claims with regards to 1.530 for any future response.  Although the remaining claims may comply with 1.530, an amendment in inter partes reexamination may not be entered in part.  Thus, the proposed amendment is **not entered** for failure to comply with 1.530.

2.      Also, in consideration of Patent Owner's amendment filed August 30, 2013 which is filed after a proper ACP (mailed Aug 02, 2013), it proposes to amend claims 1, 11, 14, 21 and 29 to add features/functions not previously of record in this proceeding or during its examination to becoming '291 Patent.  Patent Owner is reminded that after a proper ACP, Patent Owner has one opportunity to file a reply.

> After an Office action closing prosecution in an *inter partes* reexamination, the patent owner may once file comments limited to the issues raised in the Office action closing prosecution. The comments can include a proposed amendment to the claims, which amendment will be subject to the criteria of § 1.116 as to whether or not it shall be admitted.   37 CFR 1.951.

However, contrary to the Patent Owner contention on pages 1-5 and Section IV.F, pages 37-40, their response fails to comply with any requirement of 37 CFR 1.116 for the reasons succinctly

stated in section (C) on page 5 of the 1.181 Petition Decision mailed Jan 24, 2014 and as

extensively rebutted in section III. A on pages 6-18 (this is not agreeing with any suggested new

rejections therein since newly claimed merits have not been considered but instead it is only

agreeing with Requester position that Patentee response fails to comply with 1.116) of

Requester's response received Sept 24, 2013, both incorporated herein to extent stating Patentee

fails to comply with 1.116. To be clear, the Amendment does not comply with any requirement

of form expressly set forth in a prior office action because no requirement of form was expressly

set forth in a prior office action. 37 CFR §1.116(a). Also, the Patent Owner's response does not

present how their proposed amendment places the claims in better form for consideration on

appeal; however, upon review, the amendment does not place claims in better form for

consideration on appeal because it adds new features/elements which increases complexity in the

reexamination proceeding if entered rather than reduce them. Thus, for this reason, the proposed

amendment does not place any of the rejected claims in better form for consideration on appeal

so as to fail to comply. 37 CFR §1.116(b). In addition, Patent Owner has not shown good and

sufficient reasons why the amendment touching on the merits of the '291 patent under

reexamination are necessary and not earlier presented where the Patent Owner contends that the

new claims "require only a cursory review by the Examiner", "are in specific response to issues

first clearly raised by 3rd Party Requester's Response and the ACP and therefore could not have

been earlier presented" is incorrect upon cursory review of record for reasons stated in

aforementioned Requester's reply that these amendments could have been presented to respond

to the first action mailed May 18, 2012 but Patentee opted to argue a broader form of their

invention. Patentee delay to further limit their invention until now is not persuasive reason to

permit entry when they may have presented them earlier and is not a basis to re-open prosecution

to permit their entry since it was Patent Owner who opted to argue a broader form initially where

same art was applied under same statute with same basis was stated that the claims were broader

than asserted by Patentee and their experts who improperly imported limitations from '291 into

the claims/analysis whereby the alleged limitations were not claimed at that time but rather only

argued as a patentable distinction such that Patentee was seeking protection for a broader form of

the invention.  Thus, the Patent Owner, contrary to their opine on page 5 and Section IV.F failed

to provide a good and sufficient reason why the amendments are necessary and were not earlier

presented as required for entry of amendment to the claims after a proper ACP.   Also, to extent

Patent Owner contends the new features/elements in the amendment address the issues first

raised by Requester's Response and the ACP, the Examiner disagrees since the added

features/elements were raised in the Request as applied in the first office action and the first ACP

(supra) in the rebuttal by Requester adopted by examiner that state the claims were broader and

lacked the features/elements asserted by Patentee and their experts as patentable distinction as

lacking in the applied references.  Thus, the Patent Owner remarks in Section I.A (pages 1-5) and

IV.F  (pages 37-40) is pleading to continue prosecution to add new forms of their invention not

previously presented that would increase complexity by adding new issues rather than reducing

them.  Contrary to Patent Owner opine in Section IV.F, the Examiner did not suggest any of the

limitations proposed in their recent Amendment but instead, the Examiner was responding to the

Patentee rebuttal and their experts who were improperly importing features disclosed in '291 that

were not definitively claimed as clearly stated by Examiner therein and as similarly succinctly

stated in the section (B) on page 4 of the 1.181 Petition Decision mailed Jan 24, 2014 that states

in part:

> The examiner is simply rebutting Patent owner's position that the references do not disclose the claimed
> invention as he/she is required to do. It is axiomatic that an examiner must reply to all arguments, including
> any asserted advantages, advanced by Patent owner in response to a rejection. See 37 CFR 1.104 and 1.112;
> see also MPEP 707 et seq. and in particular MPEP 707.07(f).

Thus, it is evident that the Examiner was articulating that the Patentee and their experts were

arguing patentability for features/functions that were, at that time, not a requirement of the

claimed invention to be limiting or distinguish over the applied references to lack nexus to be of

probative value as stated therein. The action did not state any of these features or functions to be

a patentable distinction, but rather it only stated that their rebuttal was not commensurate in

scope with the claimed invention. For each of the above reasons, the proposed amendment

received Aug. 30, 2013 is **not entered**. Thereby, all discussion by Patentee and their experts'

testimony solely regarding the new limitations is not further considered as moot for not being

relevant to the merits (e.g. lacking nexus) of this proceeding.

### *Supplemental Amendment/Response*

Finally, regarding Patent Owner's supplemental response filed Feb 12, 2014, the Patent

Owner is reminded they are permitted to once file a response to an ACP, as quoted above in

paragraph 2 from 37 CFR. 1.951. However, this paper is **not entered**; whereby, while it regards

a supplemental response under 1.945, the supplemental response fails to comply with 37 CFR

1.945 ((b) where there is no explanation of how the requirements of 1.111(a)(2)(i) are satisfied,

the 'correction' is not clear to be typographical error due to the substantive/extensive additional

cited evidence and there is no compelling reason to enter the supplemental response. Patent

Owner failed to provide a reason to enter changes to their first response at this late date.

### *Rejections Proposed in the Request*

3.      The following regards the rejections as proposed in the Request (as also generally stated

in Order on pages 3-5):

Issue 1:        Claims 1-5, 10-16, 19 and 21 are anticipated by Sortino.

Issue 2:        Claims 6-7, 17 and 18 are rendered obvious over Sortino in view of

Hamilton.

Issue 3:        Claim 8 and 9 are rendered obvious over Sortino in view of Efron.

Issue 4:        Claim 20 is rendered obvious over Sortino in view of Patentee admitted

prior art.

Issue 5:        Claims 1, 11-13 are anticipated by Barraquand.

Issue 6:        Claims 1-5, 10, 14-16, 19 and 21 are rendered obvious over Barraquand in

view of Sortino.

Issue 7:        Claims 6-7, 17 and 18 are rendered obvious over Barraquand in view of

Sortino and Hamilton.

Issue 8:        Claims 8 and 9 are rendered obvious over Barraquand in view of Sortino

and Efron.

Issue 9:        Claim 20 is rendered obvious over Barraquand in view of Patentee

admitted prior art.

Issue 10:       Claims 22-24 and 29 are anticipated by Barraquand.

Issue 11:       Claim 25 is rendered obvious over Barraquand in view of Sortino.

Issue 12:       Claims 26-28 are rendered obvious over Barraquand in view of Reed.

Application/Control Number: 95/001,939                                        Page 8
Art Unit: 3992

    Issue 13:    Claim 30 is rendered obvious over Barraquand in view of Patentee

admitted prior art.

    Issue 14:    Claims 31 is rendered obvious over Barraquand in view of Stewart.

    Issue 15:    Claims 22-25 are rendered obvious over Sortino in view of Kaufman.

    Issue 16:    Claims 26-28 are rendered obvious over Sortino in view of Kaufman and

Reed.

    Issue 17:    Claim 29 is rendered obvious over Kaufman in view of Sortino.

    Issue 18:    Claim 30 is rendered obvious over Kaufman in view of Sortino and

Patentee admitted prior art

    Issue 19:    Claim 31 is rendered obvious over Kaufman in view of Sortino and

Stewart.

**New Rejections Proposed in Requester's 4/22/2013 reply in response Amendment**

    Issue 20:    Claims 1-5, 8-16, 29-21 and 29-31 fail to demonstrate adequate written

support for claims as amended.

4.    Since the aforementioned Amendment is not entered for reasons stated in paragraphs 1-2,

the issues remain as stated in ACP mailed Aug. 2, 2013 as incorporated herein. The Order

denied an RLP was present in issues 2, 7, 10 (only with regards to claims 22-24), 11-12 and 15-

16 so those issues are not further discussed herein since the time has passed for considering a

properly filed petition to reconsider those issues. To be clear, issue 10 continues to have present

claim 29 that remains appealable as a pending issue in this reexam, but issues 2, 7, 10 (i.e. only

claims 22-24), 11-12 and 15-16 are not appealable since they were deemed to not demonstrate a

RLP and were petitionable. See MPEP 2647 and 2648. The proposed rejections in issues 1, 3-

4, 10 (only claim 29), 13-14 and 17-19 are <u>adopted</u>; while, the proposed rejections in Issues 5-6,

8-9 and 20 are not adopted for reasons stated in ACP, updated for each Party Responses herein.

Thus, claims 1-5, 8-16, 19-21 and 29-31 are rejected, claims 6 and 17 (entered per second ACP,

paragraph 4) are allowed as amended and claims 7, 18 and 22-28 are not subject of this reexam.

*Response to Amendment*

5.      The declarations by Dr. Leonard Kaufman, Dr. Philip Neches and Dr. Sam Savage, under

37 CFR 1.132 filed Aug. 30, 2013 are each **not entered** for same reasons stated in paragraph 2

above regarding the Amendment for failure to comply with requirement of 37 CFR 1.116 to

provide good and sufficient reasons for their entry now and not earlier presented where their

rebuttal that it was in reply to Requester reply and ACP is not persuasive as facts show.  As

similarly stated in Section III.B.2 in last paragraph on page 21 to page 22 in Requester reply filed

Sep 24, 2013, the testimony by Dr. Kaufman, that discusses testimony by Dr. Hopke and Dr.

Bloomfield, both filed Nov. 5, 2012, is untimely since to have been timely, Dr. Kaufman's recent

testimony should have been filed with Patent Owner response on 22 March 2013 but Patent

Owner did not state a good and sufficient reason this testimony was necessary now with a reason

for not being earlier presented.  The testimony by Dr. Neches that responds to Examiner

comments of his earlier filed declaration in ex parte reexamination 90012366 so as to not be

pertinent to merits in this proceeding since the claims being reexamined in 90012366 are a subset

of the claims (with different art applied under different statute therein) that were denied in the

Order of this proceeding (see Order mailed 5/18/2012 of this proceeding and Order mailed

7/20/2012 of 90012366) whereby Patentee does not show good and sufficient reason to enter a

rebuttal of remarks reviewing a testimony from another proceeding (i.e. 90012366) is relevant to

Application/Control Number: 95/001,939                                              Page 10
Art Unit: 3992

merits so as to have nexus in this proceeding (i.e. 95001939) when the claims in the other

proceeding are not the claims and issues in this proceeding for not regarding same claims or

same art applied under same statute(s), supra. Thus, Patentee failed to present good and

sufficient reason why this testimony is necessary so as to be relevant to claims/issues in this

proceeding and reason it was not earlier presented. The Patent Owner was notified IAW 2618,

cited in page 3 of ACP, to not cross file declarations between proceedings especially where the

Patent Owner fails to show nexus for claimed invention and applied art as discussed in the

testimony filed in one proceeding with respect to the other proceeding when the issues differ or

at least the Patentee fails to show specifically the issues are the same where even though the

proceedings regard '291, the merits differ (supra). The testimony by Dr. Savage that provides his

interpretation of the applied Sortino reference is not timely since the Sortino reference was in

part reason for Order Granting this reexamination (at least issues 1-4, 6 and 8-9 therein), Sortino

reference was applied in the first action by adopting proposed rejections from Request and those

rejections were maintained in the first ACP mailed Feb 22, 2013 but Patent Owner and Dr.

Savage did not provide this recent testimony by Dr. Savage in response to either the first action

or the first ACP so the record clearly shows this testimony is not timely and Patent Owner did

not provide good and sufficient reason the declarations are necessary and not earlier presented.

For these reasons, the declarations by Dr. Kaufman, Dr. Neches and Dr. Savage are **not entered**.

6.      The declarations of Drs. Jerome Barraquand, William Bethke, Thomas Herzog, Leonard

Kaufman, Philip Neches, Sam Savage, Frank Sortino, Michael Spence and Thomas Tombrello in

support of Patent Owner under 37 CFR 1.132 filed Aug 39, 2013 is insufficient to overcome the

rejection of claims 1-5, 8-16, 19-21 and 29-31 based upon anticipation and/or obviousness by

Sortino, Barraquand, Kaufman, Efron, Stewart and Patentee admitted prior art as set forth in the

last Office action because:  essentially, the Examiner agrees with Patentee  request in Section IV

B-C, pages 31-32 to enter the supplemental expert declarations of Drs. Barraquand, Bethke,

Herzog, Kaufman, Neches, Savage, Sortino Spence and Tombrello that were co-filed with the

recently proposed amendment after a proper ACP that solely perfects their respective statement

regarding compensation not being linked to the outcome of this reexam to address issue in

paragraphs 5-6 in ACP mailed Aug 2, 2013 are entered.  It is noteworthy that Requester's experts

did not co-file analogous supplemental declaration for this issue that was similarly stated on page

9 of the ACP.  Thereby, as a result, the weighting for each of the Patentee experts testimony is

revised from 'afforded **some** weight but less than otherwise if the issue was clear' as stated in the

ACP to state herein 'afforded **some** weight' as revised for their supplemental testimony that

perfects their respective compensation issue.  In distinction, since the testimony of each

respective Requester's exerts testimony declarations were not supplemented to clarify the record

with regards to their affiliation as noted on page 9 of the ACP, their weighting is revised

accordingly to 'weighted a **little less** than each respective Patent Owner's expert's testimony'

from ACP stating 'weighted a little more than each respective Patent Owner's expert's

testimony.'  Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 305 n.42, 227

USPQ 657, 673-674 n. 42 (Fed. Cir. 1985), cert. denied, 475 U.S. 1017 (1986).  Thereby, in

essence, the review of the expert declarations by Drs. Barraquand, Bethke, Herzog, Kaufman,

Neches, Savage, Sortino, Spence and Tombrello filed 22 March 2013 were reviewed and

considered for their testimony therein as stated in ACP mailed 02 Aug 2013 incorporated herein

where the content of their testimony remains not persuasive for reasons stated therein (with

weighting as noted above) due to not being commensurate in scope with the claims under reexam

in this proceeding so as to lack nexus and their respective testimony improperly import disclosed

limitations of '291 into their analysis of differences between applied art and disclosed invention

(rather than claimed invention).

In this proceeding, the totality of Patent Owner's rebuttal evidence including their

expert's testimonies fails to outweigh the anticipation and/or obviousness of the applied art for

reasons stated in Request with rebuttal by Requester and the Requester's experts as noted herein.

### *Response to Arguments*

7.      Patent Owner's arguments filed Aug. 30, 2013 have been fully considered but they are

not persuasive.  At the outset, since the proposed claim amendments are not entered for reasons

in paragraphs 1-2, the examiner did not review their respective merits including whether each of

the new limitations is supported by '291.

However, in general consideration of Patent Owner arguments with support by their

experts' testimony, to the extent that they rely solely on the newly added language as in Patent

Owner remarks in Section III.A, their arguments are not persuasive for not being commensurate

in scope with the claims so as to lack nexus since the amendments with newly added limitations

has not been entered (supra) since entry of claim amendments is no longer a right to unrestricted

prosecution after a proper ACP, Patent Owner failed to comply with 1.530 and 1.116 for their

entry, failed to show that Patent Owner acted as their own lexicographer as discussed in ACP

paragraph 5-6  including reference to Fig 9A that is only a non-limiting data point and failed to

factually show these newly claimed features/elements are inherent to '291 claims (supra). See

MPEP 2672.

Further, to the extent that the Patent Owner with support by their experts' testimony rely

on their prior arguments (although which prior arguments is not clear and a reference to all prior

arguments is not proper or timely per 37 CFR 1.116), the Examiner reiterates the responses to

their prior arguments to each Issue maintained herein from ACP mailed 2 Aug 2013 (as modified

for weighting of expert's testimony as noted herein) where those arguments by Patent Owner

remain not persuasive for same reasons restated next as copied from paragraph 6. Essentially,

responsive to aforementioned Patent Owner's reply filed March 22, 2013 with their experts'

testimony filed with their July 18, 2012 response and consideration of Requester reply filed April

22, 1013 with their experts' testimony filed with their November 15, 2012 reply, the examiner

generally agrees with facts cited by the Requester with review of each of the testimonies above

regarding applied art for reasons stated above incorporated herein but note reconsideration of

Barraquand with regards to claims 29-31 due to claim breadth as detailed below. Facts stated in

Request are relied on herein. For consistency, the discussion herein follows discussion as

presented in Patentee reply filed March 22, 2013 rather than each rejection/issue in turn.

    a.    <u>Comments regarding claim interpretation of resampling</u>:

<u>Patent Owner</u> – Patent Owner argues on pages 3-5 that Dr. Glasserman cites to absolutely

nothing while they cited extensively to the ['291] specification, the definition of resampling was

implicit in Efron see Footnote #2 and Patent Owner argues Requester's broad interpretation is

not based on the '291 specification where in part it ignores that the 'period parameter' is distinct

from bias parameter.

    <u>Third Party Requester</u> – Requester did not separately reply to this issue but instead

addressed in rebuttal of arguments of both Sortino and Barraquand below incorporated herein.

Application/Control Number: 95/001,939                                    Page 14
Art Unit: 3992

Examiner – Although Requester did not readdress claim interpretation of resampling or

resampling process in the current reply, however, from their prior reply filed November 15, 2012

pages 4-6 plus Dr. Glasserman's testimony (also cited by Patent Owner), the Examiner agrees

with Requester and Patent Owner that claims must be read in view of the specification as noted

in *Phillips v. AWH Corp.* and agrees with Requester's prior reply to extent it addressed this issue.

In this case, Patent Owner failed to exercise their right to be their own lexicographer by clearly

stating their definition where their reference to Efron in '291 for copying prior art figure 9a

therein does not demonstrate that Patent Owner acted as their own lexicographer and does not

provide support for inherency of their definition of resampling or resampling process but rather it

merely is a data point of the scope of resampling where it does not establish that the definition of

resampling or resampling process of '291 must always include a timing or temporal element for

the period parameter (as implied by Patentee and their experts) but it is an optional element in a

dependent claim.  It is noted that although the claims are interpreted in light of the specification,

limitations from the specification are not read into the claims. In re Van Geuns, 988 F.2d 1181,

26 USPQ2d 1057 (Fed. Cir. 1993) (Claims to a superconducting magnet which generates a

"uniform magnetic field" were not limited to the degree of magnetic field uniformity required for

Nuclear Magnetic Resonance (NMR) imaging. Although the specification disclosed that the

claimed magnet may be used in an NMR apparatus, the claims were not so limited.); Constant v.

Advanced Micro-Devices, Inc., 848 F.2d 1560, 1571-72, 7 USPQ2d 1057, 1064-1065 (Fed.

Cir.), cert. denied, 488 U.S. 892 (1988) (Various limitations on which appellant relied were not

stated in the claims; the specification did not provide evidence indicating these limitations must

be read into the claims to give meaning to the disputed terms.); Ex parte McCullough, 7 USPQ2d

1889, 1891 (Bd. Pat. App. & Inter. 1987) (Claimed electrode was rejected as obvious despite

assertions that electrode functions differently than would be expected when used in nonaqueous

battery since "although the demonstrated results may be germane to the patentability of a battery

containing appellant's electrode, they are not germane to the patentability of the invention

claimed on appeal.").  In this case, the Patent Owner and their experts extensively rely on

disclosed features in their filed response such as the temporal requirement for the 'period

parameter' that is presently only in claim 13 of the claims under reexam herein but the language

of claim 13 makes the "period" or temporal element one option of a list of options in a Markush

grouping so as to not be a limitation of claim 1 by doctrine of claim differentiation and the

'period parameter' is not present in independent claims 11 and 29 (and their associated

dependent claims).  Thus, resampling or resampling process of '291 claims does not presently

require a 'period' or temporal element in all instances contrary to Patentee opine and there is no

basis for the claims to be solely or always limited by a period or temporal element as argued by

Patent Owner and their experts since the claims do not require that feature in every instance of

'291 claims (i.e. claims are broader due to the optional language).  It is noteworthy that if Patent

Owner desired to have a temporal restriction in all cases, they had the opportunity to amend to

require the period parameter in a manner that it was not optional, but instead they opted to argue

the broader form that is not limited to a period or temporal limitation in all cases.  Thus, the

claimed resampling or resampling process of '291 is broader than argued by Patent Owner and is

not presently solely limited to a period parameter since presently it is optional to thereby not be a

limiting element when period is not part of the analysis request.

Application/Control Number: 95/001,939                                                      Page 16
Art Unit: 3992

     b.    <u>Comments regarding Sortino</u>:

    <u>Patent Owner</u> – In general, Patent Owner asserts with support of testimony by Drs.

Sortino, Savage and , Herzog on page 6-17 that Sortino does not teach a "bias parameter" where

all examples cited by Requester and Dr. Glasserman's declaration do not involve determining a

degree of randomness in actual sample selection.  Patent Owner continues that if Sortino

introduces any bias from randomness, it would bias in the selection **of** sample space to do

resampling **from, <u>not</u>** in selection **of samples from** that sample space once that space had been

selected.  Thus the Sortino identification of different scenarios reflects a deliberate decision and

solely in this sense does introduce bias; but, such bias would correspond to step (a) selecting a

sample space from which to draw samples, not the selection of samples, from, for example, that

sample space, and therefore not "in sample selection" in a resampling process.' (emphasis by

Patentee).   Patent Owner also states that Sortino himself describes in his declaration, his

subjective weighting of various scenarios happened only after the "resampling" or selection of

samples of various scenarios was completely done.  The Patent Owner concludes Sortino does

not teach a bias parameter as now claimed in 1 and 11; while, claims 2-5, 12-16, 19 and 21 are

allowable because they depend from 1 and 11 and claims 10 and 21 are allowable for also

deleting 'gross rate of return function'.  On page 18, Patentee argues Efron and admitted prior art

do not supply the missing bias parameter as now claimed.

    <u>Third Party Requester</u> – Requester states on pages 10-16 (Section V. A. 1-5) with

consideration of testimony by Drs. Bloomfield and Glasserman that Sortino discloses a

resampling analysis with a bias parameter that determines a degree of randomness in sample

selection in a resampling process in multiple ways by restricting/selection of different economic

scenarios, by applying subjective weighting for different scenarios, and/or combining the

weighted scenarios. On page 16, Requester states the dependent claims remain unpatentable.

Examiner – The examiner agrees with Requester that although the language 'bias

parameter' is not present in Sortino, Sortino discusses a bias in sample selection in a resampling

process so as to regard a bias parameter being applied for the reasons stated by Requester. It is

noteworthy that contrary to Patent Owner statement that claim 21 is amended to eliminate 'gross

rate of return function', claim 21 was not amended.

c.    Comments regarding Kaufman and Sortino:

Patent Owner – In general, Patent Owner alleges on pages 18-25 and 27-43 with support

of testimonies by Sortino, Savage, Kaufman, Bethke, Spence Neches, and Herzog and to extent

any other is implied by their improper general reference in Footnote 6 on page 23, that Sortino

and Kaufman (and admitted prior art and Stewart) do not disclose 'two or more investments' as

presently claimed where Sortino himself made clear his methodology was limited to analyzing a

single asset at a time, he combined his distributions into a "combined" distribution, there was no

way to maintain coherence, it is mathematically impossible for Sortino to produce a joint

distribution, Sortino only analyzes a single investment, Sortino does not analyze more than one

security, cannot preserve coherence, may not perform sampling two or more investments

simultaneously with a single request. Patent Owner continues to dispute Kaufman is analogous

art or obvious to combine with Sortino, alleges Kaufman fails to provide the 'two or more

investments' lacking in Sortino for claim 29; while, claim 30 and 31 are allowable for at least

same reason. Patent Owner alleges that admitted prior art and Stewart also fail to disclose

system for analyzing two or more investments as in claim 29 with claims 30 and 31 allowable for

same reason.

Third Party Requester - Requester states, on pages 17-25 (Section V. B. 1-6) with support

from their experts testimony, facts to show Sortino is not limited to a statistical analysis of a

single investment or a single asset so as to regard performing a statistical analysis of two or more

investments under broadest reasonable interpretation of the claimed function that do not regard a

temporal limitation improperly read into the claims from its specification since 'simultaneously'

and 'at a time' is not claimed.  Likewise, claim 29 does not recite coherence, a joint distribution,

a coherent joint distribution or coherently statistically analyzing selected investments is not

claimed.  Requester states Kaufman is analogous art under the two prong test for being in the

same field of endeavor and/or is reasonably pertinent to the problem addressed in '291.

Requester also stated Patentee reliance on Wang Laboratories, Inc. v Toshiba Corp. is misplaced

where US Supreme Court decision in KSR v Teleflex is more applicable.  Requester reiterates

from ACP as stated in Request that it would have been obvious to combine Sortino and Kaufman

(and admitted prior art or Stewart as applicable) for reasons stated previously in record.

Examiner - The examiner agrees with Requester for reasons stated in their reply and

prior ACP paragraphs 11-21 and 25-28 for the same issue/features due to claims being broader

than argued by Patent Owner and their experts who extensively improperly import elements from

'291 into their arguments that are not persuasive thereby and failed to factually show Patent

Owner acted as their own lexicographer and/or that the functions are necessarily present so as to

be inherent (supra).

    d.    <u>Comments regarding Barraquand alone or in combination:</u>

<u>Patent Owner</u> – Patent Owner did not directly reply to this issue in their April 15, 2013

reply, but cites their prior reply July 18, 2012 pages 18-26 with their experts' testimonies.

<u>Third Party Requester</u> – Requester argues in Section VII on pages 27-32 that Barraquand

discloses the Xi and Yi values as the "distribution function" of claim 1 and the "distribution" of

claim 11 that is generated by a re-sampled statistical method; while, claim 1 requires plotting,

claims 11 and 29 do not.  Requester argues Patent Owner has admitted the Xi and Yi values are

generated by a method which Paten Owner has equated with "resampling" in its infringement

contentions in the parallel litigation (supra).  Requester argues that in Dr. Barraquand own words

[in his testimony] a "distribution" can be defined by a mean and a covariance matrix and

accordingly Barraquand reference explicitly discloses the Xi values as a "distribution" having a

probability along with a computed mean and covariance.  In view of this with the Yi values

being a linear transformation of Xi, the Xi values and Yi values are a "distribution" or a

"distribution function" as broadly clamed.  Requester argues Barraquand reference also plots the

distribution function.

<u>Examiner</u> – With regards to claims 1 and 11-13, the examiner generally disagrees for

same reasons stated in ACP paragraphs 22-23 on pages 12-13 that, essentially, since Barraquand

does not show a distribution or distribution function (claims 1 and 11-13) and Barraquand does

not generate a plot of the distribution function (claim 1, and similarly claim 12) and there is no

support in Request or their replies to show reliance on Sortino or other applied art to demonstrate

a prima facie case.  However, regarding claim 29-31, in reconsideration of its scope and

teachings of applied art, although Requester fails to address claim 29 in their April 22, 2013

reply for its specific limitations that do not regard same functions of 1 and 11-13 [e.g. name of

the game is the claim], the examiner agrees with facts in Request pages 73-75 and 79-81 and

prior Requester reply received November 15, 2013 pages 2 and 14-17 regarding Barraquand for

claims 29-31 for broadest reasonable interpretation of the claimed elements in consideration of

'291 without improperly importing elements into the claims where claims 29-31 are broader than

1 and 11-13.


     e.     <u>Comments regarding their experts' declarations:</u>

<u>Patent Owner</u> – Patent Owner contends on pages 43-49 that their experts' declarations

provide both primary and secondary objective indicia of non-obviousness where the declarations

were not fully or adequately considered in the ACP.

     <u>Third Party Requester</u> – Requester states on pages 26-27 that the Patent Owner failed to

identify which indicia the evidence pertains, failed to establish nexus through these declarations

between any purported "objective evidence" and the '291 claims where since the Patent Owner

declarations are almost entirely divorced from '291 claims, the declarations provide no evidence

of nonobviousness. Requester states aspects of Patent Owner's declarations were credited and

other aspects were not credited [for being persuasive] but contrary to Patent Owner's assertion,

the analysis in the ACP demonstrates the declarations were given fair and careful consideration

and due weight to all evidence.

     <u>Examiner</u> – The expert testimony by each Party was considered and the record is clarified

to specifically state their consideration and weighting where, as recognized by Requester, Patent

Owner's experts fails to establish a nexus for their testimony to have probative value due in part

Application/Control Number: 95/001,939                                              Page 21
Art Unit: 3992

to their extensive improper importing of elements from '291 into their review that fails to be

commensurate in scope of the claims under reexam to thereby lack nexus to be of probative

value and not be persuasive when their cumulative evidence is weighed as stated above.

### Weighting and Finality

8.        Also, in consideration of Patent Owner's amendment filed August 30, 2013, Patent

Owner contends in part in Section IV, pages 23-40, including page 23, that "their experts'

declarations were improperly weighted", the "Examiner afforded little weight to the Patent

Owner's expert declarations" and "the Examiner purposefully discredited these highly relevant

declarations on the unfounded assumption that the declarants were biased", the Examiner is

puzzled since there is no statement that 'little weight' was afforded to any of the expert's

declarations or that the Examiner stated any Declarant was biased or that any testimony was

discredited.  But, Examiner maintains their respective weighting is proper as stated therein.

Instead, the ACP states in part on page 9 in review of Patent Owner's experts' testimony that

'each of their testimony has been afforded **some** weight but less than otherwise if the issue was

clearer as to their impartiality' that indicates a minor adjustment to weighting only since the

respective testimony was not clear but Examiner did not assume a bias but instead only indicated

record was not clear.  The only use of the term 'little' *in the ACP* (other than from a quote) is

with regards to review of Requester's experts' testimony as stated in part, on page 9, "each

respective Requester's expert testimony is weighted a *little more than each respective Patent

Owner's experts' testimony*" (emphasis herein).  So, the weighting adjustment due to the lack of

clarity for this issue was 'little' rather than the weighting of any respective expert's testimony.

Thus, Patent Owner and their experts' conclusion and related statements are based on misreading

statements in the ACP where the Patentee with their experts have overstated this issue in the

proceedings of '291. It regards a minor clarity of record issue where the Examiner did not

assume there was bias of **any** Declarant but instead only stated the record was unclear with

regards to compensation of the Patent Owner's <u>and Requester's</u> experts (ACP, page 9). As such

there was a minor weighting adjustment for both Parties' experts. But, with the recent

testimonies that only perfect the record for the compensation issue, the minor weighting

adjustment is revised as stated herein; while, the Requester's experts did not further supplement

the record and there is a resultant 'little' adjustment accordingly only since Patentee's experts

have clarified while Requester's have not. The emphasis of '**some**' as bolded in the ACP also

shows there was not a discredit of any expert. Rather, it is the content of the evidence and

rebuttal arguments that remains unpersuasive for reasons stated in the ACP paragraphs 5-6, as

copied herein. Also, contrary to Patent Owner remarks on page 26-31, the ACP does not state

that the respective experts are/were biased or that their testimony was 'purposefully discredited';

instead, this statement and related arguments therein are a red herring to distract that the content

submitted by Patent Owner including their experts' testimony lacks factual support to be

persuasive since they improperly import disclosed features from '291 into their analysis as

detailed throughout paragraphs 5-6 where those imported features are not positively claimed so

as to lack nexus to be of probative value (see relevant discussion of broadest reasonable

interpretation of claims, improper importing of disclosed features and weighting discussed on

pages 8-31 of ACP), the Patent Owner failed to act as their own lexicographer and failed to show

factually that those [imported] features relied on as a distinction were inherent to '291 claims as

stated in ACP paragraphs 5-6 where the analysis also states in part that the record (i.e. their

Application/Control Number: 95/001,939                                    Page 23
Art Unit: 3992

respective expert's testimony) was 'unclear' (ACP page 8-9, both Parties experts). But with the

Patent Owner's recent co-filed supplemental expert testimony (see rebuttal Section IV.C, pages

32-33) that only perfect to clarify the compensation issue, the particular supplemental

declarations perfecting the clarity of record are entered and the weighting revised thereby to

'afforded **some** weight' and the Requester's weighting revised to "weighted a **little less** than

each respective Patent Owner's expert's testimony" (supra). The analysis of the respective

expert's testimony stated in ACP is maintained as being proper as consistent with guidance in

MPEP 716, 2145 and case decisions applicable to review of expert testimony. So the Patent

Owner contention that the Examiner had assumed bias is an incorrect statement. The Patent

Owner remark on page 24-25 regarding misconstruing content with regards to Dr. Savage and

Dr. Neches prior testimony, the consideration of content of Drs. Savage and Neches previous

testimony (their recently filed testimony containing new testimony is not considered for reasons

stated in paragraphs 2 and 6 herein) as on pages 17-21 of the aforementioned ACP remain not

persuasive for reasons clearly stated therein. Also, contrary to Patentee remark on page 23-24

and 25-26 that cites page 4 and 6 of ACP, there is no request for respective experts to comment

on breadth of claims or their knowledge of intellectual property law. Instead, the ACP indicated

based on the expert's statements in their testimony that the experts relied on incorrect standard in

their analysis so as to state why the respective expert's analysis was not persuasive. Patent

Owner failure to interpret the analysis of how their experts review failed to be persuasive is

noted since when read in the proper context, it is clear there was no request for an expert to state

the information inferred by Patent Owner. The consideration of co-filed supplemental expert

testimony to only perfect the issue regarding clarity that their compensation being independent of

the outcome of this proceeding does not necessitate withdrawing finality of ACP to enter them

into this proceeding so as to provide Patent Owner two more actions as they have requested in

Section IV. E pages 35-37 and re-opening prosecution is counter to compact prosecution and

special dispatch where contrary to their opinion, the issues were clearly stated in the last ACP

and there were no new issues raised therein since the same references were applied against same

claims under same statute as stated in Request and first Official action, as likewise noted in

Sections (A) and (B) on pages 3-4 of the 1.181 Petition Decision mailed 24 Jan 2014.  The last

action was not a RAN, so Patent Owner was provided their opportunity to reply to the reset (e.g.

of issue 10, 13-14) done to be consistent with claim interpretation throughout proceeding as

stated in ACP with regards to Barraquand where Patent Owner is pleading to improperly

continue prosecution.  Also, the Patent Owner insinuates in Section IV.E, pages 35-36, that some

of Patent Owner expert declarations were not considered while not stating specifically which, if

any, testimony was not considered.  However, the record shows all testimony of '1939 has been

considered as reviewed in ACP paragraphs 5-6.  Further, Patent Owner postulates on page 36 the

finality is improper because the signatories by the Conferees after the panel review conference

including the signature of the original examiner, the Patent Owner's reasoning is faulty since the

composition of the panel complied with procedure for conference panel, the signature was not of

original examiner as alleged by Patentee and thereby his conclusion is incorrect but the

participants of the panel is not a basis for removal of a proper final in any case.  In summary, the

Patent Owner request, in Section IV.E on pages 35-37, stating similar rationale as present in their

1.181 and 1.812 filed petitions, to reopen prosecution so as to remove the finality of the ACP is

unpersuasive for same reasons stated in Sections (A) and (B) on pages 3-4 of the Decision

mailed 24 Jan 2014 to their Petition under 1.181 and reasons stated in Section III. A-B, pages 6-

22 of Requester reply filed Sept 24, 2013 (only with regards to entry of amendment and ACP

being proper rather than with regards to suggested new rejections therein).  Also with regards to

Patent Owner remarks in Section IV.D, pages 33-35 of actual evidence of risk of bias, the

weighting of the Requester's experts is proper as consistent with guidance cited in ACP as noted

herein whereas Patentee has firmly argued in Section IV, pages 23-40, the Examiner cannot

assume bias where no positive averment is evident where it is for the expert to aver a situation of

(potential) bias.  However, in review of this record, there is no averment by any expert of a risk

of bias so no bias has been assumed/presumed for any expert in the ACP and herein (contrary to

Patent Owner and their experts remarks that they assert examiner stated their experts were

biased).  Patentee cannot have it one way for their Party but another way for the other Party.

     Finally, with regards to Requester's reply in Section C, pages 22-24 of their reply filed 24

Sept 2013, their request is moot due to entry of a subset of expert testimony to resolve the minor

issue regarding compensation but denial of entry for claim amendments and three declarations

whereby the merits of the testimonies is not altered but only their weight as stated above.


### *Claim Rejections - 35 USC § 102/103*

9.    The text of those sections of Title 35, U.S. Code not included in this action can be found

in a prior Office action.

### Issue 1 (Adopted)

10.    Claims 1-5, 10-16, 19, and 21 are rejected under 35 U.S.C. 102(b) as being anticipated by

Sortino. The prior art shows each limitation for broadest reasonable interpretation of claims as

detailed in the proposed rejection on pages 22-35 of Request which is ADOPTED and hereby

incorporated by reference into this action for reasons stated in paragraphs 6-8.

### Issue 3 (Adopted)

11.     Claim 8 and 9 are rejected under 35 U.S.C. 103(a) as being unpatentable over Sortino in

view of Efron.  The combination of the prior art when taken as a whole at time of the invention

by an artisan it renders obvious to show each limitation for broadest reasonable interpretation of

claims as detailed in the proposed rejection on pages 40-41 of Request which is ADOPTED and

hereby incorporated by reference into this action for reasons stated above in paragraphs 6-8.

### Issue 4 (Adopted)

12.     Claim 20 is rejected under 35 U.S.C. 103(a) as being unpatentable over Sortino in view

of Patentee admitted prior art.  The combination of the prior art when taken as a whole at time of

the invention by an artisan it renders obvious to show each limitation for broadest reasonable

interpretation of claims as detailed in the proposed rejection on page 42 of Request which is

ADOPTED as incorporated by reference into this action for reasons stated in paragraphs 6-8.

### Issue 5 (Not Adopted)

13.     Claims 1 and 11-13 were proposed to be anticipated by Barraquand.  This rejection

proposed in Request is not adopted for reasons stated in paragraphs 5-6 of ACP mailed Aug 2,

2013.

### Issue 6 (Not Adopted)

14.    Claims 1-5, 10, 14-16, 19 and 21 were proposed to be rendered obvious over Barraquand in view of Sortino.  This rejection proposed in Request is not adopted for reasons stated in paragraphs 5-6 of ACP mailed Aug. 2, 2013.

### Issue 8 (Not Adopted)

15.    Claims 8 and 9 were proposed to be rendered obvious over Barraquand in view of Sortino and Efron.  This rejection proposed in Request is not adopted for reasons stated in paragraphs 5-6 of ACP mailed Aug 2, 2013.

### Issue 9 (Not Adopted)

16.    Claim 20 is proposed to be rendered obvious over Barraquand in view of Patentee admitted prior art.  This rejection proposed in Request is not adopted for reasons stated in paragraphs 5-6 of ACP mailed Aug 2, 2013.

### Issue 10 (Adopted)

17.    Claim 29 is rejected under 35 U.S.C. 102(b) as anticipated by Barraquand.  The prior art shows each limitation for broadest reasonable interpretation of claims as detailed in the proposed rejection on pages 73-75 of Request which is ADOPTED as incorporated by reference into this action for reasons stated in paragraphs 6-8.

### Issue 13 (Adopted)

7.    Claim 30 is rejected under 35 U.S.C. 103(a) as being unpatentable over Barraquand in view of Patentee admitted prior art.  The combination of the prior art when taken as a whole at

time of the invention by an artisan it renders obvious to show each limitation for broadest

reasonable interpretation of claims as detailed in the proposed rejection on pages 79-80 of

Request which is ADOPTED as incorporated by reference into this action for reasons stated in

paragraphs 6-8.

### Issue 14 (Adopted)

8.    Claim 31 is rejected under 35 U.S.C. 103(a) as being unpatentable over Barraquand in

view of Stewart. The combination of the prior art when taken as a whole at time of the invention

by an artisan it renders obvious to show each limitation for broadest reasonable interpretation of

claims as detailed in the proposed rejection on page 81 of Request which is ADOPTED as

incorporated by reference into this action for reasons stated above in paragraphs 6-8.

### Issue 17 (Adopted)

9.    Claim 29 is rejected under 35 U.S.C. 103(a) as being unpatentable over Kaufman in view

of Sortino. The combination of the prior art when taken as a whole at time of the invention by an

artisan it renders obvious to show each limitation for broadest reasonable interpretation of claims

as detailed in the proposed rejection on pages 94-95 of Request which is ADOPTED as

incorporated by reference into this action for reasons stated above in paragraphs 6-8.

### Issue 18 (Adopted)

10.    Claim 30 is rejected under 35 U.S.C. 103(a) as being unpatentable over Kaufman in view

of Sortino and Patentee admitted prior art. The combination of the prior art when taken as a

whole at time of the invention by an artisan it renders obvious to show each limitation for

Application/Control Number: 95/001,939                                    Page 29
Art Unit: 3992

broadest reasonable interpretation of claims as detailed in the proposed rejection on pages 96-97

of Request which is ADOPTED as incorporated by reference into this action for reasons stated

above in paragraphs 6-8.


### Issue 19 (Adopted)

11.    Claim 31 is rejected under 35 U.S.C. 103(a) as being unpatentable over Kaufman in view

of Sortino and Stewart. The combination of the prior art when taken as a whole at time of the

invention by an artisan it renders obvious to show each limitation for broadest reasonable

interpretation of claims as detailed in the proposed rejection on pages 97-98 of Request which is

ADOPTED as incorporated by reference into this action for reasons stated above in paragraphs

6-8.


### *Claim Rejections - 35 USC § 112*

The following is a quotation of 35 U.S.C. 112(a):
(a) IN GENERAL.—The specification shall contain a written description of the invention, and of the
manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any
person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use
the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying
out the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), first paragraph:
The specification shall contain a written description of the invention, and of the manner and process of
making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the
art to which it pertains, or with which it is most nearly connected, to make and use the same and shall
set forth the best mode contemplated by the inventor of carrying out his invention.


### Issue 20 (Not Adopted)

12.    Claim 1-6, 8-17, 19-21 and 29-31 were proposed to be rejected as failing to comply with

the written description requirement.  As an initial matter to clarify the record, this Requester

proposed rejection is modified solely due to Patent Owner implied request to add claims 6 and 17

to this reexam noted in paragraph 4 of ACP mailed Aug 2, 2013 where due to their dependency

were added to this issue. The Requester contends the claim(s) contains subject matter which was

not described in the specification in such a way as to reasonably convey to one skilled in the

relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at the time the

application was filed, had possession of the claimed invention. Essentially, Requester proposes

on page 9 of their Reply received April 22, 2013 that there is a failure to demonstrate adequate

written specification with regards to 'in sample selection' (amended claims 1 and 11) and 'two or

more investments' (claim 29) as proposed for issue 20. In this proceeding, with regards to 'in

sample selection', although Patent Owner cites 2:49-61, Figs 11 and 14 from '291, the discussion

of figures 11 and 14 at 12:50-13:3, 14:5-23 and 16:10-21 provide adequate support for the claim

language. With regards to 'two or more investments', Patent Owner cites 2:49-62 that in part

states 'investment or investments (e.g., a portfolio)'; while, 5:67 also states 'investments' that

provides adequate written support in the '291 disclosure. So as to be clear, there is adequate

support in the original specification and claims for the amended language to not regard new

matter or lack of written description. Requester response received April 22, 2013 on page 9

provided no support that the added language does not regard existing elements with different

terms used. For the above reasons, issue 20 is **not adopted**.

### *Allowable Subject Matter*

13.     Claims 6 and 17 are allowed.

**STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION**

Application/Control Number: 95/001,939                                    Page 31
Art Unit: 3992

14.     The following is an examiner's statement of reasons for patentability and/or confirmation

of the claims found patentable in this reexamination proceeding: the claims 6 and 17 that recites

in part the step of "determining a minimum lag parameter, N, wherein the minimum lag

parameter N minimizes an autocorrelation function of the sample space" is not shown to be

present in the applied art in Request for reasons noted in Order regarding Issues 2 and 7

incorporated herein such that a prima facie case of obviousness is not established/present.

        Any comments considered necessary by PATENT OWNER regarding the above

statement must be submitted promptly to avoid processing delays.  Such submission by the

patent owner should be labeled: "Comments on Statement of Reasons for Patentability and/or

Confirmation" and will be placed in the reexamination file.


                                  *Conclusion*

15.     **This is a RIGHT OF APPEAL NOTICE (RAN)**; see MPEP § 2673.02 and § 2674. The

decision in this Office action as to the patentability or unpatentability of any original patent

claim, any proposed amended claim and any new claim in this proceeding is a FINAL

DECISION.

        No amendment can be made in response to the Right of Appeal Notice in an *inter partes*

reexamination. 37 CFR 1.953(c). Further, no affidavit or other evidence can be submitted in an

*inter partes* reexamination proceeding after the right of appeal notice, except as provided in  37

CFR 1.981 or as permitted by 37 CFR 41.77(b)(1). 37 CFR 1.116(f).

Each party has a **thirty-day or one-month time period, whichever is longer**, to file a notice of

appeal. The patent owner may appeal to the Board of Patent Appeals and Interferences with

respect to any decision adverse to the patentability of any original or proposed amended or new

claim of the patent by filing a notice of appeal and paying the fee set forth in 37 CFR

41.20(b)(1). The third party requester may appeal to the Board of Patent Appeals and

Interferences with respect to any decision favorable to the patentability of any original or

proposed amended or new claim of the patent by filing a notice of appeal and paying the fee set

forth in 37 CFR 41.20(b)(1).

In addition, a patent owner who has not filed a notice of appeal may file a notice of cross

appeal within **fourteen days of service** of a third party requester's timely filed notice of appeal

and pay the fee set forth in 37 CFR 41.20(b)(1). A third party requester who has not filed a

notice of appeal may file **a notice of cross appeal within fourteen days of service** of a patent

owner's timely filed notice of appeal and pay the fee set forth in 37 CFR 41.20(b)(1).

Any appeal in this proceeding must identify the claim(s) appealed, and must be signed by

the patent owner (for a patent owner appeal) or the third party requester (for a third party

requester appeal), or their duly authorized attorney or agent.

Any party that does not file a timely notice of appeal or a timely notice of cross appeal

will lose the right to appeal from any decision adverse to that party, but will not lose the right to

file a respondent brief and fee where it is appropriate for that party to do so. If no party files a

timely appeal, the reexamination prosecution will be terminated, and the Director will proceed to

issue and publish a certificate under 37 CFR 1.997 in accordance with this Office action.


21.     Extensions of time under 37 CFR 1.136(a) will not be permitted in inter partes

reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant"

Application/Control Number: 95/001,939                                    Page 33
Art Unit: 3992

and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 314(c) requires that

inter partes reexamination proceedings "will be conducted with special dispatch" (37 CFR

1.937). Patent owner extensions of time in inter partes reexamination proceedings are provided

for in 37 CFR 1.956. Extensions of time are not available for third party requester comments,

because a comment period of 30 days from service of patent owner's response is set by statute.

35 U.S.C. 314(b)(3).


22.     The patent owner is reminded of the continuing responsibility under 37 CFR 1.985(a), to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 6349291 throughout the course of this reexamination proceeding. The third party

requester is also reminded of the ability to similarly apprise the Office of any such activity or

proceeding throughout the course of this reexamination proceeding. See MPEP 2686 and

2686.04.


23.     **All** correspondence relating to this inter partes reexamination proceeding should be

directed:


By Mail to:
Mail Stop Inter Partes Reexam
Attn: Central Reexamination Unit
Commissioner of Patents
United States Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

By FAX to:
(571) 273-9900
Central Reexamination Unit

By hand:
Customer Service Window
Randolph Building
401 Dulany St.
Alexandria, VA 22314

By EFS-Web:
Registered users of EFS-Web may alternatively submit such correspondence via the electronic
filing system EFS-Web, at

https:efs.uspto.qov/efile/myportal/efs-registered

EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to
act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically
uploaded) directly into the official file for the reexamination proceeding, which offers parties the
opportunity to review the content of their submissions after the "soft scanning" process is
complete.


Any inquiry concerning this communication or earlier communications from the examiner, or as
to the status of this proceeding, should be directed to the Central Reexamination Unit at
telephone number (571) 272-7705.

Signed:


/Mark Sager/                    Conferee #1:               Conferee#2:
Primary Examiner                /Sam Rimell/               /WHC/
Art Unit 3992                   Primary Examiner
                                Art Unit 3992

| Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 95001939 | 6349291 |
| | Examiner | Art Unit |
| | MARK SAGER | 3992 |

| ✔ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant    ☐ CPA    ☐ T.D.    ☐ R.1.47

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 05/18/2012 | 02/22/2013 | 07/23/2013 | 01/23/2014 | | | | | |
| | 1 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 2 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 3 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 4 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 5 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 6 | | | = | = | | | | | |
| | 7 | | | | | | | | | |
| | 8 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 9 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 10 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 11 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 12 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 13 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 14 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 15 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 16 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 17 | | | = | = | | | | | |
| | 18 | | | | | | | | | |
| | 19 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 20 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 21 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 22 | | | | | | | | | |
| | 23 | | | | | | | | | |
| | 24 | | | | | | | | | |
| | 25 | | | | | | | | | |
| | 26 | | | | | | | | | |
| | 27 | | | | | | | | | |
| | 28 | | | | | | | | | |
| | 29 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 30 | ✓ | ✓ | ✓ | ✓ | | | | | |
| | 31 | ✓ | ✓ | ✓ | ✓ | | | | | |

US006349291B1

(12) **United States Patent**
Varma

(10) Patent No.: **US 6,349,291 B1**
(45) Date of Patent: **Feb. 19, 2002**

(54) **METHOD AND SYSTEM FOR ANALYSIS, DISPLAY AND DISSEMINATION OF FINANCIAL INFORMATION USING RESAMPLED STATISTICAL METHODS**

(75) Inventor: **Samir Varma**, Greenwich, CT (US)

(73) Assignee: **Attractor Holdings LLC**, Greenwich, CT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/489,364**

(22) Filed: **Jan. 21, 2000**

(51) Int. Cl.$^7$ ............................................. **G06F 17/60**

(52) U.S. Cl. ......................................... **705/35**; 705/37

(58) Field of Search ............................ 705/35, 36, 37, 705/38

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,541,115 | A | * | 9/1985 | Werth | 282/14 |
| 5,283,856 | A | * | 2/1994 | Gross et al. | 395/51 |
| 5,359,699 | A | * | 10/1994 | Tong et al. | 395/22 |
| 5,598,439 | A | * | 1/1997 | Wagner | 375/326 |
| 5,774,878 | A | * | 6/1998 | Marshall | 705/35 |
| 5,790,177 | A | * | 8/1998 | Kassatly | 348/13 |
| 5,893,069 | A | * | 4/1999 | White, Jr. | 705/1 |
| 5,918,217 | A | * | 6/1999 | Maggioncalda et al. | 705/36 |
| 5,946,666 | A | * | 8/1999 | Nevo et al. | 705/36 |
| 6,003,018 | A | * | 12/1999 | Michaud et al. | 705/36 |
| 6,012,043 | A | * | 1/2000 | Albright et al. | 705/36 |
| 6,064,662 | A | * | 5/2000 | Makivic | 705/36 |
| 6,064,984 | A | * | 5/2000 | Ferguson et al. | 705/36 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 8-221573 | * | 8/1996 |
| JP | 8-221574 | * | 8/1996 |
| JP | 10-512985 | * | 12/1998 |

OTHER PUBLICATIONS

Hansson, B., and Persson, M. "Time Diversification and Estimation Risk", Financial Analysts Journal, vol. 56, No. 5 (Sep./Oct. 2000): pp. 55–62.*
Gardner, G., and Stone, D. "Estimating Currency Hedge Rations for International Portfolios", Financial Analysts Journal, vol. 51, No. 6 (Nov./Dec. 1995): start p. 6.*
Choong, N.K., and R. McLeod, Jr. "Expert, linear models, and nonlinear models of expert decision making in bankruptcy prediction: a lens model analysis", Journal of Management Information Systems, vol. 16, No. 1, (Summer 1999): pp. 189–206.*
Mitchell, M., and Stafford, E. "Managerial decisions and long–term stock price performance", The Journal of Business, vol. 73, No. 3 (Jul. 2000): pp. 287–329.*
Laster, D. "Measuring gains form international equity diversification: The bootstrap approach", journal of investing: New York; vol. 7, No. 3, (Fall 1998): pp. 52–60.*

(List continued on next page.)

Primary Examiner—Vincent Miller
Assistant Examiner—Daniel S Felten
(74) Attorney, Agent, or Firm—Kenyon & Kenyon

(57) **ABSTRACT**

The present invention provides a method and system for the statistical analysis, display and dissemination of financial data over an information network such as the Internet and WWW. The present invention utilizes resampled statistical methods for the analysis of financial data. Resampled statistical analysis provides a meaningful and reasonable statistical description of financial information, which typically escapes modeling using parametric methods (i.e. assumptions of a Gaussian distribution). The present invention provides at least a GUI that provides functionality for user input of statistical queries, a statistical computation engine that performs statistical analysis of financial data and a graphical rendering engine that generates graphical display of statistical distributions generated by the statistical computation engine. According to one embodiment, the present invention employs a parallel processing architecture to speed generation of the resampled statistics.

**31 Claims, 17 Drawing Sheets**



US 6,349,291 B1

Page 2

OTHER PUBLICATIONS

Kemp A. W. "Bootstrap Methods: A Practitioner's Guide", Biometrics, vol. 56, No. 1 (Mar. 2000): Start p. 317.*

Caudill, S., and Holcombe, R. "Specification search and levels of significance in econometric models", Eastern Econonic Journal, vol. 25, No. 3 (Summer 1999): pp. 289–300.*

Deis, D., and Hill, R., "An application of the bootstrap method to the simultaneous equations model of the demand and supply of audit services", Contemporary Accounting Research, vol. 15, No. 1 (Spring 1998): pp. 88–99.*

Magnar, L., and Steinar, E., "Exact confidence intervals generated by conditional parametric bootstrapping", Journal of Applied Statistics (May 1999): pp. 447–459.*

Coleman, M., Lynford, L., and James, F., "A newly integrated and dynamic approach to securitized real estate risk analysis and valuation" Real estate Finance, vol. 12, No. 1 (Spring 1995): Start p. 68.*

Putnam, B. "Is the trend still my friend?" Global Investor, No. 66, (Oct. 1993): Start p. 21.*

Fiellin, D., and Feinstein, A. "Bootstraps and jackknives: New computer–intensive statistical tools that require no mathematical theories" Journal of Investigative Medicine, vol. 46, No. 2, (Feb. 1998): start p. 22.*

Berkowitz, J., and Kilian, L., "Recent Developments in Bootstrapping Time Series", manuscript, Sep. 25, 1996.*

Michaud, R. The Markowitz Optimization Enigma: Is 'Optimized' Optimal?, Financial Analysts Journal, (Jan./Feb. 1989): pp. 31–42.*

* cited by examiner–



*FIG. 1(1)*

to *FIG. 1(2)*



*FIG. 1(2)*



*FIG. 2*

| |
|---|
| Client ID - 310 |
| Client Password - 315 |
| Portfolio* - 320 |
| Alert Rules* - 325 |
| E-mail Address - 330 |
| Billing Parameter - 335 |
| Preference Parameter 1 - 340(1) |
| Preference Parameter 2 - 340(2) |

— 305

| |
|---|
| Preference Parameter N- 1 - 340(N- 1) |
| Preference Parameter N- 340(N) |

*FIG. 3*

| |
|---|
| Investment ID - 410 |
| Investment Name - 415 |
| Investment Data* - 420 |

— 405

*FIG. 4*

JA56

505

| Rule ID - 510 |
|---|
| Rule Object* - 515 |

## FIG. 5a

507

| Investment ID - 520 |
|---|
| Function - 525 |
| Period - 530 |
| Operator - 535 |
| Percentile Value - 540 |
| Sample Size - 545 |
| Replications - 550 |

## FIG. 5b

JA57

605

| Investment ID - 610 |
| Return Object 1 - 625(1) |
| Return Object 2 - 625(2) |
| Return Object 3 - 625(3) |

| Return Object N- 1 - 625(N- 1) |
| Return Object N - 625(N) |

*FIG. 6a*

625

| Date - 630 |
| Value - 635 |

*FIG. 6b*

JA58

| Function prototype ID - 710 |
| --- |
| Function Prototype Object - 715 |

— 705

*FIG. 7*

| Plot Type ID - 810 |
| --- |
| Plot Parameter - 825(1) |
| Plot Parameter 2 - 825(2) |
| Plot Parameter 3 - 825(3) |

— 805

| Return Object N- 1 - 625(N- 1) |
| --- |
| Return Object N - 625(N) |

*FIG. 8*

JA59



*FIG. 9a*



*FIG. 9b*

Request for Resampled Statistical Analysis ~1005

↓

Receive Input Parameters ~1010

↓

Request Analysis From RSAE ~1015

↓

Resampling Computation Finished ? ~1020

no

yes

↓

Request Plot from GRE ~1025

↓

Plot Finished ? ~1027

no

yes

↓

Transmit Plot Data Front End Subsystem ~1029

↓

End ~1030

*FIG. 10*

JA62



*FIG. 11*



*FIG. 12*



*FIG. 13*



*FIG. 14*

JA66

*FIG. 15*



*FIG. 16*

InvestPic.com Monitor, Distribution of Negative Days

S&P 500 Index
Nasdaq 100 Index
S&P Stock Strategy Partially Hedged
Nasdaq 100 Stock Strategy Partially Hedged
Stocks & Futures

1710
1720

Percent of Occurrences
0.40 0.35 0.30 0.25 0.20 0.15 0.10 0.05 0

Percent Negative Days
0 0.20 0.24 0.28 0.32 0.36 0.40 0.44 0.48 0.52 0.56 0.60 0.64 0.68

FIG. 17

1

# METHOD AND SYSTEM FOR ANALYSIS, DISPLAY AND DISSEMINATION OF FINANCIAL INFORMATION USING RESAMPLED STATISTICAL METHODS

## FIELD OF THE INVENTION

The present invention relates to the area of electronic information systems. In particular, the present invention relates to a method and system for the delivery of financial information using resampled statistical methods over an information network.

## BACKGROUND INFORMATION

Investors and financial analysts rely upon electronic information systems for the delivery of accurate financial and investment data and analysis in order to devise meaningful investment strategies. The growth of the Internet and World Wide Web ("WWW") highlights the potential for global distribution of "real time" or "near real time" financial information and analysis. For example, a number of WWW sites provide financial information to clients such as investors and financial analysts.

However, conventional financial information sites do not provide meaningful analysis tools to accurately analyze, forecast and predict the behavior of financial markets. Conventional technology for delivery of financial information over information networks such as the Internet typically allows users to track returns for various investments and perform rudimentary statistical analysis (e.g., computation of the mean and standard deviation) for these investments. However, these rudimentary statistical functions are not useful to investors in forecasting the behavior of financial markets because they rely upon assumptions that the underlying probability distribution function ("PDF") for the financial data follows a normal or Gaussian distribution, which is generally false.

The true distribution of returns for any financial market (and thus of a trading strategy) is unknown. It is therefore incorrect to rely upon a statistical model based on assumptions of normality (e.g., standard deviation). Typically, the PDF for financial market data is heavy tailed (i.e., the histograms of financial market data typically involve many outliers containing important information). Thus, statistical measures such as the standard deviation provide no meaningful insight into the distribution of financial data.

Providing reasonable methods for the analysis of financial market data is essential for investors. Reasonable statistical analysis of financial data should at a minimum provide an accurate assessment of potential financial risk and reward. However, conventional methods, which rely upon assumptions of a Gaussian distribution, are dangerous to investors because these analyses understate the true risk and overstate potential rewards for an investment or trading strategy. Thus, this information is not generally useful and if relied upon promotes imprudent investment decisions. In general, the heavy tailed nature of financial data presents significant challenges in providing meaningful statistical analysis.

## SUMMARY OF THE INVENTION

The present invention provides a method and system for the statistical analysis, display and dissemination of financial data over an information network such as the Internet and WWW. The present invention utilizes resampled statistical methods for the analysis of financial data. Resampled statistical analysis provides a meaningful and reasonable

2

statistical description of financial information, which typically escapes modeling using parametric methods (i.e., assumptions of a Gaussian distribution).

The present invention includes a financial information network node that is coupled to an information network such as the Internet. The financial information network node includes a front end subsystem, a resampled statistical analysis engine ("RSAE") and a graphics rendering engine ("GRE"). The front end subsystem provides a graphical user interface ("GUI") that allows clients also coupled to the information network to submit requests for resampled statistical analysis of various financial investments and receive graphical display of the results. The RSAE performs resampled statistical analysis of financial data in response to user queries and incorporates routines to preserve temporal correlation in financial data, which necessarily provides more accurate analysis. In addition, the RSAE provides for user control of a number of parameters to simulate various financial environmental conditions. For example, according to one embodiment, the RSAE allows a user to simulate either bull or bear market conditions by setting a bias parameter that controls a degree of randomness in the resampling process. The GRE generates a graphical display of statistical distributions generated by the RSAE.

According to one embodiment, the present invention employs a parallel processing architecture to speed generation of the resampled statistics. The parallel architecture is afforded by the nature of the resampling algorithm itself, which permits the financial data to be vectorized. This parallel processing architecture provides at least two significant advantages. First, the architecture permits the delivery and processing of financial data in compressed time frames, which facilitates "real time" or "near real time" statistical analysis. In addition, the parallel computation scheme provides the ability to perform statistical analysis on a large number of financial entities (e.g., a mutual fund or hedge fund) through a weighting process.

According to one embodiment of the present invention for implementation on the Internet, a financial information site is coupled to the Internet via a front end subsystem including a WWW server. The financial information site includes a front end subsystem, a RSAE and a GRE. In addition, the financial information site maintains a database of financial data for any number of financial entities such as companies, mutual funds etc. The financial information site also maintains a database of clients that have registered with the financial information site and desire to obtain statistical analysis of financial data.

In order to perform a resampled statistical analysis, a query is received from a client via the front end subsystem. A client may specify a number of parameters including an investment or investments (e.g., a portfolio) to be analyzed, a financial function, a sample size, a period, a type of plot and a bias parameter, which controls the randomness of the resampling process. Based upon the parameters specified by the client, the RSAE performs a resampled statistical analysis of relevant financial data. The GRE then produces a distribution plot based upon the output generated by the RSAE, which is presented to the client via the front end subsystem.

According to one embodiment of the present invention, the RSAE performs at least three types of financial functions on financial data. A gross rate of return function provides analysis of the gross rate of returns for an investment over a specified time period. A maximum drawdown function provides analysis of a maximum drawdown for an invest-

3

ment over a specified period. A monitor function provides analysis of a number of "up" and "down" days for a particular investment over a period of time.

The financial information site also provides functionality for storing a set of client specified alert rules that are used to automatically monitor the behavior of investments based upon a resampled statistical analysis process and notify clients of the financial information site when the behavior of a particular investment violates a specified rule.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a network architecture that illustrates the relationship between a financial information site and a client according to one embodiment of the present invention.

FIG. 2 is a detailed block diagram of a financial information site according to one embodiment of the present invention.

FIG. 3 depicts the structure of a client record that is stored in a client database at a financial information site according to one embodiment of the present invention.

FIG. 4 depicts the structure of an investment record that is stored in an investment database at a financial information site according to one embodiment of the present invention.

FIG. 5a depicts the structure of an alert rule record that is stored in an alert rules database at a financial information site according to one embodiment of the present invention.

FIG. 5b depicts the structure of a rule object record according to one embodiment of the present invention.

FIG. 6a depicts a data structure for storing financial data in a financial database according to one embodiment of the present invention.

FIG. 6b depicts a data structure for storing a financial return according to one embodiment of the present invention.

FIG. 7 depicts a data structure for storing a function prototype in a function database at a financial information site according to one embodiment of the present invention.

FIG. 8 depicts a data structure for storing plot information in a plot database at a financial information site according to one embodiment of the present invention.

FIG. 9a (reprinted from Efron and Tibshirani) depicts the underlying theory of the bootstrap method.

FIG. 9b depicts a procedure for performing a bootstrap method to generate a distribution of bootstrap replications according to one embodiment of the present invention.

FIG. 10 is a flowchart of steps for performing a resampled analysis of an investment and generating a graphical output according to one embodiment of the present invention.

FIG. 11 is a flowchart that depicts a set of steps to initiate a resampled statistical analysis of financial data using a parallel processing architecture according to one embodiment of the present invention.

FIG. 12 is a flowchart of a parallel processing control process according to one embodiment of the present invention.

FIG. 13 is a flowchart of a set of steps for performing a resampled statistical analysis according to one embodiment of the present invention.

FIG. 14 is a flowchart of a set of steps for performing a biasing procedure according to one embodiment of the present invention.

FIG. 15 is an exemplary plot of a resampled statistical analysis comparing two investment strategies with respect to

4

gross rate of returns according to one embodiment of the present invention.

FIG. 16 is an exemplary plot of a resampled statistical analysis comparing two investment strategies with respect to maximum drawdown returns according to one embodiment of the present invention.

FIG. 17 is an exemplary plot of a resampled statistical analysis comparing multiple investment strategies with respect to a monitor function according to one embodiment of the present invention.

DETAILED DESCRIPTION

Although the embodiments described herein utilize the Internet and WWW, the present invention is compatible with any type of information network public or private and thus, the embodiments described herein are not intended to limit the scope of the claims appended hereto. For example, the present invention could be implemented using a private Intranet, local area network (LAN), metropolitan area network (MAN), wide area network (WAN) or even a wireless network

FIG. 1 is a block diagram of a network topology that illustrates the relationship between the Internet, a financial information site and various clients according to one embodiment of the present invention. Based upon queries submitted by clients, financial information site 119 performs resampled statistical analysis of financial data and provides a graphical display of distribution results. Details of the functionality provided by financial information site 119 are described below.

Clients 105a–105c communicate with financial information site 119 via Internet 114. According to the embodiment depicted in FIG. 1, financial information site 119 is coupled to Internet 114 via T1 line 130b. Client 105a illustrates a typical narrowband client coupled to Internet 114 via a dial-up connection described in more detail below. Client 105b illustrates a typical broadband client coupled to Internet 114 via a cable modem. Client 105c illustrates a corporate client that is coupled to Internet via T1 line 130c and server 151. Corporate client 105c includes three network nodes 171a–171c that share bandwidth on Ethernet 161. Although FIG. 1 illustrates three clients (105a–105c ), it is to be understood that financial information site 119 may serve any arbitrary number of clients 105 limited only by the processing power and bandwidth available.

As illustrated in FIG. 1, client 105a communicates with financial information site 119 via personal computer 112a, modem 115a, POTS telephone line 117 and Internet service provider 120a. Internet service provider 120a includes modem bank 121 and router 135a that routes packets received from modem bank 121 onto Internet 114 via T1 line 130a. Packets are routed over Internet 114 to client gateway server 140a at financial information site 119 via T1 line 130b.

Client 105a utilizes personal computer 112a to navigate Internet/World-Wide-Web (WWW 114 via browser software (not shown) and display device (not shown). The browser software permits navigation between various file servers connected to Internet 114, including client gateway server 140a at financial information site 119. The browser software also provides functionality for rendering of files distributed on the Internet (i.e., through plug-ins or Active X controls).

In order to transmit data to financial information site 119, personal computer 112a transmits signals through a dial-up connection utilizing modem 115a. Modem 115a performs modulation of digital signals generated by personal com-

5

puter 112*a* onto an analog carrier signal for transmission over the public switched telephone network ("PSTN") (not shown). Modem 115*a* also performs demodulation of signals received over local lines (e.g., 117) from the PSTN extracting digital byte codes from a modulated analog carrier.

Signals are received at ISP 120*a*, which is connected to the PSTN through modem bank 121. Digital IP packets are then transmitted via Internet 114 and various routers (not shown) to WWW server 140*a*. IP packets are also transmitted in the reverse direction from WWW server 140*a* to personal computer 112*a*.

Client 105*b* is coupled to Internet 114 via a broadband cable connection. In particular, personal computer 112*b* transmits packets via cable modem 115*b* to ISP 120*b* where the packets are routed over Internet 114 to client gateway server 140*a*. Packets from financial information site 119 traverse a reverse path to client 105*b*. Similar to client 105*a*, client 105*b* utilizes browser software to navigate Internet 114 and WWW.

Corporate client 105*c* includes network nodes 171*a*–171*c*, which are coupled to Internet via Ethernet 161, server 151 and T1 line 130*c*. Network nodes 171*a*–171*c* may communicate with financial information site 119 via Ethernet, server 151, T1 line 130*c*, Internet 114 and T1 line 130*b*. Similar to clients 105*a*–105*b*, it is assumed that users at network nodes 171*a*–171*c* utilize browser software to navigate Internet 114 and WWW.

The specific nature of clients 105*a*–105*c* and the methods through which they are coupled to Internet 114 depicted in FIG. 1 are merely exemplary. The present invention is compatible with any type of Internet client and/or connection (broadband or narrowband). In general, it is to be understood that clients 105 may connect to Internet 114 using any potential medium whether it be a dedicated connection such as a cable modem, T1 line, DSL ("Digital Subscriber Line"), a dial-up POTS connection or even a wireless connection.

FIG. 2 is a detailed block diagram of a financial information site according to one embodiment of the present invention. Financial information site 119 includes front end subsystem 129, RSAE 139, GRE 149, back end server 140, client database 150*g* and alert rules database 150*c*.

Front end subsystem 129 includes client/gateway server 140*a*, which is coupled to GUI database 150*a*. Front end subsystem 129 provides a GUI, which allows clients 105 to transmit information to and receive information from financial information site 119. According to one embodiment GUI database 150*a* stores HTML ("Hypertext Markup Language") code (i.e., WWW pages) relating to various information and functions provided by financial information site 119. For example, GUI database 150*a* may store a HTML "home page" for financial information site 119 or HTML pages including forms, which allow the input of data at financial information site 119.

Front end subsystem 129 also includes SMTP ("Simple Mail Transport Protocol") server 140*f* SMTP server 140*f* performs transmission of e-mail messages to clients 105 associated with financial information site 119 in order to provide notification regarding various events (as described in more detail below).

Client gateway server 140*a* communicates with back end server 140*b*, which controls and orchestrates the large-scale processing of data at financial information site 119. In particular, back end server 140*b* handles responses to requests from clients 105 for resampled statistical analysis of investments. For example, back end server 140*b* submits

6

requests to RSAE for resampled statistical analysis of financial data and submits requests to GRE for graphical rendering of output generated by RSAE. Back end server 140*b* communicates with control server 140*c* at RSAE 139, graphics rendering server 140*e* at GRE 149 and SMTP server 140*f* at front end 1 subsystem 29.

RSAE 139 includes control server 140*c*, parallel process control server 140*d*, parallel processors 112*a*–112*e* (each including local respective cache 112*a*1–112*e*1), financial database 150*d*, investment database 150*e*, function database 150*f*, shared memory area 160*a* and output data area 160*b*. Note that RSAE 139 depicted in FIGS. 1–2 utilizes a parallel processing architecture. This parallel scheme is merely exemplary and is not intended to limit the scope of the claims appended hereto. Other embodiments may not rely upon a parallel processing architecture at RSAE 139.

Control server 140*c* provides communication functions between back end server 140*b* and RSAE 139 and controls the overall operation of a resampled statistical analysis process. Control server 140*c* is coupled to parallel process control server 140*d* and shared memory area 160*a*. Shared memory area 160*a* stores sample data for financial instruments currently being analyzed by RSAE 139. As described in detail below, control server 140*c* receives requests for parallel processing computations from back end server 140*b*, performs certain initialization functions, loads appropriate data into shared memory 160*a* and forwards these requests to parallel process control server 140*d* for performance. Control server 140*c* then waits for a completion signal from parallel process control server 140*d* and provides the output results to back end server 140*b* for further processing (e.g., graphical rendering via GRE 149).

Control server 140*c* is also coupled to financial database 150*d*, investment database 150*e*, function database 150*f* and shared memory area 160*a*. Financial database 150*d* (described in more detail below) stores financial sample data relating to particular investments. Investment database 150*e* (described in more detail below) stores financial data regarding investments for which clients may be interested in performing resampled statistical analysis (i.e., stocks, mutual finds, etc.). Function database 150*f* (described in more detail below) stores function prototypes for functions to be performed on financial data.

Parallel process control server 140*d* is coupled to parallel processors 112*a*–112*e* and output data memory area 160*b*. Parallel processors 112*a*–112*e*, which are each coupled to a respective local cache 112*a*1–112*e*1 and shared memory area 160*a*, perform resampled statistical analysis of sample data stored in shared memory area 160*a* (i.e., resampled statistical computations). Parallel process control server 140*d* (described in more detail below) orchestrates and controls parallel computation processes running on parallel processors 112*a*–112*e*. In particular, parallel process control server 140*d* requests initialization of resampled statistical analysis of data stored in shared memory area 160*a* from individual processors 112*a*–112*e*. Upon completion of all parallel processes running on processors 112*a*–112*e*, parallel process control server 140*d* retrieves the results stored in local caches 112*a*1–112*e*1 and stores the aggregate data in output data area 160*b* where it can be processed further (e.g., in GRE 149).

GRE 149 performs graphical rendering (e.g., plots) of output data generated by RSAE 139. GRE 149 includes graphics rendering engine server 140*e*, which is coupled to plot database 150*b*. As described in detail below, plot database 150*b* stores data regarding the rendering and for-

7

matting of distribution plots generated by graphics rendering engine server **140***e*.

Back end server **140***b* is also coupled to client database **150***g* and alert rules database **150***c*. Client database **150***g* stores information related to clients that have registered with financial information site **119**. Alert rules database **150***c* stores data pertaining to client specified rules for alerting clients to near real time behavior of investments. According to one embodiment of the present invention, clients are alerted to rule violations by e-mail via SMTP server **140***f*, which is also coupled to back end server **140***b*.

FIG. **3** depicts the structure of a client record that is stored in a client database **150***g* at a financial information site **119** according to one embodiment of the present invention. Each client record **305** includes client ID field **310**, client password field **315**, portfolio* pointer field **320**, alert rules* pointer field **325**, e-mail address field **330**, billing parameter field **335** and preference parameter fields **340**(1)–**340**(N).

Client ID field **310** stores a unique 16-byte character array or pointer to a character array of a client that has registered with financial information site **119**. Client password field **315** stores a unique 16-byte character array or pointer to a character array of a password associated with a client **105**. Clients **105** may establish a client ID and password upon registration with financial information site **119**.

Portfolio* pointer field **320** stores a pointer to a linked list of investments that a client **105** has selected for tracking using financial information site **119**. According to one embodiment of the present invention, each link in the linked list stores an identifier of an investment entity as described in more detail below. Alert rules* pointer field **340** stores a linked list of alert rule record IDs (discussed in more detail below) that specify particular financial alert rules that are monitored by financial information site **119** and associated with individual clients **105**. These rules are used to notify individual clients **105** of the occurrence of particular events they wish to follow based upon a resampled statistical analysis of financial data. E-mail address field **330** stores a 32-byte character array or pointer to a character array of an e-mail address of a client **105**. Billing parameter field **335** stores a pointer to billing object record that includes billing information for a client **105**. Preference parameters **340**(1)–**340**(N) store preference parameters related to customization functions associated with financial information site **119**.

FIG. **4** depicts the structure of an investment record that is stored in an investment database **150***e* at a financial information site **119** according to one embodiment of the present invention. Investments may represent stocks, mutual funds, etc. Each investment record **405** includes investment ID field **410**, investment name field **415** and investment data pointer **420**. Investment ID field **410** stores a unique 32-bit value corresponding to a particular investment. Investment name field **415** stores a 16-byte character array of a name of an investment. Investment data pointer **420** stores a pointer to a linked list of financial data records related to an investment, which are stored in financial database **150***d* (described in more detail below).

FIG. **5***a* depicts the structure of an alert rule record that is stored in an alert rules database **150***c* at a financial information site **119** according to one embodiment of the present invention. According to one embodiment of the present invention, each alert rule specifies a percentile constraint of a resampled distribution for which a client **105** desires notification. Clients **105** of financial information site **119** may desire to be notified if the occurrence of a current event is extremely unlikely. As described in detail below, financial

8

information site **119** executes a process to notify clients if a threshold percentile of a resampled statistical distribution is either below or above a current value of a financial event, indicating that the event is unlikely. For example, a client **105** may desire to be alerted if the gross rate of returns for a specified investment over a 200-day period assumes an improbable value. In this case, each day (or at a frequency specified by a client **105**), financial information site **119** calculates the actual gross rate of returns for the investment over the last 200 days. Then, financial information site **119** executes a resampled statistical process to evaluate the gross rate of returns for 200-day periods described in detail below) to determine whether a percentile value of the distribution is above or below the current value. If so, the current value is highly unlikely and the client **105** is notified via e-mail.

Each alert rule record **505** includes rule ID field **510** and rule function object* pointer field **515**. Rule ID field **510** stores a unique 32-bit integer value pertaining to an alert rule, which is used for identification purposes. Rule function object pointer field **515** stores a reference to a rule object (described with reference to FIG. **5***b*) relating to the occurrence of a financial event for which a client desires notification.

FIG. **5***b* depicts the structure of an alert rule object according to one embodiment of the present invention. Each rule alert rule record **507** includes investment ID field **520**, function field **525**, periods field **530**, operator field **535**, percentile value field **540**, sample size field **545** and replications field **550**. Investment ID field **520** stores a 32-bit integer value identifying an investment, as described below with respect to FIG. **6***a*. Function field **525** stores a 32-bit function ID of a function record as described below with respect to FIG. **7**. Periods field **530** stores a number of periods (i.e., days) for which the client **105** desires to evaluate the investment. Operator field **535** stores a 4-bit field indicating an operator such as '<' or '>.' Percentile value field **540** stores an integer representing a percentile value. Sample size field **545** stores a 32-bit integer value representing a sample size for which to conduct a resampled statistical analysis. Replications field **550** stores a 32-bit integer value representing a number of replications to perform in conducting a resampled statistical process.

As described in detail below, the resampled process is conducted based upon parameters stored in fields **520**, **525**, **530**, **545** and **550**. Based upon operator filed **535**, it is then determined whether the distribution results for a resampled statistical process above or below the current value exceed the percentile value stored in percentile value field **540**. If so, the client is notified

FIG. **6***a* depicts a data structure for storing financial data in a financial database according to one embodiment of the present invention. Each financial data record **605** includes investment ID field **610**, and one or more return objects **625**(1)–**625**(N). Investment ID field **610** stores a 32-bit integer value uniquely identifying a financial record. Return objects **625** (as described in FIG. **6***b*) store actual data values of returns associated with the investment represented by investment ID field **610**.

FIG. **6***b* depicts a data structure for storing a return object according to one embodiment of the present invention. Each return object **625** includes a date field **630** and a value field **635**. Date field **630** stores a data object corresponding to the data of a return and value field **635** stores the value (dollar amount or otherwise) of the investment on the date stored in date field **630**.

FIG. **7** depicts a data structure for storing data in a function database **150***f* at a financial information site **119**

9                                                                    10

according to one embodiment of the present invention. Function database **150**f stores various function prototypes for functions to be performed on investment data, which are used in performing resampled statistical analysis of financial data. For example, according to one embodiment function database **150**f stores function prototypes for gross rate of return, maximum drawdown and/or a monitor function. Each function record **705** includes function prototype ID **710** and function prototype object **715**. Function prototype ID field **710** stores a unique 32-bit integer value pertaining to a function prototype, which is used for identification purposes. Function prototype object field **715** stores a 1024-byte character array of a function prototype. The syntax for representing a function prototype stored in function prototype object field **715** is variable. Practitioners skilled in the art will recognize that many data structures and techniques may be utilized to represent function prototypes. According to one embodiment of the present invention, a maximum drawdown function prototype is stored in function database **150** based upon the following equation: For a set of returns $(r_1 - r_n)$:

FIG. **9**a (reprinted from Efron and Tibshirani) depicts the underlying theory of the bootstrap method. Ideally statistical inferences are based on a known probability distribution F. A parameter is a function of a known probability distribution F.

$$\theta = t(F)$$

Furthermore, generally financial data may not be modeled parametrically because it is heavy tailed (i.e., non-Gaussian) and therefore, F is not known or ascertainable. For example, with respect to financial data, an investor may desire to study a specific parameter of a financial investment such as the gross rate of return of a stock over a certain period of time that is dependent upon knowledge of the true probability distribution function for the investment. However, generally neither the PDF for an investment, nor the PDF for a parameter such as the gross rate of return over a specified time period for the investment (which is dependent upon the underlying PDF) is known.

Resampled statistical methods such as the bootstrap attempt to estimate the PDF of an unknown distribution

$$\text{Max. Drawdown} = 1 - \text{Min} \begin{pmatrix} \frac{1+r_1}{1} & \frac{(1+r_1)(1+r_2)}{1} & \frac{(1+r_1)(1+r_2)(1+r_3)}{1} & \cdots & \frac{(1+r_1)(1+r_2)(1+r_3)\ldots(1+r_n)}{1} \\ 0 & \frac{(1+r_1)(1+r_2)}{(1+r_1)} & \frac{(1+r_1)(1+r_2)(1+r_3)}{(1+r_1)} & \cdots & \frac{(1+r_1)(1+r_2)(1+r_3)\ldots(1+r_n)}{(1+r_1)} \\ 0 & 0 & \frac{(1+r_1)(1+r_2)(1+r_3)}{(1+r_1)(1+r_2)} & \cdots & \frac{(1+r_1)(1+r_2)(1+r_3)\ldots(1+r_n)}{(1+r_1)(1+r_2)} \\ \vdots & \vdots & \vdots & \cdots & \vdots \\ 0 & 0 & 0 & \cdots & \frac{(1+r_1)(1+r_2)(1+r_3)\ldots(1+r_n)}{(1+r_1)(1+r_2)(1+r_3)\ldots(1+r_{n-1})} \end{pmatrix}$$

According to one embodiment of the present invention, a gross rate of returns function prototype is stored in function database **150**f based upon the follow equation: For a set of returns $(r_1 - rn)$:

$$\text{Gross Rate of Return} = \left[ \prod_i (1+r_i) \right] - 1$$

According to one embodiment of the present invention, a monitor function calculates a number of 'up' or 'down' days for a given investment over a certain period. Thus, the following equation describes a monitor function:

$$\sum_i^N \delta(r_i = \text{up})$$

Thus, for example, according to one embodiment, the maximum drawdown function, the gross rate of return function (as described above) and the monitor function are coded according to a predefined syntax and stored as a function prototype in function database **150**f.

FIG. **8** depicts a data structure for storing plot information in a plot database at a financial information site according to one embodiment of the present invention. Each plot type record **805** stores plot type ID field **810** and one or more plot parameter fields **825**(1)–**825**(N). Plot ID field **810** stores a unique 32-bit integer identifying a particular plot type. Plot parameter fields **825**(1)–**825**(N) store various parameters relating to formatting of plots.

using sampled data. Typically, sample data is available for an investment that is dependent upon an unknown PDF F.

$$F \rightarrow x = (x_1, x_2, \ldots x_n)$$

The empirical distribution function $\hat{F}$ is defined to be the discrete distribution that puts probability $1/n$ on each value $x_i$, i=1,2, . . . n. $\hat{F}$ assigns to a set A in the sample space of x its empirical probability $\text{Prob}\{A\} = \#\{x_i \epsilon A\}/n$, In, the proportion of the observed sample $x = (x_1, x_2, \ldots, x_n)$.

The plug-in principle is a method of estimating parameters from samples. The plug-in estimate of a parameter $\theta = t(F)$ is defined to be $\hat{\theta} = t(\hat{F})$ **910**. These statistics are referred to as summary statistics, estimates or estimators. Resampled statistical methods attempt to determine the distribution of $\hat{\theta}$, an estimator of $\theta$, derived from a sample x.

Bootstrap methods depend on the notion of a bootstrap sample. If $\hat{F}$ is an empirical distribution with probability $1/n$ for each of the observed values $x_i$, i=1,2, . . . n, a bootstrap sample is defined to be a random sample of size n drawn from $\hat{F}$, $x^* = (x_1^*, x_2^*, \ldots, x_n^*)$, where $\hat{F} \rightarrow x = (x_1^*, x_2^*, \ldots, x_n^*)$. The star notion indicates that $x^*$ is not the actual data set x, but rather a randomized, or resampled version of x. The bootstrap data points $x_1^*, x_2^*, \ldots, x_n^*$ are a random sample of size n drawn with replacement from the population of n objects $(x_1, x_2, \ldots, x_n)$. Corresponding to a bootstrap data set $x^*$ is a bootstrap replication of $\hat{\theta}$, $\hat{\theta}^* = s(x^*)$ **915**. The quantity $s(x^*)$ is the result of applying the same function $s(\cdot)$ to $x^*$ as was applied to x (i.e., the statistical function of interest). For example, $s(\cdot)$ may be the gross rate of return of an investment over a specific period of time.

11

Thus the bootstrap attempts to estimate a parameter of interest $\theta=t(F)$ from an unknown distribution F using a random sample $x=(x_1, x_2, \ldots, x_n)$. Given a random sample $x=(x_1, x_2, \ldots, x_n)$ and a statistic $\hat{\theta}=s(x,F)$ that depends on the sample and possibly the underlying distribution F, the distribution of $\hat{\theta}$,

$$\zeta_F(\hat{\theta}=s(x,F))$$

is estimated by that of

$$\zeta_{\hat{F}}(\hat{\theta}^*=s(x^*,\hat{F})$$

FIG. 9b depicts a process for performing a bootstrap method (a resampled statistical method) to generate a distribution of bootstrap replications according to one embodiment of the present invention. In step 920, a sample space x is selected. In step 925, a statistical function based on the sample space data is computed $\hat{\theta}=t(\hat{F})$. In step 930, bootstrap samples $x^*=(x_1^*, x_2^*, \ldots, x_n^*)$, are generated from the sample space using a resampling process. In step 935, a bootstrap replication $\hat{\theta}=s(x^*)$ is computed for each bootstrap sample using a desired function. In step 940, a plot of the distribution of bootstrap replications $(s(x^{*1}), s(x^{*2}) \ldots s(x^{*B}))$ is generated in order to estimate the distribution of $\hat{\theta}$.

FIG. 10 is a flowchart of steps for initializing a resampled statistical analysis of financial data at a financial information site 119 according to one embodiment of the present invention. In step 1005, the process is initiated upon receipt of a request for a resampled statistical analysis of financial data, which is received via front end subsystem 129 (e.g., via an HTML form). In step 1010, input parameters relating to a resampled statistical analysis are received via client/gateway server 140a and transmitted to back end server 140b. According to one embodiment, the following parameters are solicited from a client 105: investment;

function;

periods (Q);

bias;

sample_size;

replications; and

plot_type.

The 'investment' parameter specifies an identifier of an investment (i.e., 410) stored in investment database 150e. The 'function' parameter specifies a function prototype identifier (i.e., 710) stored in function database 150f . For example, according to one embodiment, the function prototype may correspond to a function for maximum drawdown, gross rate of return or a monitor function as described above. The 'periods' parameter specifies a number of periods for which a client 105 desires to evaluate an investment. For example, a client 105 may desire to perform a resampled statistical analysis for the gross rate of returns of an investment over a 253-day period. The 'bias' parameter is a decimal value that is either −1 or between 0 and 1 that specifies the degree of randomness in the resampling process. A value of −1 indicates that the resampling process should be conducted purely randomly. As described in more detail below, if the 'bias' parameter is between 0 and 1, sampling is performed so that b% of the samples are 'up' days and 1–b% of the samples are 'down' days, where b=bias. Thus, if b=1, only 'up' days will be selected and if b=0 only 'down' days are selected. The 'sample_size' parameter specifies a number of samples to use in the resampling process (the size of the x). The 'replications' parameter specifies a number of bootstrap samples to be

12

used in the resampling process. The 'plot_type' parameter specifies a plot type identifier (i.e., 810) pertaining to formatting parameters to be used in generating a plot of distribution results.

In step 1015, back end server 140b requests the initiation of a resampled statistical analysis process at RSAE 139. In particular, according to one embodiment of the present invention, back end server 140b transmits the following vector to control server 140c at RSAE 139:

    request_resampling (investment, function, periods (Q), bias, sample_size, replications, plot_type)

Back end server 140b then waits for completion of the resampled statistical analysis task. In step 1020, back end server 140b determines whether RSAE 139 has completed the resampling process. According to one embodiment, upon completion of the resampling process, control server 140c transmits a completion signal to back end server 140b and an address in output data area 160b where output data of a resampled statistical process is stored. If the resampling process is not completed ('no' branch of step 1020), back end server 140b continues to wait for notification. If the resampling method is completed ('yes' branch of step 1020), in step 1025, back end processor 140b requests a graphics plot from GRE 129. In particular, according to one embodiment, back end processor 140b transmits the following vector to graphics rendering server 140e at GRE 149:

    plot(OutAddr, plot_type, plot_parameters).

OutAddr specifies an address in output data area, which stores results of a resampled statistical process previously conducted by RSAE 139, plot_type specifies a plot type requested by a client 105 and plot_parameters specifies additional plotting parameters that may be required by GRE 129. Back end server 140b then waits for completion of the plot. In step 1027, back end processor 140b determines whether graphics rendering server 140e has completed the requested plot (i.e., whether graphics server has transmitted a completion signal to back end processor). According to one embodiment, upon completion of a plot, graphics rendering server 140e transmits a completion signal to back end processor 140b. Graphics rendering server 140e also transmits results of the plotting process in the form of plot data, which may be used to dynamically create an HTML page for transmission to a client 105. If the plot is not finished ('no' branch of step 1027), back end processor 140b continues to wait for the completion signal. If the plot has been completed ('yes' branch of step 1027) in step 1029 back end processor 140b transmits the plot data results (e.g., HTML page) to client/gateway server 140a for transmission to client 105. The process ends in step 1030.

FIG. 11 is a flowchart that depicts a set of preparation steps performed by a control server 140c at a financial information site 119 to initialize a resampled statistical analysis of financial data using a parallel processing. In step 1105, the process is initiated upon the receipt of a request_resampling_process vector from back end server 140b as described above with reference to FIG. 10.

In steps 1115–1119, control server 140c reserves appropriate memory in shared memory area 160a and output data area 160b and stores appropriate sample data for processing in shared memory area 160a. In particular, in step 1115, a sample space is determined using the sample_size parameter received in step 1105. Because financial database 150d may store samples for investments for many different time periods, in step 1115, a set of relevant samples for the resampled statistical analysis requested by the client 105 is determined. In step 1117, based upon the sample_size parameter, control server 140c determines an amount of

US 6,349,291 B1

13

memory required for storage of samples in shared memory area **160**$a$ and allocates an appropriate memory block in shared memory area **160**$a$ for storage of the samples. Further, based upon the replications parameter, server **140**$c$ also determines an amount of memory to reserve in output data memory area **160**$b$ for storage of results of the resampling process. In step **1119**, based upon the sample_size parameter, server **140**$c$ retrieves financial data samples from financial database **150**$d$ and stores these samples in shared memory area **160**$a$ in the memory block previously reserved in step **1117**. In step **1120**, process server **140**$c$ computes $\hat{\theta}$ from the sample data stored in shared memory area **160**$a$. In particular, a statistical function such as the mean, median or standard distribution is calculated by dividing the sample space into appropriate length periods.

In steps **1125–1160**, control server **140**$c$ executes a series of steps to format and prepare the data for processing. Specifically, in step **1125**, autocorrelation of the sample space data stored in shared memory area **160**$a$ is analyzed. Specifically, control server **140**$c$ executes a process to calculate the autocorrelation and partial autocorrelation functions on the data stored in shared memory area **160**$a$ for a number of different lag periods (a) and stores the results in temporary storage. According to one embodiment, the following equations are utilized to calculate the autocorrelation and partial autocorrelation functions for the data stored in shared memory area **160**$a$:

$\forall a < n$ and $1 \leq x < a$:

Samples in the sample space are defined:

$r = (r_1, r_2, \ldots, r_n)$

Shifted versions of the sample space are defined:

$Z_1 \equiv (r_1, r_2, \ldots, r_{n-a})$
$Z_2 \equiv (r_{a+1}, r_2, \ldots, r_n)$
$Z_x \equiv (r_{a+1-x}, \ldots, r_{n-x})$

The autocorrelation function is defined as:

$$ACF(a) = \frac{S(a)_{Z_1 Z_2}}{S(a)_{Z_1} S(a)_{Z_2}}$$

The partial autocorrelation function is defined as:

$$PACF(x, a) = \frac{S(a)_{Z_1 Z_2} - S(a)_{Z_2 Z_x} S(a)_{Z_1 Z_x}}{\sqrt{1 - (S(a)_{Z_2 Z_x})^2} \sqrt{1 - (S(a)_{Z_1 Z_x})^2}}$$

The following are intermediate calculations:

$$S(a)_{Z_1 Z_2} = \frac{(Z_{1_i} - \overline{Z_1})(Z_{2_i} - \overline{Z_2})}{n - a - 1}$$

$$S(a)_{Z_1} = \sqrt{\frac{\sum_{i=1}^{n-a}(Z_{1_i} - \overline{Z_1})^2}{n - a - 1}}$$

$$S(a)_{Z_2} = \sqrt{\frac{\sum_{i=a+1}^{n}(Z_{2_i} - \overline{Z_2})^2}{n - a - 1}}$$

$$\overline{Z_{1_i}} = \sum_{i=1}^{n-a} \frac{Z_{2_i}}{n - a}$$

$$\overline{Z_{2_i}} = \sum_{i=a+1}^{n} \frac{Z_{2_i}}{n - a}$$

In step **1130**, the autocorrelation and partial autocorrelation data calculated is analyzed to determine a minimum lag

14

factor (N) that minimizes the autocorrelation (a). The minimum lag factor (a) corresponds to the number of consecutive periods that are selected at one time during the resampling process.

In step **1135**, the bias parameter received in step **1105** is analyzed. If no bias is selected (i.e., bias=−1 and data is to be selected randomly), control passes to step **1045** ('no'branch of step **1035**). If bias<>0, in step **1040**, a bias initialization algorithm is performed as described in detail below. In step **1145**, it is determined whether the sample space data should be transformed. This determination is based upon the precise function requested by the client **105** (i.e., specified by function parameter). For example, if the function is gross rate of return over a specified period, no transformation step is required. However, if for example, the function type is the monitor type, the sample data is transformed to represent the sign of the returns only (i.e., −1 and +1). Other variations will exist depending upon the type of functions implemented. If no transformation is necessary ('no' branch of step **1145**), control is transferred to step **1160**. Otherwise ('yes' branch of step **1045**) in step **1150**, the data is transformed and restored in shared memory area **160**$b$ in step **1150**.

In step **1160**, the variable M=Int(Q/N) is determined. The variable 'M' specifies the number of samples to select for each resampling. In step **1165**, server **140**$c$ executes a request for parallel processing of data stored in shared memory area **160**$a$ by transmitting a vector to parallel processing control server **140**$d$ using the prototype: Request_Parallel_Process(input_addr, input_range, output_addr, output_range, M, N function, bias, replications). The parameters 'input_addr', 'input_range', 'output_addr' and 'output_range' correspond respectively to the start address and range in shared memory area **160**$a$ and output memory area **160**$b$ that were determined in step **1117**. The parameters M and N correspond to the variables determined in steps **1130** and **1160** respectively. The parameters 'bias' and 'replications' correspond to the same parameters received in step **1105**.

In step **1170**, control server **140**$c$ determines whether it has received a signal from parallel process control server **140**$d$ indicating the completion of parallel processing. If not ('no' branch of step **1070**), control server **140**$c$ continues to wait for the completion signal. If a completion signal has been received ('yes' branch of step **1170**), in step **1175**, control server **140**$c$ transmits a completion signal to back end server **140**$b$ along with a memory address in output data area **160**$b$ where the output data for the resampled method is stored.

FIG. **12** is a flowchart of a parallel processing control process according to one embodiment of the present invention. Although only 5 parallel processors (**112**$a$–**112**$e$) are depicted in FIG. **1**, this number is arbitrary and any number P of parallel processors may be used to perform the resampling technique. Furthermore, although the method described herein utilizes a parallel processing architecture, the present invention does not require a parallel processing scheme. According to one embodiment of the present invention, the process depicted in FIG. **12** is implemented by parallel process control server **140**$d$ at financial information site **119**.

In step **1205**, parallel process control server **140**$d$ receives a vector requesting a parallel process as described in step **1165**. In step **1210**, parallel process control server **140**$d$ performs a load balancing step. In step **1220**, parallel process control server **140**$d$ requests the initiation of processes on individual parallel processors **112**$a$–**112**$e$ by trans-

US 6,349,291 B1

15

mitting a begin__process vector to each respective parallel processor 112a–112e. According to one embodiment of the present invention the vector is transmitted to each processor 112a–112e to initiate parallel processing: begin__process (input_addr, input_range, M, N, function, bias, replications/P). The parameters 'input_addr', 'input_range', correspond respectively to the start address and range in shared memory area 160a that were received in step 1205. The parameters 'periods', 'bias'and 'replications', 'M' and 'N' correspond to the same parameters received in step 1205. P specifies the number of parallel processors. Thus, each parallel processor computes replications/P replications.

In step 1230, parallel process control server 140d checks to determine whether all parallel processors 112a–112e have completed processing. Upon completion of a processing task, each parallel processor executes a step of notifying control server 140c of completion. In particular, according to one embodiment, upon completion each parallel processor 112 sends parallel process control server a notification message defining a memory block where output results have been stored on the respective local cache 112a1–112e1. If notifications have not been received from all processors 112a–112e, parallel process control server 140c continues waiting ('no' branch of step 1230). Upon receipt of all completion notifications ('yes'branch of step 1230), parallel process control server 140d retrieves the data output for each parallel processor stored on local cache 112a1–112a5.

In step 1240, parallel process control server assembles all output data from each respective local cache 112a1–112e1 in output data area 160b. In step 1250, parallel process control server 140d notifies server control 140c that the parallel processing is completed. The process ends in step 1260.

FIG. 13 is a flowchart of a set of steps for performing a resampled statistical method according to one embodiment of the present invention. The steps shown in FIG. 13 are executed on each parallel processor 112a–112e upon the request for a parallel process by server 140d. In step 1305, the process is initiated and each parallel processor receives a begin__process vector as described above with reference to step 1220 of FIG. 12. In step 1310 each respective processor 112a–112e determines a range of output memory in local cache 112a1–112e1 for storage of output results. In step 1320, the parallel processor 112 determines a random start location in shared memory area 160a to begin sampling. In step 1325, it is determined whether all replications (Q) have been completed. If not ('no' branch of step 1325) processing continues with steps 1330–1345. Steps 1330–1345 correspond to the selection of a bootstrap sample $x^{*Replication}$. In step 1330, a temporary variable 'Count' is set to zero. In step 1335, N consecutive periods of sample points are selected from shared memory area. The degree of randomness in selection is determined by the variable 'bias'. If bias=−1, the beginning of each consecutive period is selected purely randomly. If the 'bias' parameter is set to any value other than −1, sampling is performed so that bias percent of the samples are "up" days for the investment and 1-bias percent of the samples are "down" days for the investment as described in detail below. Thus, if bias=1, only "up" days will be selected. In step 1340, the temporary 'Count' variable is increment. A biasing process is described in detail below with reference to FIG. 14. In step 1345, it is determined whether Count=M. If not ('no' branch of step 1345), flow continues with step 1335 (i.e., another N consecutive periods are selected). If so ('yes' branch of step 1345), flow continues with step 1350, and a bootstrap replication $s(x^{*replication})$ is computed corresponding to the function s(.)

16

received in step 1305. In step 1355, the bootstrap replication $s(x^{*replication})$ is stored in local cache (e.g., 120a1). Flow continues with step 1325. When all replications have been completed ('yes' branch of step 1325), in step 1360, the parallel processor 112 notifies parallel process control server 140d that processing has been completed and also notifies parallel process control server 140d of the memory block in local cache (i.e., 112a–112e1) where the output data is stored.

FIG. 14 is a flowchart of a set of steps for conducting a bias algorithm according to one embodiment of the present invention. The process is initiated in step 1405. In step 1410, the sample space is separated into two sets, a first set including only 'up' days and a second set including only 'down' days. In step, 1420 a random number r, between 0 and 1 is selected. In step 1430, it is determined whether the random number r<=b (the bias parameter specified by the client). If so ('yes' branch of step 1430), in step 1440, an up day is selected. If nor ('no' branch of step 1440), in step 1450, a down day is selected. The process ends in step 1460. The process depicted in FIG. 14 is repeated for each bootstrap sample.

FIG. 15 is an exemplary plot of a resampled statistical analysis comparing two investment strategies with respect to gross rate of returns. As depicted in FIG. 15, investment strategy 1510 outperforms investment strategy 1520.

FIG. 16 is an exemplary plot of a resampled statistical analysis comparing two investment strategies with respect to maximum drawdown. As depicted in FIG. 16, investment strategy 1610 outperforms investment strategy 1620.

FIG. 17 is an exemplary plot of a resampled statistical analysis comparing two investment strategies with respect to a monitor function. As depicted in FIG. 17, investment strategies 1720 outperforms investment strategy 1710.

What is claimed is:

1. A method for calculating, analyzing and displaying investment data comprising the steps of:

(a) selecting a sample space, wherein the sample space includes at least one investment data sample;

(b) generating a distribution function using a re-sampled statistical method and a bias parameter, wherein the bias parameter determines a degree of randomness in a resampling process; and,

(c) generating a plot of the distribution function.

2. The method according to claim 1, wherein the re-sampled statistical method is a bootstrap method.

3. The method according to claim 2, wherein step (b) includes the steps of:

(a) generating at least one bootstrap sample from the sample space; and,

(b) for each bootstrap sample, generating a corresponding bootstrap replication.

4. The method according to claim 3, wherein the step of generating at least one bootstrap sample, further includes the steps of randomly selecting a set of Q data points from the sample space, wherein Q is a number of periods.

5. The method according to claim 4, wherein the step of generating a bootstrap replication, further includes the step of taking a predetermined function of a bootstrap sample.

6. The method according to claim 3, further including the steps of:

(a) before step (b), calculating at least one of an autocorrelation function and a partial autocorrelation function of the sample, space for each of at least one lag parameter (a); and,

(b) determining a minimum lag parameter, N, wherein the minimum lag parameter N minimizes an autocorrelation function of the sample space.

17

**7**. The method according to claim **6**, wherein the step of generating at least one bootstrap sample, further includes the steps of:

(a) randomly selecting a starting point in the sample space;

(b) selecting a set of N consecutive data points from the sample space; and,

(c) repeating steps (a)–(b) until at least Q data points have been selected, wherein Q is a number of periods.

**8**. The method according to claim **1**, wherein the re-sampled statistical method is a jackknife method.

**9**. The method according to claim **1**, where in the re-sampled statistical method is a cross-validation method.

**10**. The method according to claim **5**, wherein the predetermined function is one of a gross rate of return function, a maximum drawdown function and a monitor function.

**11**. A method for providing statistical analysis of investment data over an information network, comprising the steps of:

(a) storing investment data pertaining to at least one investment;

(b) receiving a statistical analysis request corresponding to a selected investment;

(c) receiving a bias parameter, wherein the bias parameter determines a degree of randomness in a resampling process; and,

(d based upon investment data pertaining to the selected investment, performing a resampled statistical analysis to generate a resampled distribution.

**12**. The method according to claim **11**, further including the steps of generating a plot based upon the resampled distribution.

**13**. The method according to claim **12**, wherein the statistical analysis request includes at least one of an investment identifier, a periods parameter, a function parameter, a replications parameter and a plot parameter.

**14**. The method according to claim **12**, wherein the step of performing a resampled statistical analysis further includes the steps of:

(a) selecting a sample space;

(b) generating at least one bootstrap sample from the sample space; and,

(c) for each bootstrap sample, generating a corresponding bootstrap replication.

**15**. The method according to claim **14**, wherein the step of generating at least one bootstrap sample, further includes the steps of randomly selecting a set of Q data points from the sample space, wherein Q is a number of periods.

**16**. The method according to claim **14**, wherein the step of generating a bootstrap replication, further includes the step of taking a predetermined function of the bootstrap sample.

**17**. The method according to claim **14**, further including the steps of:

(a) before step (b), calculating at least one of an autocorrelation function and a partial autocorrelation function of the sample space for each of at least one lag parameter (a); and

(b) determining a minimum lag parameter, N, wherein the minimum lag parameter N minimizes an autocorrelation function of the sample space.

**18**. The method according to claim **17**, wherein the step of generating at least one bootstrap sample, further includes the steps of:

(a) randomly selecting a starting point in the sample space;

18

(b) selecting a set of N consecutive data points from the sample space; and,

(c) repeating steps (a)–(b) until at least Q data points have been selected, wherein Q is a number of periods.

**19**. The method according to claim **15**, wherein the bias parameter is used to control a degree of randomness in selecting the set of Q data points.

**20**. The method according to claim **11**, wherein the information network is the Internet.

**21**. The method according to claim **16**, wherein the predetermined function is one of a gross rate of returns function, a maximum drawdown function and a monitor function.

**22**. A system for providing statistical analysis of investment information over an information network comprising:

a financial data database for storing investment data;

a client database;

a plurality of processors collectively arranged to perform a parallel processing computation, wherein the plurality of processors is adapted to:

receive a statistical analysis request corresponding to a selected investment;

based upon investment data pertaining to the selected investment, perform a resampled statistical analysis to generate a resampled distribution; and,

provide a report of the resampled distribution.

**23**. The system according to claim **22**, wherein the report of the resampled distribution is a distribution plot.

**24**. The system according to claim **22**, wherein the statistical analysis request includes at least one of an investment identifier, a bias parameter, a periods parameter and a plot parameter.

**25**. The system according to claim **22**, wherein the processor:

(a) selects a sample space;

(b) generates at least one bootstrap sample from the sample space; and,

(c) for each bootstrap sample, generates a corresponding bootstrap replication.

**26**. The system according to claim **22**, further including an alert rules database, wherein the alert rules database stores at one alert rule record pertaining to a condition upon which a client desires to be notified.

**27**. The system according to claim **26**, wherein the processor, upon the violation of an alert rule based upon a resampled statistical analysis, notifies a client.

**28**. The system according to claim **27**, wherein the client is notified by electronic mail ("e-mail").

**29**. A system for providing statistical analysis of investment information over an information network comprising:

a financial data database for storing investment data;

a front end subsystem for receiving a statistical analysis request;

a parallel processor, wherein the parallel processor includes:

at least one processor for performing resampled statistical analysis.

**30**. The system according to claim **29**, wherein the front end subsystem includes a Web server.

**31**. The system according to claim **29**, wherein each of the at last one processor performs a resampled statistical analysis of a financial investment in parallel using financial data stored in a shared memory area.

*  *  *  *  *

# CERTIFICATE OF COMPLIANCE

This brief complies with the requirements of Federal Rule of Appellate Procedure 32 and Federal Circuit Rule 32:

1.  Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), this brief meets the type-volume limitation because it contains no more than 14,000 words. Specifically, it contains 13629 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.  Pursuant to Federal Rules of Appellate Procedure 32(a)(5)(A) and 32(a)(6), this brief uses a proportionally spaced serif font of 14-point or larger in a plain, roman style. Specifically, it was written in Microsoft Word 2010 using 14-point Times New Roman.

_____/s/  Jay P. Kesan_____

JAY P. KESAN
CECIL E. KEY
TERESA M. SUMMERS
DIMURO GINSBERG PC/DGKEYIP GROUP
1101 King Street, Suite 610
Alexandria, VA 22314
(703) 684-4333

**Counsel for Appellant, InvestPic LLC**

July 16, 2015

## CERTIFICATE OF SERVICE

I certify that on July 16, 2015, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system, which will send notification of such filing to all registered participants.

<div align="center">

*/s/ Jay P. Kesan*
_____

</div>

JAY P. KESAN
CECIL E. KEY
TERESA M. SUMMERS
DIMURO GINSBERG PC/DGKEYIP GROUP
1101 King Street, Suite 610
Alexandria, VA 22314
(703) 684-4333

**Counsel for Appellant, InvestPic LLC**

July 16, 2015